Thomas H. Bienert, Jr., – State Bar No. 135311
    tbienert@bienertkatzman.com
Whitney Z. Bernstein, – State Bar No. 304917
    wbernstein@bienertkatzman.com
BIENERT KATZMAN PC
903 Calle Amanacer, Suite 350
San Clemente, CA 92673
Telephone: (949) 369-3700
Facsimile: (949) 369-3701

Attorneys for James Larkin

Gary S. Lincenberg – State Bar No. 123058
    glincenberg@birdmarella.com
Ariel A. Neuman – State Bar No. 241594
    aneuman@birdmarella.com
Gopi K. Panchapakesan – State Bar No. 279586
    gpanchapakesan@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT,
NESSIM, DROOKS, LINCENBERG &
RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for John Brunst, Mary Ann
Brunst, and The Brunst Family Trust

*[Additional counsel listed on next page]*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>    vs.<br><br>$1,546,076.35 IN BANK FUNDS SEIZED FROM REPUBLIC BANK OF ARIZONA ACCOUNT '1889, et al.,<br><br>            Defendants. | CASE NO. 2:18-cv-8420-RGK-PJWx<br><br>**MOTION TO DISMISS CONSOLIDATED MASTER VERIFIED FIRST AMENDED COMPLAINT FOR FORFEITURE**<br><br>Date:      August 17, 2020<br>Time:      9:00 A.M.<br>Crtrm.:   850<br><br>Assigned to Hon. R. Gary Klausner |

3657859.3

1    Robert Corn-Revere *(admitted pro hac vice)*
         bobcornrevere@dwt.com
2    DAVIS WRIGHT TREMAINE LLP
     1919 Pennsylvania Ave., NW, Suite 800
3    Washington, D.C.  20006
     Telephone: (202) 973-4200
4    Facsimile: (202) 973-4499

5    James C. Grant *(admitted pro hac vice)*
         jamesgrant@dwt.com
6    DAVIS WRIGHT TREMAINE LLP
     950 Fifth Avenue, Suite 3300
7    Seattle, WA  98104
     Telephone: (206) 622-3150
8    Facsimile: (206) 757-7700

9    Attorneys for James Larkin and Michael
     Lacey
10

11   Paul J. Cambria, Jr. – State Bar No. 177957
         pcambria@lglaw.com
12   LIPSITZ GREEN SCIME CAMBRIA LLP
     42 Delaware Avenue, Suite #120
13   Buffalo, NY 14202
     Telephone: (716) 849-1333
14   Facsimile: (716) 855-1580

15   Attorneys for Michael Lacey

16

17   John K. Rubiner – State Bar No. 155208
         jrubiner@fmglaw.com
18   FREEMAN, MATHIS & GARY LLP
     550 S. Hope Street, Suite 2200
19   Los Angeles, CA 90071
     Telephone: (213) 615-7000

20   Bruce Feder *(admitted pro hac vice)*
         bf@federlawpa.com
21   FEDER LAW OFFICE, P.A.
     2930 E. Camelback Road, Suite 160
22   Phoenix, AZ 85016
     Telephone: (602) 257-0135
23   Facsimile: (602) 954-8737

24   Attorneys for Scott Spear

25

26   David W. Wiechert – State Bar No. 94607
         dwiechert@aol.com
27   WIECHERT, MUNK & GOLDSTEIN, PC
     27136 Paseo Espada, Suite B1123
28   San Juan Capistrano, CA 92675
     Telephone: (949) 361-2822

1   Daniel J. Quigley *(admitted pro hac vice)*
      quigley@djqplc.com
2   DANIEL J. QUIGLEY, PLC
    5425 E. Broadway Blvd., Suite 352
3   Tucson, Arizona 85711
    Telephone: (520) 867-4450
4
    Attorneys for Attorneys for Medalist
5   Holdings, Inc., Leeward Holdings, LLC,
    Camarillo Holdings, LLC, Vermillion
6   Holdings, LLC, Cereus Properties, LLC,
    Shearwater Investments, LLC, and
7   Broadway Capital Corp., LLC

8

9

10   **TO THE COURT AND ALL PARTIES ENTITLED TO NOTICE:**

11   **PLEASE TAKE NOTICE** that on August 17, 2020, at 9:00 A.M., or as soon as

12   counsel may be heard, claimants Michael Lacey, James Larkin, John Brunst, Scott

13   Spear, Mary Ann Brunst, Medalist Holdings, Inc., Leeward Holdings, LLC, Camarillo

14   Holdings, LLC, Vermillion Holdings, LLC, Cereus Properties, LLC, Shearwater

15   Investments, LLC, Broadway Capital Corp., LLC, and The Brunst Family Trust

16   (collectively, "Claimants") will bring on for hearing the following Motion to Dismiss

17   First Amended Consolidated Master Verified Complaint for Forfeiture ("First

18   Amended Complaint" or "FAC") under Rule 12(b)(6) of the Federal Rules of Civil

19   Procedure ("F.R.C.P.") and Rule G(8)(b)(i) of the Supplemental Rules for Admiralty or

20   Maritime Claims and Forfeiture Actions ("Supp. R."), on the grounds that the First

21   Amended Complaint fails to state a claim on which relief can be granted due to the

22   preclusive effect of Section 230 of the Communications Decency Act ("CDA"), 47

23   U.S.C. § 230 ("Section 230").

24   Section 230(c)(1) establishes that "[n]o provider . . . of an interactive computer

25   service shall be treated as the publisher . . . of any information provided by another []

26   content provider" and bars civil suits such as this forfeiture action.  Section 230

27   precludes this action because the entirety of the government's civil First Amended

28   Complaint for Forfeiture rests on allegations that, as the alleged former owners and/or

1   operators of Backpage.com, Claimants as online publishers are responsible for the
2   content of classified ads that were posted to the website by third parties, even if the
3   publisher was responsible for neither the content of the ads nor any third-party
4   conduct.  There are hundreds of cases, including cases involving Backpage and virtually
5   identical allegations, making clear Section 230 is an absolute bar to the government's
6   claims here.

7        This Motion is based upon this Notice, the attached Memorandum of Points
8   and Authorities, and the First Amended Complaint's allegations.*

9        *Local Rule 5-4.3.4(a)(2)(i) Compliance:  Filer attests that all other signatories listed concur in*
10  *the filing's content and have authorized this filing.*

11

12  DATED:  July 1, 2020              Respectfully submitted,

13                                   Thomas H. Bienert, Jr.
14                                   Whitney Z. Bernstein
                                     BIENERT KATZMAN, PLC
15

16                                   By:  _____/s/ Thomas H. Bienert, Jr._____
17                                            Thomas H. Bienert, Jr.
                                         Attorneys for James Larkin
18

19  DATED:  July 1, 2020              Gary S. Lincenberg
20                                   Ariel A. Neuman
                                     Gopi K. Panchapakesan
21                                   BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
                                     DROOKS, LINCENBERG & RHOW, P.C.
22

23                                   By:  _____/s/ Gary S. Lincenberg_____
24                                            Gary S. Lincenberg
                                         Attorneys for John Brunst, Mary Ann Brunst,
25                                       and The Brunst Family Trust

26

27  _____
28  * Undersigned counsel contacted counsel for the Plaintiff, Assistant United States
    Attorney Daniel Boyle, who indicated that the government opposes this motion.

DATED:  July 1, 2020

Robert Corn-Revere
James C. Grant
DAVIS WRIGHT TREMAINE LLP

By:  _____/s/ Robert Corn-Revere_____

Robert Corn-Revere

Attorneys for James Larkin and Michael Lacey

DATED:  July 1, 2020

LIPSITZ GREEN SCIME CAMBRIA LLP

By:  _____/s/ Paul J. Cambria, Jr._____

Paul J. Cambria, Jr.

Attorneys for Michael Lacey

DATED:  July 1, 2020

FREEMAN, MATHIS & GARY LLP

By:  _____/s/ John K. Rubiner_____

John K. Rubiner

FEDER LAW OFFICE, P.A.

By:  _____/s/ Bruce Feder_____

Bruce Feder

Attorneys for Scott Spear

DATED:  July 1, 2020

WIECHERT, MUNK & GOLDSTEIN, PC

By: _____ /s/ David W. Weichert _____
David W. Weichert

DANIEL J. QUIGLEY, PLC

By: _____ /s/ Daniel J. Quigley _____
Daniel J. Quigley

Attorneys for Medalist Holdings, Inc., Leeward Holdings, LLC, Camarillo Holdings, LLC, Vermillion Holdings, LLC, Cereus Properties, LLC, Shearwater Investments, LLC, and Broadway Capital Corp., LLC

# **TABLE OF CONTENTS**

**Page**

I.   BACKGROUND ...................................................................................................2

II.  ARGUMENT.......................................................................................................5

    A.   The Criteria for Section 230 Immunity Are Met..........................................7

    B.   Section 230 Bars the Forfeiture Claims Because the First Amended Complaint Does Not Allege Ads on Backpage.com Were Created by Anyone Other Than the Third Parties Who Posted Them...................11

    C.   The Government Cannot Evade Section 230 by Claiming a Website "Facilitated" Illegal Conduct. ............................................. 15

    D.   Parallel Criminal Proceedings Are Irrelevant. ................................ 17

    E.   Predicate Money Laundering Claims Do Not Save the First Amended Complaint. ........................................................................ 18

III. CONCLUSION ............................................................................................... 20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Almeida v. Amazon.com, Inc.*
   456 F.3d 1316 (11th Cir. 2006) ........................................................................ 6

*Ashcroft v. Iqbal*
   556 U.S. 662 (2009) ........................................................................................... 5

*Backpage.com LLC v. McKenna*
   881 F. Supp. 2d 1262 (W.D. Wash. 2012) ................................................... 4, 8

*Backpage.com, LLC v. Cooper*
   939 F. Supp. 2d 805 (M.D. Tenn. 2013) .................................................. 3, 4, 8

*Backpage.com, LLC v. Dart*
   807 F.3d 229 (7th Cir. 2015) ...................................................................... 3, 20

*Backpage.com, LLC v. Hoffman*
   2013 WL 4502097 (D.N.J. Aug. 20, 2013) ..................................................... 8

*Batzel v. Smith*
   333 F.3d 1018 (9th Cir. 2003) ............................................................... 6, 7, 13

*Beckman v. Match.com*
   2013 WL 2355512 (D. Nev. May 29, 2013), *aff'd in part,*
   *rev'd in part on other grounds*, 668 F. App'x 759 (9th Cir. 2016) ................... 12

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) ........................................................................................... 5

*Ben Ezra, Weinstein, & Co., Inc. v. America Online Inc.*
   206 F.3d 980 (10th Cir. 2000) ................................................................... 6, 14

*Blumenthal v. Drudge*
   992 F. Supp. 44 (D.D.C. 1998) ....................................................................... 12

*California v. Ferrer*
   2016 WL 7237305 (Cal. Super. Ct. Sac. Cty. Dec. 9, 2016) ................... *passim*

*California v. Ferrer*
   No. 16FE024013, slip op. (Cal. Super. Ct. Sac. Cty. Aug. 23, 2017) ......... *passim*

*Carafano v. Metrosplash.com*
    339 F.3d 1119 (9th Cir. 2003) ................................................................ 7, 8, 11, 12

*Cohen v. Facebook, Inc.*
    252 F. Supp. 3d 140 (E.D.N.Y. 2017) ............................................................ 1

*Daniel v. Armslist, LLC*
    926 N.W. 2d 710 (Wis. 2019), *cert. denied,*
    2019 WL 6257416 (2019) ............................................................. 6, 8, 10, 16

*Dart v. Craigslist*
    665 F. Supp. 2d 961 (N.D. Ill. 2009) ......................................... 7, 18, 20

*Doe II v. MySpace Inc.*
    175 Cal. App. 4th 561 (2009) .................................................................. 11

*Doe v. Backpage.com, LLC*
    104 F. Supp. 3d 149 (D. Mass. 2015), *aff'd,* 817 F.3d ............................ 8, 10

*Doe v. Bates*
    2006 WL 3813758 (E.D. Tex. Dec. 27, 2016) ........................................ *passim*

*Doe v. MySpace, Inc.*
    528 F.3d 413 419-20 (5th Cir. 2008) ................................................... 11, 16

*Dyroff v. Ultimate Software Grp., Inc.*
    934 F.3d 1093 (9th Cir. 2019) ........................................................... 1, 7, 15

*Eclectic Props. East, LLC v. Marcus & Millichap Co.*
    751 F.3d 990 (9th Cir. 2014) ................................................................ 5

*Fair Hous. Council of San Fernando Valley v. Roommates.com*
    LLC, 521 F.3d 1157 (9th Cir. 2008) *(en banc)* ..................................... *passim*

*Federal Agency of News LLC v. Facebook*
    2020 WL 137154 (N.D. Cal. Jan. 13, 2020) ......................................... *passim*

*Fields v. Twitter, Inc.*
    217 F. Supp. 3d 1116 (N.D. Cal. 2016),
    *aff'd on other grounds,* 881 F.3d 739 (9th Cir. 2018) .............................. 18

*Force v. Facebook, Inc.*
    934 F.3d 53 (2d Cir. 2019) ................................................................ *passim*

*Free Kick Master LLC v. Apple Inc.*
  140 F. Supp. 3d 975 (N.D. Cal. 2015) ................................................. 7, 12, 14

*FTC v. Accusearch Inc.*
  570 F.3d 1187 (10th Cir. 2009) ................................................................. 12

*GoDaddy.com, LLC v. Toups*
  429 S.W. 3d 752 (Tex. App. 2015) ........................................................ 14, 18

*Goddard v. Google, Inc.*
  2008 WL 5245490 (N.D. Cal. Dec. 17, 2008) ........................................ 17, 18

*Goddard v. Google, Inc.*
  640 F. Supp. 2d 1193 (N.D. Cal. 2009) ...................................................... 16

*Gonzalez v. Google*
  335 F. Supp. 3d 1156 (N.D. Cal. 2018) ...................................................... 18

*Gonzalez v. Google, Inc.*
  282 F. Supp. 3d 1150 (N.D. Cal. 2017) ........................................................ 1

*Green v. AOL*
  318 F.3d 465 (3d Cir. 2003) ..................................................................... 11

*Herrick v. Grindr*
  LLC, 306 F. Supp. 3d 579 (S.D.N.Y. 2018),
  *aff'd*, 765 F. App'x 586 (2d Cir. 2019) ............................................ 10, 11, 12, 14

*Hill v. StubHub, Inc.*
  727 S.E. 2d 550 (N.C. App. 2012) ...................................................... 2, 11, 17

*Hinton v. Amazon.com.dedc, LLC*
  72 F. Supp. 3d 685 (S.D. Miss. 2014) ....................................................... 18

*Jane Doe No. 1 v. Backpage.com, LLC*
  817 F.3d 12 (1st Cir. 2016) ............................................................... *passim*

*Jones v. Dirty World Entm't Recordings LLC*
  755 F.3d 398 (6th Cir. 2014) ........................................................ 7, 12, 14, 15

*Kimzey v. Yelp! Inc.*
  836 F.3d 1263 (9th Cir. 2016) (Ninth Circuit
  application of § 230 where civil RICO was alleged) .................................... 18

*Klayman v. Zuckerberg*
    753 F.3d 1354 (D.C. Cir. 2014) ....................................................................... 8

*La'Tiejira v. Facebook, Inc.*
    272 F. Supp. 3d 981 (S.D. Tex. 2017) ................................................. 8, 14, 16

*Lee v. OfferUp, Inc.*
    2018 WL 4283371 (E.D. La. Sept. 7, 2018) ................................................ 12

*M.A. ex rel. P.K. v. Village Voice Media Holdings, LLC*
    809 F. Supp. 2d 1041 (E.D. Mo. 2011) ................................................. *passim*

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*
    591 F.3d 250 (4th Cir. 2009) ................................................................... 7, 20

*S.C. v. Dirty World, LLC*
    2012 WL 3335284 (W.D. Mo. Mar. 12, 2012) ............................................ 17

*Sekiya v. Zuckerberg*
    2017 WL 3405627 (D.N.M. Mar. 10, 2017) ................................................. 8

*Silver v. Quora, Inc.*
    2016 WL 9777159 (D.N.M. June 13, 2016) ................................................ 14

*U.S. v. Lacey*
    No. 18-CR-00422-PHX-SPL (D. Ariz.) ........................................................ 2

*U.S. v. One White Crystal Covered Bad Tour Glove*
    2012 WL 8467453 (C.D. Cal. Sept. 6, 2012) ............................................ 5, 6

*U.S. v. Ursery*
    518 U.S. 267 (1996) ..................................................................................... 2

*U.S. v. Various Coins*
    2013 WL 1183312 (D. Ore. Mar. 21, 2013) ................................................. 5

*Universal Commc'n Sys., Inc. v. Lycos, Inc.*
    478 F.3d 413 (1st Cir. 2007) ..................................................... 6, 7, 11, 16

*Warren v. Fox Family Worldwide, Inc.*
    328 F.3d 1136 (9th Cir. 2003) ...................................................................... 5

*Zeran v. Am. Online, Inc.*
    129 F.3d 327 (4th Cir. 1997) ......................................................... 6, 15, 16

**Statutes**

18 U.S.C.

§ 981 .................................................................................................. 2
§ 1591 ........................................................................................... *passim*
§ 1595 ............................................................................................ 17, 18
§ 1952 ........................................................................................ 3, 18, 19
§ 1956 ............................................................................................. 3, 20
§ 1957 ............................................................................................. 3, 18
§ 2252 ................................................................................................ 18
§ 2255 ................................................................................................ 18
§ 2333 ................................................................................................ 18

47 U.S.C. § 230 ........................................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 12(b) .................................................................................. 5

## **MEMORANDUM OF POINTS AND AUTHORITIES**

The First Amended Complaint must be dismissed, given the preclusive effect of Section 230 of the CDA.  Section 230(c)(1) establishes that "[n]o provider . . . of an interactive computer service shall be treated as the publisher . . . of any information provided by another [] content provider."  *Id.*  Subject to limited exceptions not relevant here, the CDA bars virtually all civil claims against online publishers based on third-party content,[1] including these civil forfeiture claims.

The only allegations supporting forfeiture rest on Claimants' alleged former roles in owning or operating the Backpage.com classified advertising website—which the FAC makes clear was an interactive computer service—that hosted ads posted by third parties, some of which the government alleges promoted prostitution and sex trafficking.  *See, e.g., Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1097 (9th Cir. 2019) (listing criteria for § 230 immunity).  The FAC does not anywhere allege Backpage.com or Claimants created any ads, or that they added anything to ads.  At most, it alleges the content of some ads on the website suggested the ads related to illegal activities and Backpage.com (not Claimants) *deleted* from some of them language or images merely *indicative* of illegality, using moderation processes the website generally applied.  But the First Amended Complaint does not allege these processes were applied to any particular ad, and has no allegations about the editing of any specific ads (even deletions).

However, under Section 230 and the vast body of uniform case law interpreting it, any allegations must focus on *specific content*, not general website operations, and must identify how the interactive computer service is responsible for what allegedly made the content unlawful or actionable.  Neither "whole website" theories, generic claims about moderation practices and operation, nor allegations of knowledge or intent can avoid

---

[1]   *E.g., Gonzalez v. Google, Inc.*, 282 F. Supp. 3d 1150, 1163 n.5 (N.D. Cal. 2017) (citing *Cohen v. Facebook, Inc.*, 252 F. Supp. 3d 140, 157 n.11 (E.D.N.Y. 2017)), *aff'd*, 934 F.3d 53 (2d Cir. 2019)).

1  Section 230.  General claims that the very nature of Backpage.com facilitated,
2  encouraged, or "promoted" illegality are precisely the kind of claims that Section 230
3  bars.

4      The government here seeks civil forfeitures based on the content of classified
5  ads third parties posted to Backpage.com, and the conduct of those third parties,
6  despite *hundreds* of cases nationwide—including several involving Backpage.com—
7  holding Section 230 precludes such liability.  *See Hill v. StubHub, Inc.*, 727 S.E. 2d 550,
8  562 (N.C. App. 2012) (reporting (in 2012) approximately 300 reported decisions, with
9  all but a handful finding sites immune under § 230).  As this Court recognized, these
10  related forfeiture actions represent "a separate civil proceeding" from any prosecution
11  in which individual Claimants are named.[2]  Section 230 bars the FAC, including the
12  money-laundering claims which also depend on content posted by users of the website
13  and their alleged unlawful activity.  The FAC must be dismissed, and Claimants' assets
14  must be returned.

15  **I.**    **BACKGROUND**

16      The FAC alleges nearly 100 Defendant Accounts (holding tens of millions of
17  dollars the government has already seized), numerous parcels of real property, and
18  other assets seized from or surrendered by Backpage.com are forfeitable under 18
19  U.S.C. §§ 981(a)(1)(A) & (C).  The asserted grounds for forfeiture are that the assets
20  allegedly "represent property derived from or traceable to proceeds of" violations of
21  "federal laws constituting ['specified unlawful activity' ('SUA')] . . . including 18 U.S.C.
22  §§ 1591 [and] 1952," and conspiracy to commit same, involving, respectively, sex
23  trafficking and prostitution-based Travel Act violations.  FAC ¶ 101, 145; *see also id.*
24  ¶ 239 (First Claim for Relief).  The FAC also alleges the assets were involved in money

25

26  [2]  *Any and all funds held in Republic Bank of Arizona Accounts*, No. 2:18-cv-06742-RGK-
27  PJW, Dkt. 130, Dec. 20, 2019, at 6-7 (citing *U.S. v. Lacey*, No. 18-CR-00422-PHX-SPL
   (D. Ariz.); *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 23 (1st Cir. 2016); *Force v.*
28  *Facebook, Inc.*, 934 F.3d 53, 72 (2d Cir. 2019); *U.S. v. Ursery*, 518 U.S. 267, 292 (1996)).

1  laundering under 18 U.S.C. §§ 1956(a)(1)(B)(i), (a)(2) & h, and § 1957, as proceeds of

2  § 1591 or § 1952 SUA.  *Id.* ¶¶ 102, 145-47.[3]  All alleged "evidence supporting

3  forfeiture" arises from operations of Backpage.com, *id.* ¶¶ 118-30; *see also id.* ¶¶ 106-17,

4  with all "criminal proceeds" alleged to derive therefrom, *id.* ¶¶ 131-42; everything

5  seized allegedly comprises "assets representing, traceable to, and involved with"

6  specified SUA premised on the content of ads posted by third parties on the website.[4]

7      The FAC alleges individual Claimants were originators, directors, policymakers

8  or strategists, or officers of entities that operated Backpage.com.  *Id.* ¶¶ 108-12, 121-

9  22.[5]  It describes Backpage.com, LLC as an Internet-based company formed to counter

10  online competition to the classified ad business of weekly newspapers some of the

11  Claimants operated, *id.* ¶ 121, by allowing consumers to post classifieds at

12  Backpage.com.  *Id.* ¶ 106.  *See also id.* ¶¶ 153.d & 201.b (citing Backpage.com's "internet

13  presence" and services).  Ads could post in categories such as automotive, dating, jobs,

14  rentals and services, *id.* ¶ 106, and "adult," which the FAC alleges comprised less than

15  10% of ads on the website.  *Id.* ¶ 107.[6]  Backpage.com did not dictate or require

16  inclusion of any content in ads.  *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 813

17  (M.D. Tenn. 2013).  Ads were posted solely by third-party users, *id.*, as the FAC makes

18  clear.  *See, e.g.*, FAC ¶ 107 ("Backpage advertisers posted . . . ads").[7]  *Accord Backpage.com,*

19

---

20  [3]   *See also* FAC ¶¶ 240-41 (claims for relief alleging "Defendant Assets were involved
    in and are traceable to . . . one or more financial transactions, attempted transactions,

21  and a conspiracy to conduct or attempt to conduct such transactions [in connection

22  with the SUA of] violations of . . . Sections 1591 . . . and 1952").

    [4]   *Id.* § IV.  *Cf. id.* ¶ 123 ("most of Backpage's earnings represented the proceeds of

23  illegal activity, specifically prostitution and sex trafficking," used to pay for ads).

24  [5]   As the FAC recites, Claimants sold their interests in the companies that operated
    the website in 2015.  FAC ¶ 122.

25  [6]   The adult section was shuttered in early 2017 after years of pressure by government

26  actors.  *See id.* ¶ 126.c.; *see also* https://cdt.org/press/backpage-com-succumbing-to-
    government-is-blow-to-free-speech-online.  The rest of the website ceased operating in

27  2018 when the government seized Backpage.com itself.  *See* FAC ¶¶ 126.c, 224.

28  [7]   *See also, e.g.*, FAC ¶ 125 (alleging some posters were "pimps and sex traffickers who

1    *LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015).

2        The FAC does not allege Backpage.com (or Claimants) created content at the

3    website.  Or that they added anything to content others posted.  Nor does it allege they

4    imported any content from other websites, or invited or enlisted third parties to do so

5    (or to post ads).  The only allegations of Backpage.com's involvement with any ads,

6    beyond hosting what users posted, are claims its moderation practices "'sanitized' some

7    ads . . . customers posted," *id.* ¶ 127, by "deleting words, phrases, and images."  *Id.*

8    ¶ 126.c.  *Cf. id.* ¶ 127.a ("Ferrer instructed Backpage's technical staff to edit . . . ads by

9    removing particular terms").  It is alleged this involved identifying "terms . . . that

10    should be 'stripped' from ads," *id.* ¶ 127.c, under rules that "prohibited use of certain

11    terms." *Id.* ¶ 127.h; *see also id.* ¶ 127.i (alleging the "list of prohibited terms . . . evolved .

12    . . to adjust to Backpage advertisers' use of new code words").[8]  But, as the FAC

13    stresses, these changes did not affect what the posters of the ads intended to convey.

14    *See, e.g., id.* ¶¶ 125, 126.a, 126.d, 128.  The FAC faults this "policy of moderation" as

15    "allowing otherwise neutral or innocuous terms" constituting "coded language for sex

16    trafficking and prostitution," *id.* ¶ 128.c, to "avoid deleting ads when possible" when

17    "editing should be sufficient." *Id.* ¶ 127.d-e (internal quotation marks omitted).[9]

18        The FAC does not allege Backpage.com (or Claimants) ever edited any particular

19    ad.  In fact, its 90 pages hardly mention specific ads at all, citing just a few specific

---

21    used Backpage to advertise"); *id.* ¶ 125.a (discussing a "pimp who placed [a given] ad");

22    *id.* ¶ 125.b (alleging "same pimp" placed a "Backpage ad"); *id.* ¶ 125.c (discussing a
pimp who "told [] girls to post ads on Backpage.com" and "ads the girls posted"); *id.*

23    ¶ 125.d (alleging a "pimp drafted [] ads"); *id.* ¶ 125.e (citing "D.O's Backpage ads").  *See*
*id.* ¶ 130 (citing "ads posted by pimps or prostitution agencies").  *Cf.* ¶¶ 135.a, 135.b,

24    137.d, 137.i.b (referencing payment by users to post ads).

25    [8]  These allegations accompany similar claims about disapproval (*i.e.*, deletion) of
images in ads that Backpage.com determined should not appear on the site.  *Id.* ¶ 127.c.

26    [9]  However, Backpage.com's "automated and manual reviews" also blocked and
removed posts.  *Cooper*, 939 F. Supp. 2d at 813-14; *Backpage.com LLC v. McKenna*, 881 F.

27    Supp. 2d 1262, 1266-67 (W.D. Wash. 2012) (automated filters screened 26,000 terms,

28    phrases, and online identifiers, and 100 personnel reviewed and blocked ads).

1    posts.  *See id.* ¶¶ 125.a-e, 128.b, 129.c.  Even for this handful of ads, there are no

2    allegations they were edited from how they originally posted—that is, *none* are alleged to

3    have been "moderated."  The FAC does not contain a single allegation that Backpage

4    created, added to, or changed the meaning of *any* ads the website hosted.

5    **II.   <u>ARGUMENT</u>**

6         Claimants with standing to contest forfeiture may seek dismissal under F.R.C.P.

7    12(b).  Supp. R. G(8)(b)(i).[10]  To avoid dismissal, the rules require that complaints

8    "contain sufficient factual matter, accepted as true, to state a claim . . . that is plausible

9    on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cite and internal quotation marks

10   omitted), though the Court does not accept as true legal conclusions merely cast as

11   factual allegations.  *U.S. v. One White Crystal Covered Bad Tour Glove*, 2012 WL 8467453,

12   at *1 (C.D. Cal. Sept. 6, 2012) (quoting *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d

13   1136, 1139 (9th Cir. 2003)).  Under the "plausibility standard" of *Bell Atlantic Corp. v.*

14   *Twombly*, alleged facts "must be enough to raise a right to relief above the speculative

15   level," an "obligation [that] requires more than labels and conclusions."  550 U.S. 544,

16   555 (2007).[11]  And forfeiture complaints must satisfy not only *Iqbal/Twombly* standards,

17   but also heightened pleading obligations to "state sufficiently detailed facts to support

18   a reasonable belief that the government will be able to meet its burden of proof at

19   trial."  *One White Crystal Glove*, at *2 (quoting Supp. R. G(2)(f)).  In ruling on dismissal,

20   the Court must consider only the allegations on the face of the complaint.[12]

---

22   [10]  Between claimants' claims on the Defendant Assets and the descriptions of them,
*see* FAC ¶¶ 3-99, there should be no dispute as to standing.  *See, e.g., U.S. v. Various*
23   *Coins*, 2013 WL 1183312, at *2-3 (D. Ore. Mar. 21, 2013).

24   [11]  When facts pled are subject to "two possible explanations, only one of which can be
true and only one of which results in liability, plaintiffs cannot offer allegations that are
25   merely consistent with their favored explanation but are also consistent with the
26   alternative explanation.  Something more is needed, such as facts tending to exclude the
possibility that the alternative explanation is true . . . ."  *Eclectic Props. East, LLC v.*
27   *Marcus & Millichap Co.*, 751 F.3d 990, 996-97 (9th Cir. 2014).

28   [12]  Documents attached to the FAC, matters properly judicially noticeable, and

1        Dismissal is required here as Section 230 immunity seeks to "encourage []

2   unfettered and unregulated development of free speech on the Internet," to "promote

3   the development of e commerce," and completely bars the instant FAC.[13]

4   Section 230(c)(1) mandates that "[n]o provider . . . of an interactive computer service

5   shall be treated as the publisher or speaker of any information provided by another

6   information content provider."  47 U.S.C. § 230(c)(1).[14]  The consensus is that

7   Section 230 applies expansively, "establish[ing] broad 'federal immunity to any cause of

8   action that would make service providers liable for information originating with a third

9   party,'" *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006); *see also Lycos*,

10  478 F.3d at 419, with the Ninth Circuit emphasizing that "close cases . . . must be

11  resolved in favor of immunity."  *Roommates.com*, 521 F.3d at 1174.[15]  Many courts have

12  

_____

13  documents whose contents are alleged may be considered, *One White Crystal Glove*, at
    *1—but the FAC here neither attaches nor incorporates any documents

14  [13]  *Batzel v. Smith*, 333 F.3d 1018, 1027-28 (9th Cir. 2003); *see also Ben Ezra, Weinstein, &*

15  *Co., Inc. v. America Online Inc.*, 206 F.3d 980, at 985 n.3 (10th Cir. 2000) (quoting 47
    U.S.C. §§ 230(a)(3), (b)(2)).  Congress sought to eliminate liability for online services

16  "given the volume of material communicated" through them and "the difficulty of
    separating lawful from unlawful speech."  *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478

17  F.3d 413, 418-19 (1st Cir. 2007) (citation omitted).  *Accord Daniel v. Armslist, LLC*, 926
    N.W. 2d 710, 717 ¶ 14 (Wis. 2019), *cert. denied*, 2019 WL 6257416 (2019); *Force*, 934 F.3d

18  at 63, 71.

19  [14]  The "plain language" of Section 230 thus "creates a federal immunity to any cause
    of action that would make service providers liable for information originating with a

20  third-party user."  *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997).  "Put

21  another way, Section 230 'immunizes providers of interactive computer services against

22  liability arising from content created by third parties.'"  *Federal Agency of News LLC v.
    Facebook*, 2020 WL 137154, at *5 (N.D. Cal. Jan. 13, 2020) ("*FAN*") (quoting *Fair Hous.*

23  *Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008)

24  (*en banc*)) (internal quotation marks omitted).

25  [15]  Section 230 cases are governed by several basic principles:
        ***First***, immunity turns on who created and developed the ***specific content that***

26  ***allegedly caused Plaintiff's harm***, and cannot be avoided through aspersions
    about the general construct or operation of a website.

27      ***Second***, courts uniformly reject claims based on allegations that a website
    "facilitated" or "promoted" illegality in some way.

28      ***Third***, Section 230 immunity cannot be avoided by claiming a website knew or

granted or affirmed dismissal in cases that, like this, assert claims based on online content third parties created.  *E.g., Dyroff*, 934 F.3d 1093, *Craigslist*, 665 F. Supp. 2d 961; *Doe No. 1*, 817 F.3d 12; *Lycos*, 478 F.3d 413.[16]  The same applies here.

## A.     The Criteria for Section 230 Immunity Are Met.

A party is entitled to Section 230 immunity "as long as (1) it is a provider or user of an interactive computer service, (2) the . . . claims treat [it] as a publisher or speaker of [injurious] information, and (3) the . . . information [was] provided by another content provider.'"  *Free Kick Master LLC v. Apple Inc.*, 140 F. Supp. 3d 975, 980 (N.D. Cal. 2015) (quoting *Batzel*, 333 F.3d at 1037 (9th Cir. 2003)) (internal quotation marks omitted; editing supplied); *see also Dyroff*, 934 F.3d at 1097; *Doe No. 1*, 817 F.3d at 19.  This "turns on who was responsible for the specific harmful material at issue, not on whether the service provider was responsible for the general features and mechanisms of the service or other content" that also appeared.  *Doe v. Bates*, 2006 WL 3813758, at *17 (E.D. Tex. Dec. 27, 2016) (citing *Carafano v. Metrosplash.com*, 339 F.3d 1119 (9th Cir. 2003)).  Under settled law, a website is not liable for "consequences of [] ads posted" by users unless it developed "the specific content" at issue.  *M.A. ex rel. P.K. v. Village*

---

should have known of illegal material posted by third parties; such knowledge does not make publishers liable for speech of others.

**Fourth**, a website loses immunity only if it **requires** unlawful content or generates it itself, either directly or by hiring others to do so.

**Fifth**, accusations about website efforts to review, screen, block, or edit third party posts are **perforce** immune under Section 230.  Scores of cases recognize that these publisher functions—deciding what to allow and what to disallow—are expressly protected by Section 230(c)(1).

[16]  Where Section 230 applies, dismissal at the earliest possible phase of a case is vital, as its immunity "is effectively lost if a case is erroneously permitted" to proceed.  *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009) (citation omitted); *accord Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 417 (6th Cir. 2014).  Invocation of Section 230 must be resolved promptly as it "forecloses liability" if an online publisher "is not the author of the ads and [can]not be treated as the 'speaker' of the posters' words."  *Dart v. Craigslist*, 665 F. Supp. 2d 961, 966 (N.D. Ill. 2009).  This is necessary because "Section 230 protects . . . not merely from ultimate liability, but also . . . costly and protected legal battles."  *FAN*, 2020 WL 137154, at *5 (quoting *Roommates.com*, 521 F.3d at 1174) (internal quotation marks, editing omitted).

*Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041, 1051 (E.D. Mo. 2011).  *See also Armslist*, 926 N.W. 2d at 719 ¶ 24; *Carafano*, 339 F.3d at 1125.[17]  The same follows here, as Claimants "fulfill[] all three prerequisites . . . to claim Section 230 immunity."  *FAN*, 2020 WL 137154, at *5.

First, Backpage was a "quintessential publisher contemplated by the CDA." *Cooper*, 939 F. Supp. 2d at 823; *see also Ferrer I*, 2016 WL 7237305, at *6 (which the FAC reaffirms, alleging Backpage.com was an online service that allowed third parties to post online classifieds); *see* FAC ¶¶ 106, 121, 153.d, 201.b.[18]  Second, the grounds asserted for forfeiture all involve operation of Backpage.com and, in particular, ads third parties posted.[19]  Ads on Backpage.com are the essence of "information provided by another content provider" under Section 230.[20]  The FAC does not allege Backpage.com (or Claimants) created content at the website.  Or that they added anything to ads users posted, imported content from other sites, or invited or enlisted others to do so.  Or even that any ad specifically identified in the FAC was *in any way*

---

[17]   Under this test, seven courts have held Backpage.com and/or its principals to be immunized by Section 230.  *Doe v. Backpage.com, LLC*, 104 F. Supp. 3d 149, 157-58 (D. Mass. 2015), *aff'd*, 817 F.3d at 20-22; *Backpage.com, LLC v. Hoffman*, 2013 WL 4502097, at *8 (D.N.J. Aug. 20, 2013); *Cooper*, 939 F. Supp. 2d at 823-25; *McKenna*, 881 F. Supp. 2d at 1271-75; *M.A.*, 809 F. Supp. 2d at 1050-54; *California v. Ferrer*, 2016 WL 7237305 (Cal. Super. Ct. Sac. Cty. Dec. 9, 2016) ("*Ferrer I*"); *California v. Ferrer*, No. 16FE024013, slip op. (Cal. Super. Ct. Sac. Cty. Aug. 23, 2017) ("*Ferrer II*").

[18]   This tracks the "[m]any cases [that] have held [Backpage.com] satisfies the definition for 'interactive computer service'" under Section 230.  *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 993 (S.D. Tex. 2017).  To the extent that the forfeitures rest on Claimants' former roles as alleged Backpage.com operators, they "too, qualif[y] for protection" as the alleged "'provider' of [the] interactive computer service." *Sekiya v. Zuckerberg*, 2017 WL 3405627, at *2 (D.N.M. Mar. 10, 2017) (citation omitted).  *Accord Klayman v. Zuckerberg*, 753 F.3d 1354, 1357-58 (D.C. Cir. 2014).

[19]   *See, e.g.*, FAC ¶ 107 ("Backpage advertisers posted . . . ads"); *id.* ¶ 130 (citing "ads posted by pimps or prostitution agencies"); *see also supra* n.7 (quoting FAC's averments of third-party posting and payments); *infra* § III.E (dependency of trafficking claims on allegations of unlawful third-party postings).

[20]   *E.g., Doe No. 1*, 817 F.3d at 17-21; *M.A.*, 809 F. Supp. 2d at 1050-53; *see also, e.g., Bates*, 2006 WL 3813758, at *15; *Armslist*, 926 N.W. 2d at 724 ¶ 45.

1    modified.  And, as explained *infra* at § III.B, nothing in any alleged deletion of ad

2    content makes Backpage.com or Claimants responsible for any ads that may have

3    related to or involved illegal conduct.

4           Finally, the claims here treat Backpage.com (and by extension Claimants as its

5    alleged former owners and/or operators) as "the publisher or speaker" of content the

6    government claims is unlawful.  The FAC alleges "the Defendant Assets constitute, and

7    are derived from, proceeds traceable to one or more violations of . . . Sections 1591 . . .

8    and 1952."  FAC ¶ 239.  The alleged factual basis for this claim is Backpage.com's

9    hosting of third-party ads implicating prostitution and/or trafficking, and any

10   moderation that occurred.  *See id.* ¶¶ 106-07 & "Evidence Supporting Forfeiture,"

11   ¶¶ 121-30.  All claims regarding the "proceeds" are predicated on there being

12   "Payments for Advertising on Backpage," *id.* ¶¶ 131-37, and "Proceeds Traceable to"

13   SUA of hosting and moderating alleged unlawful ads, which became "Involved in

14   Money Laundering."  *Id.* ¶¶ 138-44.  The FAC characterizes these allegations as its

15   "Bases for Forfeiture," all of which rely on the same alleged violations of Sections 1591

16   and/or 1952, based on ad content.  *See supra* 3 (citing, *inter alia*, FAC ¶¶ 145-47).

17          Prior cases involving Backpage.com illustrate how Section 230 immunity applies

18   here.  In *Doe No. 1*, all theories of liability alleged third-party traffickers posted ads

19   relating to plaintiffs, and that Backpage.com "deliberate[ly] structur[ed] . . . its website

20   to facilitate sex trafficking" and used moderation processes that removed material from

21   ads.  817 F.3d at 16-17 & n.2.[21]  The court dismissed, finding these general features

22   "amount to neither affirmative participation in an illegal venture nor active . . . content

23

---

24   [21]   *Compare, e.g.*, FAC ¶ 127 (alleging "Backpage instituted and maintained policies . . .
     designed to cultivate and sustain its promotion of sex trafficking and prostitution"); *id.*
25   ¶ 126 (alleging "all levels of Backpage management, including the Backpage Operators,
     were aware of Backpage's role in promoting criminal activity"); *id.* ¶ 127.e (citing "email
26   . . . acknowledging that . . . illegal content removed through Backpage's moderation . . .
     was usually money for sex act") (internal quotation marks omitted); *id.* ¶ 126.c (alleging
27   "a practice of altering ads before publication by deleting words, phrases and images"
     that "served to sanitize the content of innumerable ad[s]").
28

1   creation." *Doe No. 1*, 104 F. Supp. 3d at 157, 162.  The First Circuit affirmed, holding

2   the claims uniformly "address[ed] the structure and operation of the Backpage website"

3   and "decisions about how to treat [third-party] postings."  *Doe No. 1*, 817 F.3d at 21

4   ("Features [that are part and parcel of the website's design and operation] reflect

5   choices about what content can appear . . . and in what form" and are "within the

6   purview of traditional publisher functions.") (cited with approval in *Force*, 934 F.3d at

7   64, 71; *Armslist*, 926 N.W. 2d at 724 ¶¶ 45-46; and *Herrick v. Grindr*, LLC, 306 F. Supp.

8   3d 579, 588 (S.D.N.Y. 2018), *aff'd*, 765 F. App'x 586, 590 (2d Cir. 2019)).[22]

9          Under the same settled principles, a California state court dismissed under

10   Section 230 an indictment based on allegations similar to those here against some of

11   the same Claimants.  *Ferrer I*, 2016 WL 7237305, at *1-5.  Prosecutors alleged pimping

12   based on defendants operating Backpage.com to "profit from . . . ad placement" by

13   third parties, but as "the substance of [all] ads came from the original" as posted, the

14   court held "[t]his is not prohibited activity" but rather "falls within . . . protected

15   editorial functions."  *Id.* at *5 (citing, *inter alia, Doe No. 1*, 817 F.3d at 20-21).  A second

16   California court concurred, again granting a demurrer after the State, rather than

17   appealing , filed new charges that defendants "conspired to create and organize

18   a website that facilitates sex trafficking."  *Ferrer II*, slip op. 1.  It rejected charges based

19   on Backpage.com's "system where terms would be deleted or blocked . . . but the user

20   would still be allowed to post," holding "such actions generally fall within the scope of

21   protected" Section 230 activity.  *Id.* 13-14.  It held that deleting "code for underage

22   girls," allegedly in order to "sanitize" ads, is not "material contribution to the offensive

23

24   ————————————————
    [22]  In *M.A.* before that, a plaintiff alleging she was trafficked by a third party who

25   posted ads on Backpage.com attacked the site's features as "a highly tuned marketing
    site" with a "veil of legality" that "knew" posts "were ad[s] for prostitution" and

26   "sexual contact with minors."  809 F. Supp. 2d at 1043-44.  The court rejected these
    claims challenging the site's "construct and operation," *id.* at 1050, observing that a site

27   is "immune under § 230 unless it created the offending ads," and "however horrific the
    consequences . . . the ads were created by [the pimp]."  *Id.* at 1051.

28

content" that defeats Section 230 immunity.[23]  Many cases involving other online
services are to the same effect.[24]

    **B.**    **Section 230 Bars the Forfeiture Claims Because the First Amended Complaint Does Not Allege Ads on Backpage.com Were Created by Anyone Other Than the Third Parties Who Posted Them.**

    The common thread in the cases above is that website operators cannot be held liable for curating and/or editing content that third parties post.  Section 230 immunity is not avoided by attacking a website's basic design and configuration.  Where "third-party content . . . appears as an essential component" of all claims, *Doe No. 1*, 817 F.3d at 22—as it does here—the government seeks what Section 230 prohibits:  liability for Claimants as "publisher or speaker" of ads third parties created.  47 U.S.C. § 230(c)(1). *See also, e.g., MySpace*, 528 F.3d at 419-20 (§ 230 barred holding site liable for sex assault

---

[23]  *Ferrer II*, slip op. 14.  The court further held immunity is not lost based on "overall course of conduct," especially where Backpage.com did nothing to "require" offensive content, nor based on claims the site "'manipulated' ad[s] to evade law enforcement." *Id.* 16-17.  Notably, the court also dismissed money-laundering charges that were dependent on the pimping allegations, holding that, as defendants were immune for operating an online forum for third-party speech, the decision to charge for ads also constituted activity protected by the CDA.  *Id.*  18; *see also infra* § III.E.

[24]  *See, e.g., Carafano*, 339 F.3d at 1124-25 (§ 230 barred claims involving identity thief's creation of dating profile for actress who then received sexually explicit and threatening messages); *Doe II v. MySpace Inc.*, 175 Cal. App. 4th 561, 573 (2009) (plaintiffs "want MySpace to ensure that sexual predators do not gain access to (*i.e.*, communicate with) minors on its Web site," yet "activity . . . to restrict or make available certain material . . . is expressly covered by section 230"); *Doe v. MySpace, Inc.*, 528 F.3d 413 419-20 (5th Cir. 2008) (§ 230 barred claims seeking to hold MySpace liable for sexual assault of 14-year-old victim by a man who met her on the site); *Green v. AOL*, 318 F.3d 465, 471 (3d Cir. 2003) (plaintiff sought "to hold AOL liable for decisions relating to the monitoring, screening, and deletion of content from its network—actions quintessentially related to a publisher's role"); *Herrick*, 306 F. Supp. 3d at 588 ("To the extent Herrick has identified a defect in Grindr's design . . . it is inextricably related to Grindr's role in editing or removing [] content—precisely the role for which Section 230 provides immunity."); *Lycos*, 478 F.3d at 422 (rejecting "construct and operation" theory); *StubHub*, 727 S.E. 2d 561-62 (rejecting "entire website" theory).

1    of 14-year-old by man she met on site) (cited in *Lee v. OfferUp, Inc.*, 2018 WL 4283371,

2    at *4 (E.D. La. Sept. 7, 2018)).  The FAC leaves no question all "Bases for Forfeiture"

3    arise entirely from third-party content. *Supra* 2-3, 9.  "So long as a third party willingly

4    provides the essential [] content," the service provider "receives full immunity,

5    regardless of the editing or selection process." *Free Kick Master*, 140 F. Supp. 3d at 981

6    (quoting *Carafano*, 339 F.3d at 1124).

7         This underscores another fundamental problem, which is that Section 230

8    analyses must focus on who authored, created, and posted the specific allegedly

9    actionable content.[25]  The "case law confirms that the immunity analysis turns on who

10   was responsible for *the specific harmful material at issue*, not on whether the service

11   provider was responsible for the general features and mechanisms of the service or

12   other content . . . that might have also appeared on the service." *Bates*, 2006 WL

13   3813758, at *17 (citing *Carafano*, 339 F.3d 1119); *see also id.* at *16.[26]  "The critical issue

14   is whether [the website] acted as an information content provider with respect to the

15   information that [is] claim[ed to be unlawful]," and Section 230 "bar[s] claims unless

16   [the website] created or developed the particular information at issue." *Carafano*, 339

17   F.3d at 1125 (internal quotation marks and citation omitted).

18        The FAC here alleges next to no facts about "particular information at issue,"

19   and what little it alleges only reinforces that Section 230 applies.  As noted, it discusses

20

21   _____

     [25]   *See FTC v. Accusearch Inc.*, 570 F.3d 1187, 1198-99 (10th Cir. 2009) (online service

22   can be liable *only* to the extent it created or developed "*specific content* that was the *source*

23   of the alleged liability") (emphases added); *Beckman v. Match.com*, 2013 WL 2355512, at
     *4 (D. Nev. May 29, 2013) (same), *aff'd in part, rev'd in part on other grounds*, 668 F. App'x

24   759 (9th Cir. 2016).  *See also, e.g., Doe No. 1*, 817 F.3d at 20-21; *Jones*, 755 F.3d at 410.
     [26]   *See also Blumenthal v. Drudge*, 992 F. Supp. 44, 51-52 (D.D.C. 1998); *Force*, 934 F.3d at

25   68-70; *Herrick*, 306 F. Supp. 3d at 589 ("An ICS is not the creator of offensive content

26   unless it contributes to . . . what makes the content unlawful.") (citation and internal
     quotation marks omitted).  In *M.A.*, the court held the relevant issue was whether

27   Backpage.com was "responsible for the development of the specific content that was

28   the source of the alleged liability." 809 F. Supp. 2d at 1051 (citation omitted).

specific content of only a handful of ads, *see* FAC ¶ 125, and for each of those described in any detail, it makes clear they were posted by third parties. *See supra* 4 & n.7. The government dwells on Backpage.com's moderation practices, e.g., FAC ¶¶ 126-28, but there is no allegation they were ever applied to these five ads—or that Backpage.com did *anything* to alter them. *See id.* ¶ 125.a-e.[27] The government nowhere alleges Backpage.com "provided, created, or developed any portion or content of" any of the ads identified in the FAC. *FAN*, 2020 WL 137154, at *7. Its allegations thus hardly constitute "sufficiently detailed facts to support a reasonable belief the government" can overcome the CDA's protections. Supp. R. G(2)(f).

If anything, the allegations *undercut* any claim that Section 230 can be avoided, as the government attacks only the moderation process generally.[28] It cites a Senate subcommittee report's claims that this constituted "a practice of altering ads before publication by deleting words, phrases, and images indicative of criminality" that "served to sanitize the content of innumerable ad[s]." FAC ¶ 126.c.[29] According to the FAC, this "had the effect of allowing otherwise neutral or innocuous terms . . . as coded language for sex trafficking and prostitution." *Id.* ¶ 128.c. The "gravamen of the complaint" is thus that Claimants were "directly involved in [] alleged [violations]

---

[27] Elsewhere, the FAC offers minimal details for ads "mostly free of coded language, but [that] included sexually provocative images" that it describes generally. FAC ¶ 128.b. Here, too, it is clear (a) third-party posters were responsible for the content, and (b) there is no allegation the ads were altered by the website. *See also id.* ¶ 129.c (same). The only other examples of "specific" content are ads from which the FAC quotes phrases, but only to match them to payments, *id.* ¶ 129.a-b; *cf. id.* ¶ 135.a, d; there are also no claims Backpage created or edited these ads, either.

[28] *Cf. Batzel*, 333 F.3d at 1031 ("The 'development of information' [] means [] more [] than merely editing portions of [a post] and selecting material for publication.").

[29] This included, it is alleged, efforts "to edit the wording of such ads by removing particular terms . . . indicative of prostitution," *id.* ¶ 127.a, using a "list [that] prohibited use of certain terms" to "'be stripped' from ads before publication," *id.* ¶¶ 127.c, h, which "changed and evolved over time." *Id.* ¶ 127.i ("Backpage's 'moderation' policy would be adapted by adding . . . to the 'blocked' list.").

because [Backpage.com had] content guidelines and rules" or removed some content "for violations of those rules," which is "insufficient to avoid § 230." *Free Kick Master*, 140 F. Supp. 3d at 983. Such filtering cannot undermine Section 230 immunity, *see Roommates.com*, 521 F.3d at 1174 n.36, especially here, where based on the government's own descriptions, these practices, at most, *deleted* or *removed* content from ads. *See supra* 4 (citing FAC ¶¶ 126.c, 127.a, 127.c, 127.h, 127.i).

This is fatal to the FAC's claims for forfeiture, as Section 230's broad immunity does not permit claims based on a website's deletion of content—which is not "displayed content." *Jones, supra* n.25.[30] "[R]emoving content is something publishers do, and to impose liability on the basis of such conduct *necessarily involves treating the liable party as a publisher*" under Section 230. *FAN*, 2020 WL 137154, at *8. Such deletion of content cannot be a basis for liability because any harm comes from the substance of ads third parties post.[31] That is particularly true for the kinds of automatic stripping of terms this FAC alleges, as "algorithmic filtering . . . and display functions" are "features [] available equally to all users" within Section 230 immunity. *Herrick*, 306 F. Supp. 3d at 589. Section 230 "plainly allow[s ] algorithms to . . . block content [] deemed

---

[30] The Tenth Circuit decision in *Ben Ezra* exemplifies this, where it rejected plaintiff's argument that because the "Defendant deleted some stock symbols or other information," "such alteration . . . constitutes 'creation or development' of information and transforms Defendant into an 'information content provider.'" Instead, the court held, "deleting [] allegedly inaccurate stock quotation information . . . was simply engaging in the editorial functions Congress sought to protect." 206 F.3d at 985-86.

[31] *See supra* 8-10; *Doe No. 1*, 817 F.3d at 20 ("cho[osing] what words or phrases can be displayed" are "publisher functions under any coherent definition," and § 230 bars liability based on "posting standards," including "which terms are permitted"). *Accord Silver v. Quora, Inc.*, 2016 WL 9777159, at *3 (D.N.M. June 13, 2016) ("Silver does not [] contend [] Quora provided, created, or developed . . . content, aside from possibly 'editing'" it). *See La Tiejira*, 272 F. Supp. 3d at 993-94 ("monitoring, screening, and deletion of user-generated content are actions quintessentially related to a publisher[]") (citation, internal quotation marks, editing omitted); *GoDaddy.com, LLC v. Toups*, 429 S.W. 3d 752, 758 (Tex. App. 2015) ("removing content is something publishers do").

1   objectionable," *Force*, 934 F.3d at 70 n.24,[32] as the Ninth Circuit recently agreed.  *See*

2   *FAN*, 2020 WL 137154, at *7 (discussing *Dyroff*, 934 F.3d at 1098).

3        For all the government's claims about "stripping" and deletions of language

4   from ads, there is no allegation those practices changed the meaning of what

5   Backpage.com's third-party users originally posted.  The government maintains the

6   SUA was apparent from the ads as posted, and nothing in the website's alleged

7   moderation practices contributed to what allegedly made ads unlawful.[33]  Per the FAC,

8   this "'moderation' only caused ads explicitly promoting sex trafficking to become more

9   coded and implicit," FAC ¶ 128, leaving "otherwise neutral or innocuous terms to be

10  understood."  *Id.* ¶ 128.c.  This is "insufficient to render the website [] a content

11  provider," as it is "the third party who is responsible for the illegal content of the ad."

12  *Ferrer II*, slip op. 14 (citing *Jones*, 755 F.3d at 414).  The FAC's allegations based on

13  moderation thus seek liability not for anything Backpage.com or Claimants created or

14  posted, but for content allegedly *rejected* from the site.  Section 230 "forbids . . . liability

15  [for] a service provider for . . . editorial and self-regulatory functions."  *Zeran*, 129 F.3d

16  at 331.  As the Ninth Circuit held, "any activity that can be boiled down to deciding

17  whether to exclude material that third parties seek to post online is ***perforce immune***

18  under section 230."  *Roommates*, 521 F.3d at 1170-71 (emphasis added).

19     **C.   The Government Cannot Evade Section 230 by Claiming a Website**

20          **"Facilitated" Illegal Conduct.**

21     The government cannot avoid Section 230 on theories that Backpage.com's

22

---

23  [32]  The Second Circuit specifically rejected any notion that "Congress implicitly

24  intended to restrain the automation of interactive computer services' publishing

    activities in order for them to retain immunity."  *Force*, 934 F.3d at 67.  As the court

25  noted, it would "turn Section 230(c)(1) upside down to hold that Congress intended

26  that when publishers of third-party content become especially adept at performing the

    functions of publishers, they are no longer immunized."  *Id.*

27  [33]  *See, e.g.*, FAC ¶¶ 145, 239-41; *see also, e.g., id.* ¶ 107 ("Backpage advertisers posted sex

28  trafficking ads"), *id.* ¶ 125.a-e (describing ads); *id.* ¶¶ 128.a-b, 129.b-c (same).

practices "facilitated" traffickers, or "encouraged" or "promoted" illicit conduct.  FAC
§ III.A (header); *id.* ¶¶ 126, 126.c, 127, 127.h-i, 131.  Such allegations "*necessarily* treat
the website as a publisher or speaker of content provided by third parties and, thus, are
precluded by section 230(c)(1)."  *Doe No. 1*, 817 F.3d at 22 (emphasis added).[34]  As the
Ninth Circuit recognized, "a clever lawyer [can] argue that *something* the website
operator did encouraged the illegality," but such cases "must be resolved in favor of
immunity, lest we cut the heart out of section 230 by forcing websites to . . . fight[] off
claims that they promoted or encouraged—or at least tacitly assented to—the illegality
of third parties."  *Roommates*, 521 F.3d at 1174.  *See also Goddard v. Google, Inc.*, 640 F.
Supp. 2d 1193, 1196 (N.D. Cal. 2009) (immunity despite claims ad program
"encourages[,] collaborates in the development of [and] effectively, requires" illegal
content).

Nor is a provider's knowledge that its service may be used for unlawful activity
grounds for denying immunity.  "It is . . . well established that notice of the unlawful
nature of the information provided is not enough to make it the service provider's own
speech."  *Lycos*, 478 F.3d at 420.[35]  Under Section 230, even if an online provider has
*actual* knowledge of specific illegal content posted on its site, failure to delete does not
make it liable (and the FAC makes no allegation Claimants had actual knowledge of
specific illegal content posted to Backpage).  *E.g., Zeran*, 129 F.3d at 331-33.[36]  The

---

[34]   *See also, e.g., MySpace*, 528 F.3d at 421-22.  In *Ferrer I*, the court dismissed pimping
charges against certain Claimants here, rejecting the same encouragement theory.  2016
WL 7237305, at *7 (citing Ninth Circuit, California, and other authority).

[35]   *See also La'Tiejira*, 272 F. Supp. 3d at 994 ("CDA immunity 'applies even after notice
of the potentially unlawful nature of the third-party content'") (quoting *Lycos*, 479 F.3d
at 420); *accord Armslist*, 926 N.W. 2d at 721 ¶ 33, *id.* at 726 ¶ 52.  *Compare, e.g.,* FAC
¶ 126 (alleging "management . . . were aware of Backpage's role in promoting criminal
activity"); *id.* ¶ 126.c (citing Backpage.com's alleged "Knowing Facilitation of Online
Sex Trafficking"); *id.* ¶ 127.e & i (alleged "acknowledg[ment]" of "illegal content" and
"sex trafficking").

[36]   Thus, the *M.A.* court rejected claims that immunity should be denied because
Backpage.com allegedly knew or should have known "minors [were] sexually trafficked

same applies to allegations about a site's intentions, such as claims that Backpage.com's "policies and procedures [were] designed to cultivate and sustain [] promotion of sex trafficking and prostitution," FAC ¶ 127, as there is no Section 230 "exception" for allegations of "intentional violation of criminal law." *Barnes*, 2006 WL 3813758, at *4.[37]

### D.  Parallel Criminal Proceedings Are Irrelevant.

This civil forfeiture action is barred by Section 230 notwithstanding that the government seeks to justify it based on alleged criminal violations. While an exception exists for federal prosecutions, 47 U.S.C. § 230(e)(1), this is a *civil* action (as this Court has noted), and courts uniformly hold civil cases under federal criminal laws are not "enforcement" under Section 230(e)(1).[38]  In *Doe No. 1*, plaintiffs claimed

---

on its website." 809 F. Supp. 2d at 1050-51. *See also Ferrer I*, 2016 WL 7237305, at *7 ("[O]nline publishers are not subject to notice liability.").

[37] *See also, e.g., Ferrer II*, slip. op. 15; *S.C. v. Dirty World, LLC*, 2012 WL 3335284, at *4 (W.D. Mo. Mar. 12, 2012) (rejecting claims that site intended to elicit defamatory content); *StubHub*, 727 S.E. 2d at 562 (disregarding allegations that StubHub's purpose was to violate anti-scalping laws). Thus, allegations of profit motive do not affect Section 230 immunity. *See, e.g.*, FAC ¶ 107 (alleging "Backpage realized annual profits of tens of millions of dollars from adult ad[s]" including where "advertisers posted sex trafficking ads"); *see also id.* ¶¶ 108-09. Claims that Backpage.com "elicit[ed] online content for profit," or sought to profit from posters' "illegal prostitution activities" are simply irrelevant. *M.A.*, 809 F. Supp. 2d at 1045, 1050, 1053. There is "no 'for-profit exception to § 230's broad . . . immunity,'" and the "fact that a website elicits online content for profit *is immaterial*; the only relevant inquiry is whether the interactive service provider creates or develops that content." *FAN*, 2020 WL 137154, at *7 (quoting *M.A.*, 809 F. Supp. 2d at 1050) (quoting *Goddard*, 2008 WL 5245490, at *3) (emphasis added; internal quotation marks omitted).

[38] Other exceptions are equally inapplicable. Section 230(e)(5)(A) was added to allow civil actions under federal trafficking law, but only by "victim[s] of violations" and state attorneys general, neither of whom are plaintiffs here, and claims must be brought under 18 U.S.C. § 1595, which is not invoked here. The same is true of Sections 230(e)(5)(B) & (C), which allow certain state trafficking and prostitution prosecutions, but this is not a state prosecution, and the criminal laws invoked are federal. (Note also that individual Claimants here who are defendants in the Arizona criminal case challenge that prosecution, even under the federal Travel Act, as being precluded by the CDA 230, as it depends on state criminal offenses that Section 230 immunizes.)

Section 230(e)(1) allowed their claims because civil suits "enforce" Sections 1591 and 1595, but the court held that argument, "though creative, does not withstand scrutiny." 817 F.3d at 23.  The *Craigslist* court held the same as to Sheriff Dart's effort to avoid Section 230 under the Travel Act, 665 F. Supp. 2d at 965 n.6 (discussing 18 U.S.C. § 1952), and a California federal court rejected a similar attempt to avoid Section 230 for money laundering by invoking 18 U.S.C. § 1957.  *See Goddard v. Google, Inc.*, 2008 WL 5245490, at *5 n.5 (N.D. Cal. Dec. 17, 2008).[39]  Any such argument here is a nonstarter.

### E.   Predicate Money Laundering Claims Do Not Save the First Amended Complaint.

The civil forfeiture claims based on money laundering must be dismissed under Section 230.  As *Ferrer I* held, "online publishing . . . is generally provided immunity under the CDA" and that "extend[s] . . . to functions [] associated with publishing . . . such as accepting payment."  2016 WL 7237305, at *10.  *See also Doe No. 1*, 817 F.3d at 20-22 (§ 230 immunized decision to charge money to allow third-party content).  Permitting claims like money laundering to proceed based on receiving proceeds from third-party content would "impermissibl[y] recharacteriz[e] allegations that ultimately turn on [] hosting" immunized by Section 230.  *Goddard*, 2008 WL 5245490, at *5 n.5.

---

[39]  This outcome holds not only for the bases of civil liability asserted here, but for all federal criminal statutes that allow civil actions.  The Second Circuit held as much in *Force* under the Anti-Terrorism Act.  934 F.3d at 71-72 (reviewing 18 U.S.C. § 2333); *accord Gonzalez v. Google*, 335 F. Supp. 3d 1156, 1169 (N.D. Cal. 2018); *see also Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116, 1123-28 (N.D. Cal. 2016), *aff'd on other grounds*, 881 F.3d 739 (9th Cir. 2018).  The same applied to civil claims under federal child pornography law in *Bates*, 2006 WL 3813758, at *5, *22 (considering 18 U.S.C. §§ 2252A & 2255); *see also GoDaddy*, 429 S.W. 3d at 760 ("plain language of [§ 230] contemplates . . . immunity from civil suit . . . even when the posted content" could be prosecuted, such as for child pornography or obscenity), and to the Consumer Protection Act in *Hinton v. Amazon.com.dedc, LLC*, 72 F. Supp. 3d 685, 690-91 (S.D. Miss. 2014); *see also Kimzey v. Yelp! Inc.*, 836 F.3d 1263 (9th Cir. 2016) (Ninth Circuit application of § 230 where civil RICO was alleged).

1    *Ferrer II* also  dismissed "money laundering charges based on prostitution."  Slip.

2    op 11.  The court rejected charges that "Defendants acquired income from prostitution

3    . . . ad[s on] Backpage.com," *id.* 12, that involved allegedly "knowing [funds]

4    represented the proceeds of the prostitution," *id.* 17, because "the CDA's immunity"

5    must "inform[] the [] analysis."  *Id.* 18.  Here, the government likewise seeks forfeitures

6    as if Backpage.com was "the speaker of the offensive content leading to prostitution,

7    which is prohibited under the immunity provision of the CDA."  *Id.*  The "purported

8    use of [the] proceeds . . . cannot [] serve as the basis for money laundering charges,"

9    because "charg[ing] money for [] postings constitutes activity protected under the

10   CDA."  *Id.*

11        In the FAC, virtually all the Defendant Assets "are alleged to [be] traceable to

12   SUA, involved in money laundering, or both."[40]  The "SUA" is defined as alleged

13   Section 1591 and Section 1952 violations allegedly connected to Backpage.com, *see*

14   FAC ¶ 100, the attempt to impose civil liability for which falls under Section 230

15   immunity as explained above.  *See supra* §§ III.A-C.  These alleged violations also form

16   a basis for the money laundering claims.  *See, e.g.*, FAC ¶ 102.c; *id.* ¶ 124.  The money

17   laundering claims are therefore precluded by Section 230, for the same reasons they

18   were in, *e.g, Ferrer II.*  Moreover, the mass of Defendant Assets embraced by the FAC

19   derive not only from the five ads described in detail therein, or the handful of others

20   whose contents are cited, *see supra* 13, but from the multitude of ads Backpage.com

21

---

22   [40]   FAC ¶¶ 152-53, 155, 157-58, 160, 164, 166, 171, 173, 175, 177, 180-81, 185, 187,
189, 191, 195-97, 199-200, 202, 204, 206, 208, 210, 212, 214, 216, 218, 232.  In some
23   cases the FAC is clearer that funds allegedly "involved in money laundering" are only
those "traceable to SUA" comprising alleged CDA-immunized Section 1591 and 1952
24   violations.  *E.g., id.* ¶¶ 203, 205, 207, 209, 211, 213, 215, 217, 219.  Elsewhere, the tie to
Section 230-immunized activity is more explicit.  *E.g., id.* ¶ 151 (funds alleged as
25   "payments for the operation of Backpage.com"); ¶¶ 203, 205 (discussing funds as
"payments for [] ads"), ¶ 201.b (funds as "payment for Backpage[.com] services . . . to
26   promote [] trafficking and [] prostitution"); ¶ 153 (funds "used to promote and
facilitate prostitution"); ¶ 193 (alleging funds were "proceeds of SUA").

27

28

1  hosted.  The money laundering claims thus depend on presuming all ads at the site for

2  which funds were received were for trafficking and illegal prostitution, a premise that

3  has been soundly and repeatedly rejected.[41]  Ultimately, as Section 230 provides "*an*

4  *immunity from suit* rather than a mere defense to liability," *Nemet Chevrolet*, 591 F.3d at

5  254, it requires dismissal of the FAC for civil forfeiture here, including its claims based

6  on money laundering.

7  **III.   CONCLUSION**

8       For the foregoing reasons, Claimants respectfully request that the First Amended

9  Complaint be dismissed.

10

11       *Local Rule 5-4.3.4(a)(2)(i) Compliance:  Filer attests that all other signatories listed concur in*

12  *the filing's content and have authorized this filing.*

13

14  DATED:  July 1, 2020            Respectfully submitted,

15                        Thomas H. Bienert, Jr.

16                        Whitney Z. Bernstein

17                        BIENERT KATZMAN, PLC

18                 By:      */s/ Thomas H. Bienert, Jr.*

19                        Thomas H. Bienert, Jr.

                        Attorneys for James Larkin

20

21

22

23

24  ─────────────────────

   [41]   *E.g., Ferrer I*, 2016 WL 7237305, at*9; *Backpage.com v. Dart*, 807 F.3d at 234 ("not all

25  ad[s] for sex are ads[]for illegal sex" and "[t]here is no estimate of how many

   [Backpage] ads . . . promote illegal activity"); *Craigslist*, 665 F. Supp. 2d at 968.  *Compare*

26  FAC ¶ 123 ("most of Backpage's earnings [were] proceeds of illegal activity, specifically

   prostitution and sex trafficking" through ads users posted).  This also begs the question

27  how Claimants (or the government) could know all funds were proceeds of criminal

   activity, *see, e.g.*, 18 U.S.C. §§ 1956(a)(1)(B)(i), (a)(2)(B); 1957(a), when the allegation is

28  simply (and impermissibly) that "all" adult ads at Backpage were unlawful.

DATED:  July 1, 2020

Gary S. Lincenberg
Ariel A. Neuman
Gopi K. Panchapakesan
BIRD, MARELLA, BOXER, WOLPERT,
NESSIM, DROOKS, LINCENBERG &
RHOW, P.C.

By:  _____
     */s/ Gary S. Lincenberg*
         Gary S. Lincenberg
Attorneys for John Brunst, Mary Ann Brunst,
and The Brunst Family Trust

DATED:  July 1, 2020

Robert Corn-Revere
James C. Grant
DAVIS WRIGHT TREMAINE LLP

By:  _____
     */s/ Robert Corn-Revere*
         Robert Corn-Revere
Attorneys for James Larkin and Michael
Lacey

DATED:  July 1, 2020

LIPSITZ GREEN SCIME CAMBRIA LLP

By:  _____
     */s/ Paul J. Cambria, Jr.*
         Paul J. Cambria, Jr.
Attorneys for Michael Lacey

DATED:  July 1, 2020

FREEMAN, MATHIS & GARY LLP

By:  _____
     */s/ John K. Rubiner*
         John K. Rubiner

FEDER LAW OFFICE, P.A.

By:  _____
     */s/ Bruce Feder*
         Bruce Feder

Attorneys for Scott Spear

DATED:  July 1, 2020

WIECHERT, MUNK & GOLDSTEIN, PC

By:      */s/ David W. Weichert*
                    David W. Weichert

DANIEL J. QUIGLEY, PLC

By:      */s/ Daniel J. Quigley*
                    Daniel J. Quigley

Attorneys for Medalist Holdings, Inc., Leeward Holdings, LLC, Camarillo Holdings, LLC, Vermillion Holdings, LLC, Cereus Properties, LLC, Shearwater Investments, LLC, and Broadway Capital Corp., LLC