# EXHIBIT A

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, <br><br> v. <br><br> TAREK OBAID, *Claimant-Appellant*, <br><br> CERTAIN RIGHTS TO AND INTERESTS IN SHARES OF SERIES D PREFERRED STOCK IN PALANTIR TECHNOLOGIES, *Defendant.* | No. 18-56657 <br><br> D.C. No. 2:17-cv-04446-DSF-PLA <br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
Dale S. Fischer, District Judge, Presiding

Argued and Submitted September 11, 2019
Pasadena, California

Filed August 24, 2020

Before: Johnnie B. Rawlinson, Sandra S. Ikuta, and
Mark J. Bennett, Circuit Judges.

Opinion by Judge Rawlinson;
Dissent by Judge Ikuta

## SUMMARY[*]

**Personal Jurisdiction / *In Rem* Civil Forfeiture / Venue**

The panel affirmed the district court's order denying
Tarek Obaid's motion to dismiss for lack of personal
jurisdiction and for lack of proper venue a civil forfeiture
case involving Obaid's shares of stock in Palantir
Technologies, a corporation with its principal place of
business in California.

Obaid is a citizen of Saudi Arabia who wired $2 million
from his account in Switzerland to a bank in California to
purchase stock in Palantir.  The government filed this *in rem*
civil forfeiture action against Obaid's Palantir shares.  Obaid
moved to dismiss the forfeiture action, contending that *in
personam* jurisdiction over him was necessary to adjudicate
this *in rem* action, and the district court was required to apply
the minimum contacts standard to determine whether he had
sufficient contacts with the forum.

The panel held that the United States Supreme Court's
decision in *Shaffer v. Heitner*, 433 U.S. 186 (1977) (requiring
the application of a minimum contacts framework to each
person who claims ownership of property), addressed a *quasi
in rem* proceeding rather than a true *in rem* proceeding.  The
panel held further that *Tennessee Student Assistance Corp. v.
Hood*, 541 U.S. 440 (2004), provided more direct guidance
for the issues before the panel.  The panel concluded that
*Hood* supported its view that *Shaffer* was limited to *quasi in*

---

[*] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

*rem* actions and did extend to *in rem* actions, such as this one. The panel held that the district court did not err when it determined that the constitutional due process requirements set forth in *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), were inapplicable to this *in rem* action. In an *in rem* action, the focus for the jurisdictional inquiry is the res, in this case Obaid's Palantir shares, rather than Obaid's personal contacts with the forum.

The panel held that venue was proper because sufficient acts giving rise to the civil forfeiture occurred in the Central District of California. The panel concluded that the conspiratorial activity in the Central District was sufficient to support venue given the relatively low standard set forth in 28 U.S.C. § 1355. The panel also held that whether Obaid was involved in the conspiracy was immaterial to the venue analysis.

Dissenting, Judge Ikuta wrote that the majority erred in not applying *Shaffer v. Heitner*, and created a split with two circuits that applied *Shaffer* and seven circuits that expressly construed it to cover ordinary *in rem* proceedings. Judge Ikuta would remand to the district court to conduct the required minimum contacts analysis.

**COUNSEL**

David B. Rivkin (argued), Jonathan R. Barr, Lee A. Casey, Mark W. DeLaquil, Elizabeth Price Foley, and Andrew M. Grossman, Baker Hostetler LLP, Washington, D.C.; Jonathan B. New, Baker Hostetler LLP, New York, New York; for Claimant-Appellant.

Joshua L. Sohn (argued), Trial Attorney; Woo S. Lee, Deputy Chief; Deborah Connor, Chief; Money Laundering and Asset Recovery Section, United States Department of Justice, Washington, D.C.; L. Ashley Aull, Chief, Criminal Appeals Section; Nicola T. Hanna, United States Attorney; United States Attorney's Office, Los Angeles, California; for Plaintiff-Appellee.

David L. Zifkin, Boies Schiller Flexner LLP, Santa Monica, California; Matthew L. Schwartz, Boies Schiller Flexner LLP, New York, New York; for Amicus Curiae Qentas Holdings.

**OPINION**

RAWLINSON, Circuit Judge:

Appellant-claimant Tarek Obaid (Obaid) appeals the district court's order denying his motion to dismiss for lack of personal jurisdiction and for lack of proper venue in this civil forfeiture case involving his shares of stock in Palantir Technologies (Palantir), a corporation with its principal place of business in California. Reviewing *de novo*, we affirm the judgment of the district court.

## I. BACKGROUND

Obaid is a citizen of Saudi Arabia, who serves as the chief executive officer of PetroSaudi International (PSI), an oil and gas exploration company. In 2009, PSI entered into a joint venture with 1Malaysia Development Berhad (1MDB), an investment company wholly-owned by the government of Malaysia. 1MDB was created to pursue economic development for the benefit of the Malaysian people. According to the government, 1MDB was riddled with fraud from its inception, as multiple individuals conspired to divert and launder billions of dollars from the fund. From 2009 to 2011, 1MDB and PSI arranged for the fraudulent transfer of more than $1 billion from 1MDB to a Swiss bank account in the name of Good Star Limited (Good Star Account). Jho Low, a Malaysian national, was involved in the creation of 1MDB, and laundered more than $400 million through the Good Star Account into the United States. Low then used the laundered funds to, among other things, purchase luxury items and real estate.

As the chief executive of PSI, Obaid allegedly facilitated the 1MDB and PSI joint venture, including by signing various documents to effectuate the transfers of money into the Good Star Account. Additionally, Obaid personally received $153 million from the Good Star Account that was processed through a bank account in New York and ultimately sent to Obaid's personal account in Switzerland. Relevant to this appeal, Obaid wired $2 million from his account in Switzerland to a bank in California to purchase 2,500,000 shares of Series D preferred stock in Palantir.[1]

As part of its efforts to recoup money fraudulently obtained in the scheme, the government filed this *in rem* civil forfeiture action against Obaid's Palantir shares. In a lengthy complaint, the government alleged that the Palantir shares were forfeitable because they were derived from proceeds traceable to the wire fraud and money laundering scheme involving 1MDB and PSI. Contemporaneous with the action brought against Obaid's Palantir shares, the government filed multiple civil forfeiture suits seeking to reclaim assets such as luxury hotels, yachts, certain movies rights, and expensive real estate in Beverly Hills, connected to the fraudulent scheme. However, it is unclear from the complaint whether—and to what extent—Obaid maintains an ownership interest in the additional assets being sought by the government in the related civil forfeiture actions.

Obaid confirmed his ownership of the Palantir shares and subsequently moved to dismiss the forfeiture action,

---

[1] Because this is an *in rem* action, the defendant in this appeal is property—the Series D Palantir shares. *See United States v. 2,164 Watches, More or Less Bearing a Registered Trademark of Guess?, Inc.*, 366 F.3d 767, 771 (9th Cir. 2004).

contending that the district court lacked personal jurisdiction over him as the property owner.  Obaid also maintained that venue was improper because the disputed res, *i.e.*, the Palantir shares, was not alleged to be located in the Central District of California.  The district court rejected Obaid's argument that personal jurisdiction over him was required to adjudicate rights to the named property.  And the district court concluded that venue was proper in the Central District, reasoning that civil forfeiture actions may be brought in the district "in which any of the acts or omissions giving rise to the forfeiture occurred."  In the district court's view, venue was proper because multiple acts giving rise to the alleged conspiracy occurred in the Central District.

Obaid moved for reconsideration of the district court's rulings and, in the  alternative, to certify the rulings for interlocutory appeal.  The district court denied the motion for reconsideration, but granted the motion to certify its ruling for interlocutory appeal.

## II.  STANDARD OF REVIEW

A district court's rulings on personal jurisdiction and venue are reviewed *de novo*.  *See Myers v. Bennett Law Offices*, 238 F.3d 1068, 1071 (9th Cir. 2001).

## III.   DISCUSSION

Obaid contends that the district court erred when it denied his motion to dismiss for lack of personal jurisdiction. According to Obaid, *in personam* jurisdiction over him was necessary to adjudicate this *in rem* forfeiture action, and the district court was required to apply the minimum contacts standard established by United States Supreme Court

precedent to determine whether he had sufficient contacts with the forum.  Applying that standard, Obaid asserts that he lacked sufficient contacts with the forum to satisfy due process requirements.  Obaid also challenges the district court's determination that venue was proper in the Central District.

### A.  *In Personam* Jurisdiction in an *In Rem* Action

Obaid urges us to conclude that the district court erred when it held that the United States Supreme Court's decision in *Shaffer v. Heitner*, 433 U.S. 186 (1977) does not control the outcome of the jurisdiction issue in this *in rem* civil forfeiture action.  Obaid maintains that *Shaffer* squarely stands for the proposition that *all* assertions of jurisdiction—*in rem*, *quasi in rem*, and *in personam*—must be evaluated according to a minimum contacts standard.

Before delving into the issues in this case, it is helpful to distinguish among the types of potential jurisdiction in federal cases.  "*In personam* jurisdiction, simply stated, is the power of a court to enter judgment against a person."  *SEC v. Ross*, 504 F.3d 1130, 1138 (9th Cir. 2007).  By contrast, *in rem* jurisdiction is the court's power to adjudicate rights over property.  *See id*.  "Jurisdiction *in rem* is predicated on the fiction of convenience that an item of property is a person against whom suits can be filed and judgments entered. . . ." *United States v. Approximately $1.67 Million (US) in Cash, Stock & Other Valuable Assets*, 513 F.3d 991, 996 (9th Cir. 2008) (citation and internal quotation marks omitted).  More nebulous is the concept of *quasi in rem* jurisdiction:

> A *quasi in rem* action is basically a halfway house between *in rem* and *in*

> *personam* jurisdiction. The action is not really against the property; rather, the action involves the assertion of a personal claim against the defendant of the type usually advanced in an *in personam* action and the demand ordinarily is for a money judgment, although in some contexts the objective may be to determine rights in certain property. The basis for transforming the suit from one *in personam* to an action against the defendant's property is the attachment or garnishment of some or all of the property the defendant may have in the jurisdiction.

*Ventura Packers, Inc. v. F/V JEANINE KATHLEEN*, 424 F.3d 852, 860 n.4 (9th Cir. 2005), *as amended* (citations and alteration omitted).

Fortunately, there is no dispute that the underlying action is *in rem* because "[a] forfeiture action is *in rem*." *$1.67 Million*, 513 F.3d at 996 (citation omitted). The Supreme Court recognizes a "sharp distinction between *in rem* civil *forfeitures* and *in personam* civil *penalties* such as fines." *United States v. Ursery*, 518 U.S. 267, 275 (1996). While a civil action to recover penalties is similar to a criminal prosecution in that "it is the wrongdoer in person who is proceeded against, in an *in rem* forfeiture proceeding, it is the property which is proceeded against." *Id.* at 283 (citation, alteration, and internal quotation marks omitted). Thus in a civil forfeiture proceeding *in rem*, "jurisdiction [is] dependent upon seizure of a physical object." *Id.* at 277 (citation omitted). Here, the focus is on the district court's jurisdiction over the property in dispute, *i.e.*, Obaid's Palantir shares. *See Ross*, 504 F.3d at 1138.

To resolve this case we must decide which of two cases is the more pertinent precedent. The first is *Shaffer*, which involved a Delaware shareholder derivative suit against Greyhound Corporation, as well as its officers and directors. *See* 433 U.S. at 189–90. In conjunction with his action, the plaintiff moved to sequester the Delaware property—stock in Greyhound Corporation—of the individual defendants. *See id.* at 190–91. Under Delaware law, the primary purpose of "sequestration" was to use the property as a basis to "compel the personal appearance of a nonresident defendant to answer and defend a suit brought against him in a court of equity." *Id.* at 193 (citation omitted). The individual defendants challenged the suit on personal jurisdiction grounds, contending that they lacked sufficient contacts with Delaware to satisfy the jurisdictional requirements of *International Shoe Co. v. Washington*, 326 U.S. 310 (1945). *See Shaffer*, 433 U.S. at 192–93. The Delaware Supreme Court rejected the defendants' argument, holding that the *quasi in rem* jurisdiction was predicated "on the presence of capital stock [in Delaware], not on prior contact by defendants with this forum." *Id.* at 195 (quoting *Greyhound Corp. v. Heitner*, 361 A.2d 225, 229 (Del. 1976)).

The United States Supreme Court reversed the ruling of the Delaware courts *See id.* In the Supreme Court's view, the same precepts that govern *in personam* jurisdiction, "fair play and substantial justice," also applied in *Shaffer* because "judicial jurisdiction over a thing, is a customary elliptical way of referring to jurisdiction over the interests of persons in a thing." *Id.* at 207 (citation, footnote reference, and internal quotation marks omitted). Logically, this means that "in order to justify an exercise of jurisdiction *in rem*, the basis for jurisdiction must be sufficient to justify exercising jurisdiction over the interests of persons in a thing." *Id.*

(footnote reference and internal quotation marks omitted). "The standard for determining whether an exercise of jurisdiction over the interests of persons is consistent with the Due Process Clause is the minimum-contacts standard elucidated in *International Shoe*." *Id*. The Supreme Court thus concluded that "all assertions of state-court jurisdiction must be evaluated according to the standards set forth in *International Shoe* and its progeny." *Id*. at 212 (footnote reference omitted).

Left with this conclusion from *Shaffer*, one might deduce that Obaid's position carries the day. But not so fast. Another Supreme Court decision, *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440 (2004), decided some twenty-five years after *Shaffer*, has something to say about *in rem* jurisdiction and it does not say the same thing that *Shaffer* seemingly says.

The Tennessee Student Assistance Corporation (TSAC) is a government agency that administers student assistance programs in the state of Tennessee. *See id*. at 443. Among other things, TSAC guarantees student loans to residents of Tennessee. *See id*. at 444. Hood was one such resident, and she signed promissory notes for loans guaranteed by TSAC. *See id*. Years after receiving the loans, Hood filed a "no asset" bankruptcy petition. She did not mention her student loans and those debts were not included in her discharge. *See id*. Hood then reopened her bankruptcy petition for the limited purpose of seeking a discharge of her student loans pursuant to the "undue hardship" provision of the Bankruptcy Code. *See id*. TSAC was named as a defendant. *See id*. at 445.

TSAC filed a motion to dismiss Hood's complaint for
lack of jurisdiction, on the basis of the state's sovereign
immunity under the Eleventh Amendment. *See id*. The
bankruptcy court, Sixth Circuit Bankruptcy Appellate Panel,
and the Sixth Circuit all agreed that states have no immunity
from suit in the bankruptcy context. *See id*.

The Supreme Court granted certiorari and affirmed. *See
id*. at 443. Rather than addressing the "broader question" of
whether states have no immunity from suit in the bankruptcy
context, the Court addressed the narrower question of
whether discharge of a student loan debt implicated Eleventh
Amendment immunity. *See id.* at 445. The Court's answer
to this question was "no." *See id*.

To resolve this question, the Court first clarified that
"[t]he discharge of a debt by a bankruptcy court is . . . an *in
rem* proceeding and that [b]ankruptcy courts have exclusive
jurisdiction over a debtor's property." *Id*. at 447 (citations
omitted). The Court noted that its precedent "has drawn a
distinction between *in rem* and *in personam* jurisdiction, even
when the underlying proceedings are, for the most part,
identical." *Id*. at 453. For the purpose of adjudicating the
discharge claim, the bankruptcy court's "jurisdiction is
premised on the res, not on the persona." *Id*. at 450. The
Court concluded that the case did not implicate the Eleventh
Amendment because the bankruptcy court's *in rem*
jurisdiction "allows it to adjudicate the debtor's discharge
claim without *in personam* jurisdiction over the State." *Id*. at
453 (citation omitted). "The bankruptcy court's *in rem*
jurisdiction permits it to determine all claims that anyone,
whether named in the action or not, has to the property or
thing in question. . . . *Id*. at 448 (citation, alteration, and
internal quotation marks omitted). This conclusion follows

because in an *in rem* action, "jurisdiction over the person is irrelevant if the court has jurisdiction over the property." *Id.* (citation omitted). The Court emphasized that Hood did not ask the bankruptcy court to exercise personal jurisdiction; she simply wanted "a determination of the dischargeability of her debt." *Id.* For that reason, the Eleventh Amendment was not implicated and the denial of TSAC's motion to dismiss was upheld. *See id.* at 455.

Neither of these two cases is precisely on point. *Shaffer* addressed a *quasi in rem* proceeding rather than a true *in rem* proceeding. *See Ventura Packers*, 424 F.3d at 860 n.4 (describing a *quasi in rem* proceeding as "a halfway house between *in rem* and *in personam* jurisdiction" with the "action not really against the property" but more "a personal claim . . . of the type usually advanced in an *in personam* action"). As noted in *Shaffer*, the primary purpose of sequestration was "not to secure possession of property" but to "compel the personal appearance of a nonresident defendant to answer and defend a suit brought against him in a court of equity." 433 U.S. at 193 (citation omitted). In other words, "the only role played by the property [was] to provide the basis for bringing the defendant into court." *Id.* at 209 (footnote reference omitted). Indeed, once the defendant made a general appearance before the court, the res was released. *See id.* at 193. Unlike in a true *in rem* proceeding, the seized property "[was] not the subject matter of [the] litigation, nor [was] the underlying cause of action related to the property." *Id.* at 213. Thus, despite the Court's reference to *in rem* proceedings, it is apparent from its

analysis that *Shaffer* is limited to *quasi in rem* proceedings.[2] There is no dispute that civil forfeiture does not involve the *quasi in rem* proceedings contemplated by *Shaffer*, in which the "action is not really against the property; rather, the action involves the assertion of a personal claim against the defendant of the type usually advanced in an *in personam* action." 4A C. Wright & A. Miller, Federal Practice and Procedure § 1070 (4th ed. 2020).

This conclusion is supported by the failure of the Court to expressly overrule its longstanding precedent anchoring *in rem* jurisdiction to the presence of the res. *See, e.g., Republic Nat. Bank of Miami v. United States*, 506 U.S. 80, 84 (1992) ("Certainly, it long has been understood that a valid seizure of the res is a prerequisite to the initiation of an *in rem* civil forfeiture proceeding. . . .") (citations omitted); *see also Kline v. Burke Constr. Co.*, 260 U.S. 226, 229 (1922) ("Where the action is in rem the effect is to draw to the federal court the possession or control, actual or potential, of the res . . ."); *Overby v. Gordon*, 177 U.S. 214, 221 (1900) ("An essential characteristic of a proceeding *in rem* is that there must be a *res* or subject-matter upon which the court is to exercise its jurisdiction. . . .").

---

[2] *See also* James Weinstein, *The Federal Common Law Origins of Judicial Jurisdiction*, 90 Va. L. Rev. 169, 246 & n.28 (2004) ("In continuing the common law process that gave rise to the *in rem* rules in the first place, the Court has, for a variety of reasons (including forum state interest, history, and considerations of individual fairness), decided that most of the traditional *in rem* rules continue to square with its vision of how state judicial authority should be allocated in our federal system. Only where changed circumstances have rendered a traditional practice outmoded and dysfunctional, as was the case with attachment jurisdiction [in *Shaffer*], has the Court, in the best common law tradition, declared the practice invalid.").

It would be "exceeding strange"**3** if the Supreme Court intended to eliminate the historical distinction between *in personam* and *in rem* jurisdiction without explicitly saying so. *See United States v. Ten Thousand Dollars*, 860 F.2d 1511, 1513 (9th Cir. 1988) (applying "traditional *in rem* principles" in a forfeiture action).**4** We should not assume that the Supreme Court has implicitly overruled its precedent. *See Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000) ("This Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*. . . ."). In our view, the more reasonable interpretation of *Shaffer* limits it to the scenario presented to the Court—a *quasi in rem* statutory scheme.

The Supreme Court evidently did not sweep away traditional *in rem* principles in *Shaffer*, as it relied on those same principles almost thirty years later in *Hood* to conclude that "the bankruptcy court's jurisdiction is premised on the res, not on the persona." *Hood*, 541 U.S. at 450. We are persuaded that *Hood* provides more direct guidance for the issue we are called upon to decide. Unlike in *Shaffer*, *Hood* involved a true *in rem* case. In this case and in *Hood*, the res is the subject of the action, not a substitute for the *person* who is the subject of the action. *See Shaffer*, 433 U.S. at 213 (explaining that the property was "not the subject matter of this litigation").

---

**3** William Shakespeare, The Merchant of Venice, Act 1, Scene 1. The dissent maintains that the Supreme Court "explicitly said" that it was overruling decades of precedent governing *in rem* jurisdiction. *Dissenting Opinion*, p.38–39. However, it is notable that the dissent does not point to one *in rem* case that the Supreme Court overruled in *Shaffer*.

**4** The dissent ignores this language in its citation of this case. *See Dissenting Opinion*, p.40.

The dissent's attempt to restrict *Hood's* application of traditional *in rem* principles to bankruptcy cases where the absent party is the creditor, rather than the debtor, is unpersuasive. The Court was clear that its jurisdiction was "premised on the res," *see Hood*, 541 U.S. at 448, and that "jurisdiction over the person is irrelevant if the court has jurisdiction over the property." *Id.* at 453 (citation omitted). Contrary to the characterization in the dissent of our "misunderstanding of the nature of bankruptcy proceedings" and our misreading of *Hood*, *Dissenting Opinion*, 34, we fully understand and faithfully apply the statutory bankruptcy scheme as interpreted by the Supreme Court in *Hood*. Under 28 U.S.C. § 1334(e), bankruptcy courts have "exclusive jurisdiction of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate." Thus, *in rem* bankruptcy jurisdiction "essentially creates a fiction that the property—regardless of actual location—is *legally* located within the jurisdictional boundaries of the district in which the court sits." *Beck v. Fort James Corp.* (*In re Crown Vantage, Inc.*), 421 F.3d 963, 971 (9th Cir. 2005) (citation omitted) (emphasis in the original).[5] The jurisdictional statute here creates a similar legal fiction, providing that a "forfeiture action or proceeding may be brought in the district court for the district in which any of the acts or omissions giving rise to the forfeiture occurred," even if the property is located in a foreign country. 28 U.S.C. § 1355(b).

---

[5] The dissent elides our reliance on this precedent, preferring to reference only a treatise cited in *Hood*. *See Dissenting Opinion*, p.36. The dissent's only attempted response to the express language in *Hood* is to seek to blunt its impact through resorting to "context." *Id.*

The discharge of a debt by a bankruptcy court is "an *in rem* proceeding." *Hood*, 541 U.S. at 447. Although the bankruptcy court's discharge order "operat[es] as an injunction to prohibit creditors from attempting to collect or to recover the debt," the court need not have personal jurisdiction over the creditor. *Id*.[6]

If we adopt the broad reasoning of *Shaffer* advocated by Obaid and the dissent, we would be discarding a longstanding body of Supreme Court authority. We hasten to add that we do not read *Hood* as overruling or purporting to overrule *Shaffer*. Rather, we conclude that each survives in its respective sphere: *Shaffer* in the realm of *quasi in rem* jurisdiction and *Hood* in the realm of *in rem* jurisdiction.[7]

---

[6] The dissent states that "[n]othing in *Hood* suggests that a court may exercise *in rem* jurisdiction without personal jurisdiction over the owner of the res." *Dissenting Opinion*, p. 36. But *Hood* is clear that *in rem* jurisdiction is "premised on the res, not on the persona"—this statement would make no sense if the personal jurisdiction is also necessary. 541 U.S at 450. The "owner of the res" is "persona" not "res." *In rem* jurisdiction does not include an additional personal jurisdiction requirement over the debtor: the debtor filed the petition and 28 U.S.C. § 1334(e) provides the bankruptcy court with "exclusive jurisdiction of all the property . . . of the debtor . . . and of property of the estate." In accordance with traditional *in rem* principles, jurisdiction over property is all that is required. *See also United States v. Gurley*, 434 F.3d 1064, 1068 (8th Cir. 2006) (holding that when the "government, as a creditor, asserted a right to payment" through filing a proof of claim in debtor's bankruptcy proceeding, "there was no need to establish personal jurisdiction over" the debtor "[b]ecause it was an *in rem* proceeding").

[7] Contrary to the dissent's unpersuasive reading of *Hood*, *see Dissenting Opinion*, p.36, everything in *Hood* points to the court's *in rem* jurisdiction without regard to personal jurisdiction over the owner of the res. *See* 541 U.S. at 447.

The dissent concedes that in the forty-plus years since *Shaffer* was decided, no court has dismissed a civil forfeiture action for lack of personal jurisdiction over a claimant. *See Dissenting Opinion*, p.43 n.12. The dissent attempts to minimize this fact by saying that "this is to be expected." *See id.* We beg to differ. Generally, when the Supreme Court makes a sweeping change in a fundamental legal theory, there is a tsunami of reversals in the lower courts applying the new precedent. One need only compare the legal aftermath of the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), to make the point. *Iqbal* redefined the pleading standards under Rule 8 of the Federal Rules of Civil Procedure, *see id.* at 678–80, and prompted a barrage of dismissals. *See* Daniel W. Robertson, *In Defense of Plausibility: Ashcroft v. Iqbal and What the Plausibility Standard Really Means*, 38 Pepp. L. Rev. 111, 140 (2010) ("In the few months since the decision in *Iqbal* came down, it has resulted in the dismissal of 1500 district court and 100 appellate court cases, many if not most of which would probably have survived; more dismissals are pending.") (citation omitted).

Nevertheless, we acknowledge that two of our sister circuits have noted in passing that *Shaffer* requires a minimum contacts analysis in an *in rem* proceeding. In *United States v. Batato*, 833 F.3d 413 (4th Cir. 2016), on which the dissent relies to support its reading of *Shaffer*, the Fourth Circuit acknowledged that "*Shaffer* provides only limited guidance as to how to proceed." *Id.* at 423. Contrary to the dissent's contention that the Court "applied" *Shaffer* to require satisfaction of *International Shoe* in an *in rem* action, the *Batato* panel "assume[d] without deciding that a traditional, state-based minimum contacts approach is

appropriate" in a forfeiture action. *Id.* (footnote reference omitted).[8]

Obaid also cites a Second Circuit case, *LiButti v. United States*, 178 F.3d 114 (2d Cir. 1999), for the proposition that "*in rem* jurisdiction cannot lie to adjudicate ownership of shares owned by a non-resident . . . when the shareowner lacks minimum contacts with the forum." But the Second Circuit's holding was not as sweeping as Obaid contends.

*LiButti* involved litigation over the ownership of a racehorse, "Devil His Due." *Id.* at 116. When the IRS issued a levy against the horse, contending that LiButti owned it, his daughter brought a wrongful levy action, claiming that she, not her father, was the owner. *See id.* at 116–17. While the case was pending on appeal, the daughter entered into a syndicate agreement dividing ownership of the horse into shares, half of which were sold to a third party. *See id.* at 117. When the IRS ultimately prevailed on appeal, it sought restitution for the full value of "Devil His Due" from the daughter and the third party. *Id.* at 118. The Second Circuit determined that the third party could not be compelled to pay restitution because the court had no personal or *in rem* jurisdiction under a minimum-contacts analysis. *See id.* at 122–23. Contrary to Obaid's contention, the court did not dismiss the *in rem* action for lack of jurisdiction—it upheld the determination about the ownership of the horse, notwithstanding any lack of jurisdiction over the third party claimant. *See id.* at 120. The court simply held that the third

---

[8] Faced with these explicit statements from the *Batato* decision, the dissent again falls back on "context" to spin its analysis. *Dissenting Opinion*, p.40 n.9.

party could not be ordered to reimburse the IRS.  *See id.*
at 122–23.[9]

We are not persuaded by the lukewarm discussion of
*Shaffer* by the Fourth Circuit and the Second Circuit.  Neither
are the other cases cited by the dissent of sufficient
persuasive value to undermine our analysis of the *Shaffer*
decision.  For starters, not one of the cases cited by the
dissent involves a civil forfeiture action, which is governed
by a statute expressly allowing a forfeiture action to be
brought in any district "in which any of the acts or omissions
giving rise to the forfeiture occurred," even if the property "is
located in a foreign country."  28 U.S.C. § 1355(b)(1)(A),
(b)(2).  Consequently none of the cases, or the dissent for that
matter, grapples with the application of *Shaffer* to civil
forfeiture proceedings brought under a statute conferring
exclusive jurisdiction.  A brief discussion of each of the cases
confirms this observation.

- *Inland Credit Corp. v. M/T Bow Egret*, 556 F.2d 756,
  757 (5th Cir. 1977) - admiralty case brought *in rem*
  against the vessel and *in personam* against the owner
  of the vessel.  Cites *Shaffer* for its "philosophy"
  without analysis and notes that it was decided "in a
  quite different context"—but did not apply *Shaffer*.
  *Id.*  The dissent quotes an order denying a petition for
  rehearing.  The underlying opinion expressly declined
  to address the question:  "We need not decide in the
  present case whether the philosophical underpinnings
  of the system of in rem jurisdiction in admiralty have

---

[9] The dissent once more resorts to analytic gyrations in an effort to
twist the Second Circuit decision to more closely mirror *Shaffer*.  *See
Dissenting Opinion*, p.40 n.9.

been critically shaken. . . ." 552 F.2d 1148, 1152 (5th Cir. 1977).

- *Pickens v. Hess*, 573 F.2d 380, 387 (6th Cir. 1978) - a case addressing *in personam* jurisdiction. Cites *Shaffer* in a *see also* citation, without analysis, to support the proposition that the modern view of jurisdiction does not "herald[] the eventual demise of all restrictions on the personal jurisdiction of state courts." *Id.* (citation omitted).

- *Lakeside Bridge & Steel Co. v. Mountain State Const. Co., Inc.*, 597 F.2d 596, 600–02 (7th Cir. 1979) - a case addressing *in personam* jurisdiction. Restates the holding of *Shaffer*, without analysis, to support application of *International Shoe* to the question of *in personam* jurisdiction over a non-resident defendant, not jurisdiction over a res. Characterizes the Delaware court's exercise of jurisdiction as "in rem jurisdiction to sequester shares of stock and stock options" even though the action was *quasi in rem*. *Id.* at 601.

- *Salazar v. Atlantic Sun*, 881 F.2d 73, 76, 80 (3d Cir. 1989) - admiralty case. Distinguishes *Shaffer* on the basis that *Shaffer* did not arise "in the admiralty context," and rejected a due process claim raised by the owner. *Id.* at 76.

- *Pittsburgh Terminal Corp. v. Mid Allegheny Corp.*, 831 F.2d 522, 525 (4th Cir. 1987) - a case addressing *in personam* jurisdiction. Recognizes that *International Shoe* addresses *in personam* jurisdiction and agrees with our interpretation that in *Shaffer*, "the

litigation there was not related to the property [and] the only role played by the property was to bring the defendants before the court." *Id.* at 526.

As stated previously, not one of the cited cases purported to address civil forfeiture proceedings. Thus, the dissent's declaration of a circuit conflict is much exaggerated, particularly in view of the lack of any mention in *Shaffer* of overruling the legion of cases embodying principles of *in rem* jurisdiction. And the Supreme Court has continued to recognize *in rem* jurisdiction predicated on presence of the res in civil forfeiture proceedings post-*Shaffer*. *See, e.g.*, *Republic Nat. Bank of Miami v. United States*, 506 U.S. 80, 84–85 (1992). We are persuaded that *Hood* supports our view that *Shaffer* is limited to *quasi in rem* actions and does not extend to *in rem* actions. *See Hood*, 541 U.S. at 453 (noting the distinction in Supreme Court precedent between *in rem* and *in personam* jurisdiction).[10]

---

[10] The law review articles cited by the dissent—all of them published before the Supreme Court's decision in *Hood*—are similarly unpersuasive on the issue of jurisdiction in forfeiture proceedings. At best, commentators at the time confirmed that the effect of *Shaffer* on *in rem* forfeiture proceedings is uncertain. *See, e.g.*, Andreas Lowenfeld, *In Search of the Intangible: A Comment on Shaffer v. Heitner*, 53 N.Y.U.L. Rev. 102 (1978) ("The debate goes on whether *Shaffer v. Heitner* really overruled *Pennoyer v. Neff* [95 U.S. 714 (1878)], whether *Seider v. Roth* [216 N.E.2d 312 (N.Y. 1966)] can survive after *Shaffer*, [and] whether one can build an effective structure to enforce judgments obtained in forum 1 against assets maintained in (or removed to) forum 2. . . ."); Angela M. Bohmann, *Applicability of* Shaffer *to Admiralty in Rem Jurisdiction*, 53 Tul. L. Rev. 135, 141 (1978–79); Kenneth G. Whyburn, *Attachment Jurisdiction After* Shaffer v. Heitner, 32 Stan. L. Rev. 167, 167 n.1 (1979).

## B. Venue

Under 28 U.S.C. § 1355(b)(1)(A), in a civil forfeiture action venue is appropriate in "the district court for the district in which any of the acts or omissions giving rise to the forfeiture occurred." The government emphasizes that the words "any acts" encompass acts committed in furtherance of the conspiracy. Obaid responds that this interpretation is too broad. In contrast, he focuses on the "giving rise to the forfeiture" language of section 1355. Under his interpretation, only a specific criminal act that took place in the Central District, directly implicating the Palantir shares, would establish venue.

We conclude that Obaid's preferred interpretation is much too narrow and ignores the antecedent language in section 1355 permitting venue in the district where "any acts" of the conspiracy occurred. 28 U.S.C. § 1355(b)(1)(A). His interpretation is also inconsistent with the legislative history of section 1355. The Congressional analysis of section 1355(b)(1) explained that its enactment "would be a great improvement over current law," because the government would no longer be compelled "to file separate forfeiture actions in each district in which the subject property is found." 137 Cong. Rec. 31538 (Nov. 13, 1991). Contrary to Obaid's assertion, section 1355(b)(1) broadened, not narrowed, the scope of civil forfeiture suits "by providing that the court in the district where the acts giving rise to the forfeiture occurred has jurisdiction over the forfeiture action." *Id.*

The threshold inquiry under section 1355 is whether "sufficient acts . . . giving rise to the forfeiture" took place in the Central District. *$1.67 Million*, 513 F.3d at 996. As

alleged, the Palantir shares were purchased using funds traceable to a $700 million transfer to the Good Star Account as part of the 1MDB scheme. Some of the alleged acts in furtherance of the conspiracy were conducted in the Central District, including expensive real estate purchases in Beverly Hills, the financing of a motion picture, and the purchase of the Palantir shares. Purchasing real estate in Beverly Hills and shares of stock in Palantir are not *per se* criminal acts. However, if the purchases were a mechanism to launder proceeds in furtherance of the 1MDB scheme, "sufficient acts" giving rise to the forfeiture occurred in the Central District, thus making venue proper. *See id.* We thus conclude that the conspiratorial activity in the Central District was sufficient to support venue in that district, given "the relatively low standard set forth in section 1355." *Batato*, 833 F.3d at 420.

Finally, Obaid's assertion that the actions of third parties in the Central District (co-conspirators) cannot serve as a proxy to establish venue based on *his conduct*, misses the point. This civil forfeiture action is not premised on Obaid's conduct; rather, the action is predicated on whether the Palantir shares, *i.e.*, the res, are traceable to the proceeds of a crime. *See Ross*, 504 F.3d at 1138. Accordingly, whether Obaid was involved in the conspiracy is immaterial to the venue analysis.

## IV.    *CONCLUSION*

The Supreme Court decision in *Hood* supports our conclusion that the district court did not err when it determined that the constitutional due process requirements set forth in *International Shoe* were inapplicable to this *in rem* action. The Court's decision in *Shaffer* addressed *quasi-*

*in-rem* actions rather than *in rem* actions directed solely toward a res instead of property seized as a substitute for the defendant. In an *in rem* action, the focus for the jurisdictional inquiry is the res, in this case Obaid's Palantir shares, rather than Obaid's personal contacts with the forum.[11] Finally, venue was proper because sufficient acts giving rise to the civil forfeiture occurred in the Central District.

**AFFIRMED.**

---

IKUTA, Circuit Judge, dissenting:

With one stroke, the majority has swept away *Shaffer v. Heitner*, the Supreme Court's landmark decision ensuring that "traditional notions of fair play and substantial justice" apply to all persons with property subject to adjudication, regardless of the Latin label attached to the proceeding. 433 U.S. 186, 212 (1977). *Shaffer* held that a court cannot extinguish a person's property rights unless it first obtains personal jurisdiction over that person, and eliminated a 100-year-old rule to the contrary as "fundamentally unfair." *Id.* Instead of applying *Shaffer*, the majority applies the principles of in rem jurisdiction that *Shaffer* rejected as lacking "substantial modern justification." *Id.* In doing so, the majority creates a split with two circuits that have faithfully applied *Shaffer* and seven circuits that have expressly construed it to cover ordinary in rem proceedings. The majority's attempt to

---

[11] Because we conclude that the district court correctly determined that *Shaffer* did not extend to this *in rem* action, we do not address whether Obaid had sufficient contacts with the forum as to satisfy the constitutional due process requirements set forth in *International Shoe*.

bolster its opinion with an irrelevant bankruptcy case, *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440 (2004), is unavailing. Because *Shaffer* adopted a principle of fairness and equity that the majority now ignores, I dissent.

## I

Obaid, a resident of Saudi Arabia and Switzerland, purchased 2.5 million shares of stock in Palantir Technologies Inc. by wiring funds to Palantir's bank in Northern California. Obaid states that the Palantir stock certificate is currently held by a bank in Switzerland. Although the government argues that the shares are deemed to be present in Delaware as a matter of Delaware law, there is no dispute that the shares are not in California.[1]

The government commenced a forfeiture action to gain possession of the Palantir shares on the grounds that Obaid had been engaged in a criminal conspiracy and the Palantir shares were traceable to funds indirectly linked to the conspiracy. The government brought this suit in the Central District of California based on a statute allowing a forfeiture action to be brought where "any of the acts or omissions giving rise to the forfeiture occurred," even when the assets subject to forfeiture are located in a foreign country. 28 U.S.C. § 1355(b)(1)(A), (b)(2). In this case, the specific acts "giving rise to the forfeiture" that allegedly took place in

---

[1] For this reason, the majority's suggestion that it is merely honoring "the historical distinction between *in personam* and *in rem* jurisdiction," Maj. at 15, is incorrect. Whereas traditional in rem principles gave courts jurisdiction "based on the court's power over property within its territory," *Shaffer*, 433 U.S. at 199, there is no dispute that Obaid's Palantir shares are neither within the court's territory nor its control.

the Central District of California are vague.  According to the government, certain conspirators not including Obaid, while engaged in a phase of the alleged criminal conspiracy not involving Obaid, used proceeds generated by the conspiracy to purchase property in Beverly Hills and then sent emails abroad.  Over Obaid's objections, the district court ruled it had in rem jurisdiction over the Palantir shares, even though it lacked personal jurisdiction over Obaid.  This interlocutory appeal followed.

## II

Does a district court have jurisdiction over a person's property solely because alleged co-conspirators took some actions within the court's territorial jurisdiction?  Forty years ago, the Supreme Court decisively said no—that jurisdiction over Obaid's property in such circumstances "is fundamentally unfair to the defendant" and offends "[t]raditional notions of fair play and substantial justice." *Shaffer*, 433 U.S. at 212.  Contrary to the majority's efforts to minimize *Shaffer v. Heitner*, this decision constituted a dramatic shift in the Supreme Court's jurisprudence.

### A

In *Shaffer*, a plaintiff filed a shareholder derivative suit in Delaware against a corporation and various individual defendants, and at the same time obtained an order sequestering the individual defendants' Delaware property. *Id*. at 190–91.  The defendants argued that the sequestration order violated their due process rights because they lacked sufficient contacts with Delaware. *Id.* at 193.  The Delaware court rejected this argument, relying on a state statute that authorized courts to sequester property in order to compel the

personal appearance of a nonresident defendant; under this statute, the Delaware court had quasi in rem jurisdiction. *Id.* at 193–94.

The Supreme Court reversed, and used the case as a vehicle for radically reformulating the law of in rem jurisdiction.

The Court first explained the historical roots of in personam and in rem jurisdiction. Under "the century-old case of *Pennoyer v. Neff*," a court's authority was based on its "power over either persons or property." *Id.* at 196, 199 (citing 95 U.S. 714 (1878)). If the court's jurisdiction was based on its authority over the person, the court had "in personam" jurisdiction; if "based on the court's power over property within its territory," the court had "in rem" or "quasi in rem" jurisdiction. *Id.* at 199. Although the Court recognized the difference between judgments in rem and quasi in rem,[2] that distinction did not affect its analysis. The Court explained that it would "for convenience generally use

---

[2] The Court explained:

> A judgment in rem affects the interests of all persons in designated property. A judgment quasi in rem affects the interests of particular persons in designated property. The latter is of two types. In one the plaintiff is seeking to secure a pre-existing claim in the subject property and to extinguish or establish the nonexistence of similar interests of particular persons. In the other the plaintiff seeks to apply what he concedes to be the property of the defendant to the satisfaction of a claim against him.

*Shaffer*, 433 U.S. at 199 n.17.

the term 'in rem' in place of 'in rem and quasi in rem.'" *Id.* at 199 n.17.

*Shaffer* then described the development of in personam jurisdiction. After *Pennoyer*, courts asserted personal jurisdiction over a defendant when the defendant was not present within the state only in certain limited circumstances. *Id*. at 200–02. But *International Shoe Co. v. Washington* dramatically expanded jurisdiction over absent defendants. *See id*. at 203–04 (citing *International Shoe*, 326 U.S. 310, 317–19 (1945)). Under *International Shoe*, due process did not require the defendant's presence. A defendant "not present within the territory of the forum" could be subject to a judgment in personam so long as he had "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* at 203 (quoting *International Shoe*, 326 U.S. at 316). Accordingly, "the relationship among the defendant, the forum, and the litigation, rather than the mutually exclusive sovereignty of the States on which the rules of *Pennoyer* rest, became the central concern of the inquiry into personal jurisdiction." *Id.* at 204.[3]

*Shaffer* then turned to the law of in rem jurisdiction. The Court recognized that "[n]o equally dramatic change [had]

---

[3] *International Shoe*'s conclusion that personal jurisdiction must be based on the relationship among the defendant, forum, and litigation led to the development of two categories of personal jurisdiction: (1) general jurisdiction, where defendants' "affiliations with the State are so continuous and systematic as to render them essentially at home in the forum State," and (2) specific jurisdiction, where defendants' "in-state activities" are "enough to subject [them] to jurisdiction in that State's tribunals with respect to suits relating to that in-state activity." *Daimler AG v. Bauman*, 571 U.S. 117, 126–27 (2014).

occurred in the law governing jurisdiction in rem." *Id.* at 205. But the Court stated it intended to effect such a change, announcing that "the time is ripe to consider whether the standard of fairness and substantial justice set forth in *International Shoe* should be held to govern actions in rem as well as in personam." *Id.* at 206.

*Shaffer* had no difficulty concluding that the answer to this question was yes. According to the Court, "the same test of 'fair play and substantial justice'" discussed in *International Shoe* should apply to exercises of both in personam and in rem jurisdiction. *Id*. at 207. This is because "[a]ll proceedings, like all rights, are really against persons." *Id.* at 207 n.22 (quoting *Tyler v. Court of Registration*, 175 Mass. 71, 76 (1900) (Holmes, C.J.)). The only functional difference between an in rem and in personam proceeding is "the number of persons affected." *Id.*[4] Therefore, going forward, any "exercise of jurisdiction over the interests of persons" would have to meet "the minimum-contacts standard elucidated in *International Shoe*" in order to be "consistent with the Due Process Clause." *Id.* at 207. As with in personam jurisdiction, "the relationship among the defendant, the forum, and the litigation, rather than the mutually exclusive sovereignty of the States on which the rules of *Pennoyer* rest," would determine whether a court has in rem jurisdiction "over the interests of persons in a thing." *Id.* at 204, 207 (internal quotation marks omitted).

Having announced the new rule governing in rem jurisdiction, *Shaffer* considered and rejected the arguments

---

[4] As discussed above, in personam proceedings impose personal obligations on defendants, but in rem proceedings may affect all persons with an interest in the property. *Id.* at 199 n.17.

raised against such a change. Most important, *Shaffer* brushed aside "the long history of [in rem] jurisdiction based solely on the presence of property in a State." *Id*. at 211. The Court declared it was not bound by precedent "supporting the proposition that jurisdiction based solely on the presence of property satisfies the demands of due process." *Id*. at 212. That obsolete idea had to be rejected, because "'[t]raditional notions of fair play and substantial justice' can be as readily offended by the perpetuation of ancient forms that are no longer justified as by the adoption of new procedures that are inconsistent with the basic values of our constitutional heritage." *Id.* As to in rem jurisdiction in particular, "[t]he fiction that an assertion of jurisdiction over property is anything but an assertion of jurisdiction over the owner of the property supports an ancient form without substantial modern justification," and "[i]ts continued acceptance would serve only to allow state-court jurisdiction that is fundamentally unfair to the defendant." *Id*.

*Shaffer* also rejected the argument that its departure from precedent would eliminate jurisdiction in too many cases. As the Court explained, "jurisdiction over many types of actions which now are or might be brought in rem would not be affected by a holding that any assertion of state-court jurisdiction must satisfy the *International Shoe* standard," *id*. at 208, because "the presence of property in a State may bear on the existence of jurisdiction by providing contacts among the forum State, the defendant, and the litigation," *id.* at 207. Where "claims to the property itself are the source of the underlying controversy between the plaintiff and the defendant, it would be unusual for the State where the property is located not to have jurisdiction." *Id.*

Encapsulating its rejection of 100 years of precedent, the Court stated: "We therefore conclude that *all* assertions of state-court jurisdiction must be evaluated according to the standards set forth in *International Shoe* and its progeny." *Id.* at 212 (emphasis added). Applying its new rule to the facts before it, the Court concluded that "Delaware's assertion of jurisdiction" was "inconsistent" with the Due Process Clause. *Id.* at 216–17.

## B

*Shaffer* is directly on point here. The government's forfeiture action against Obaid's Palantir stock under the civil forfeiture statute, 18 U.S.C. § 981(a)(1), is an in rem proceeding. Under the statute, the government "begins a judicial civil forfeiture action by filing an in rem complaint against the property." *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 634 (9th Cir. 2012). The district court then adjudicates the interests of any persons claiming an ownership interest in the property. 18 U.S.C. § 983(a)(4). If the government prevails, title to the property vests in the government. *See United States v. Spahi*, 177 F.3d 748, 754 (9th Cir. 1999) (citing *United States v. 92 Buena Vista Ave.*, 507 U.S. 111, 125 (1993)) ("under the forfeiture statutes," the United States "is required to perfect title by legal action before title may vest.").[5]

---

[5] Although a forfeiture judgment under § 981 "relates back" to when the offense was committed, *see* 18 U.S.C. § 981(f), "[w]here there is no such judgment the government acquires no title or interest in the property," 1 David B. Smith, Prosecution and Defense of Forfeiture Cases ¶ 3.05[2] (Matthew Bender). In other words, a § 981 forfeiture proceeding adjudicates property not yet owned by the government.

Under *Shaffer*, the district court's jurisdiction over the property subject to an in rem complaint constitutes an "assertion of jurisdiction over *the owner* of the property." 433 U.S. at 212 (emphasis added).[6]   Therefore, *Shaffer* requires the district court to apply the minimum contacts framework to each person who claims ownership of the property.  *Id*.  Here, it is undisputed that Obaid is the owner of the seized Palantir shares.  Under *Shaffer*, therefore, the district court must consider whether Obaid has "minimum contacts" with the forum such that "the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  *International Shoe*, 326 U.S. at 316. The district court did not address this question of minimum contacts, and the answer is not obvious:  the government argues that Obaid has sufficient contacts with the United States as a whole to confirm the court's jurisdiction under 28 U.S.C. § 1355(b), while Obaid argues that the court must find that he has sufficient contacts with California.  We should remand to the district court to address that question and conduct the required minimum contacts analysis.

### III

The majority acknowledges that "one might deduce" from *Shaffer* that "Obaid's position carries the day."  Maj. at 11. But the majority then concludes that the Supreme Court undermined (or overturned) *Shaffer*'s groundbreaking expansion of "fair play and substantial justice" when it decided a subsequent bankruptcy case, *Tennessee Student*

---

[6] The conclusion that the court is asserting jurisdiction over Obaid is particularly compelling where, as here, the court's authority over the res is merely a legal fiction:  the Palantir shares are not within either the territory or control of the district court.

*Assistance Corp. v. Hood*, 541 U.S. 440 (2004). According to the majority, *Hood* stands for the proposition that a court may continue to assert jurisdiction over the property rights of an absent owner so long as it has in rem jurisdiction over the property itself. Maj. at 12–13, 15.

The majority's reading of *Hood* is incorrect because it is based on a misunderstanding of the nature of bankruptcy proceedings. In *Hood*, a debtor sought a determination that her student loans were dischargeable under 11 U.S.C. § 523(a)(8), which provides that a bankruptcy court cannot discharge a student loan guaranteed by a governmental unit unless the court determines that allowing the debt to survive would impose an "undue hardship" on the debtor. As required by the Federal Rules of Bankruptcy Procedure, the debtor filed a proceeding (styled as an "adversary" action) against various government guarantors, including the Tennessee Student Assistance Corporation (TSAC), a state entity. *Hood*, 541 U.S. at 444–45, 451–52. TSAC moved to dismiss the action, asserting sovereign immunity under the Eleventh Amendment. *Id.* at 445. The Supreme Court rejected TSAC's argument, holding that a bankruptcy court's discharge of government-guaranteed student loan debt under § 523(a)(8) does not implicate a state's Eleventh Amendment immunity. *Id.* at 450.

The Supreme Court based this conclusion on the nature of bankruptcy proceedings. In a "typical voluntary bankruptcy proceeding," the debtor invokes the court's jurisdiction by filing a petition for bankruptcy. *Id.* at 447. The commencement of the proceeding creates a bankruptcy estate consisting of the debtor's property interests. 11 U.S.C. § 541(a); *see also* 1 Collier on Bankruptcy ¶ 3.01[4] (Richard Levin & Henry J. Sommer eds., 16th ed.). The bankruptcy

court has jurisdiction over the debtor and the debtor's estate, *Hood*, 541 U.S. at 447, and creditors can participate in the bankruptcy by filing a proof of claim, 11 U.S.C. §§ 501, 726. But the court does not adjudicate the creditors' property rights, *see Hood*, 541 U.S. at 447, and need not have jurisdiction over the creditors, *see id.* at 453. At the close of the bankruptcy proceeding, the bankruptcy court issues a discharge order that "releases a debtor from personal liability with respect to any discharged debt." *Id.* at 447. This proceeding is in rem, because it determines "all claims that anyone, whether named in the action or not, has to the property or thing in question." *Id.* at 448.

Although a bankruptcy court does not exercise personal jurisdiction over creditors, *id.* at 453, it is able to provide the debtor with a fresh start from all debts because "[a] federal court's jurisdiction over the dischargeability of debt . . . derives not from jurisdiction over the state or other creditors, but rather from jurisdiction over debtors and their estates." *Id.* at 447–48 (quoting *In re Collins*, 173 F.3d 924, 929 (4th Cir. 1999)). Of course, a bankruptcy court's rulings may affect creditors' interests in the debtor's property. For example, a creditor's debt may become uncollectible after a bankruptcy court discharges a debtors' debts. *See* 11 U.S.C. § 524(a). But this does not mean that the court exercises jurisdiction over the creditor or the creditor's property. "A debtor does not seek monetary damages or any affirmative relief from a [creditor] by seeking to discharge a debt; nor does he subject an unwilling [creditor] to a coercive judicial process. He seeks only a discharge of his debts." *Hood*, 541 U.S. at 450.

*Hood* applied these principles undergirding bankruptcy jurisdiction to the question whether bankruptcy proceedings

could infringe a state's sovereign immunity when the state is a creditor. The Court first noted that a state is treated like any other creditor in bankruptcy, *see, e.g.*, *Gardner v. State of New Jersey*, 329 U.S. 565, 571, 573–75 (1947); *Van Huffel v. Harkelrode*, 284 U.S. 225, 227–28 (1931), and is therefore "bound by a bankruptcy court's discharge order no less than other creditors." *Hood*, 541 U.S. at 448. Next, the Court concluded that because bankruptcy proceedings do not adjudicate creditors' property rights, the bankruptcy court's "exercise of its *in rem* jurisdiction to discharge a debt does not infringe a State's sovereignty," and the court does not exercise "jurisdiction over the State." *Id.* at 448, 453.

Ignoring the difference between a creditor in a bankruptcy case and a property owner in a forfeiture action, the majority reads *Hood* as supporting application of all "traditional *in rem* principles." Maj. at 16. The majority's sole support for this conclusion is *Hood*'s cite to a civil procedure treatise and an accompanying parenthetical stating that "jurisdiction over the person is irrelevant if the court has jurisdiction over the property." *Hood*, 541 U.S. at 453 (quoting 4A C. Wright & A. Miller, Federal Practice and Procedure § 1070, pp. 280–81 (3d ed. 2002)). In context, the parenthetical merely supports *Hood*'s holding that a bankruptcy court's in rem jurisdiction over the debtor's property is sufficient to resolve the claims of all creditors (including a state) to that property, and the court need not have jurisdiction over the state to accomplish this goal. *Id.* Nothing in *Hood* suggests that a court may exercise in rem jurisdiction without personal jurisdiction over the owner of the res.

In sum, *Hood* did not resurrect the in rem jurisdiction theory, rejected in *Shaffer*, that a court may assert jurisdiction over an absent property owner so long as it has jurisdiction

over the property itself. To the contrary, *Hood* did not mention or cite *Shaffer* and held only that a bankruptcy court does *not* assert jurisdiction over creditors because a bankruptcy proceeding does not adjudicate their property interests. *Id.* at 447. Because the debtor, not the creditor, owns the property before a bankruptcy court, and the bankruptcy court does not adjudicate the creditor's property rights, *Hood* had no occasion to address the question whether a court with in rem jurisdiction over property can adjudicate the rights of that property's absent owner.

As this description makes clear, *Hood* provides no guidance here. Obaid is not a mere creditor. His rights to the property he owns—the Palantir shares—are at stake in the forfeiture proceeding. Nor is Obaid a debtor who has voluntarily submitted himself and his property to the district court, obviating the need for due process protections. Obaid is the person described in *Shaffer*; the subject of a proceeding against his property, and therefore against Obaid himself. 433 U.S. at 207 n.22. Therefore, *Hood* gives the majority no grounds for ignoring *Shaffer*.

## IV

Although the majority recognizes that *Hood* is not "precisely on point," Maj. at 13, it provides other reasons for ignoring *Shaffer*'s clear directive. These reasons are equally misguided.

### A

First, the majority tries to confine *Shaffer* to its facts. Disregarding *Shaffer*'s statement that it was not distinguishing between in rem and quasi in rem jurisdiction,

*see* 433 U.S. at 199 n.17, the majority contends that *Shaffer*'s holding applies only to quasi in rem proceedings, Maj. at 13–14, 15. According to the majority, this reading is "supported by the failure of the Court to expressly overrule its longstanding precedent anchoring *in rem* jurisdiction to the presence of the *res*." Maj. at 14. Applying traditional in rem principles, the majority contends that the defendant here is the Palantir shares, not Obaid, and therefore *Shaffer*'s "fair play and substantial justice" requirements do not apply. Maj. at 15.[7]

This reinterpretation of *Shaffer* contradicts *Shaffer*'s actual language. The Court clearly established a new rule for both in rem and quasi in rem jurisdiction, concluding that "*all* assertions of state-court jurisdiction must be evaluated according to the standards set forth in *International Shoe* and its progeny." *Shaffer*, 433 U.S. at 212 (emphasis added). Moreover, *Shaffer* did not ignore longstanding precedent governing in rem jurisdiction. Rather, the Court made clear that it was sweeping away "the perpetuation of ancient forms that are no longer justified." *Id*. Indeed, the majority is right that the Supreme Court has not overruled its precedent

---

[7] The majority also tries to distinguish *Shaffer* on the ground that it does not apply to a civil forfeiture proceeding such as this one. Maj. at 14, 20. But a civil forfeiture proceeding is an in rem proceeding, and *Shaffer* stated that "all" assertions of in rem jurisdiction are subject to *International Shoe*'s minimum-contacts test. 433 U.S. at 212. The majority has not explained why civil forfeiture proceedings are exempt from *Shaffer*. Nor has the government argued that civil forfeitures have unique characteristics that place them outside *Shaffer*'s ambit. Indeed, at least one circuit has applied *Shaffer* to a civil forfeiture proceeding. *See United States v. Batato*, 833 F.3d 413, 423 (4th Cir. 2016); *infra* footnote 9; *cf.* Maj. at 22 (asserting that the cases cited by the dissent do not include cases applying *Shaffer* to civil forfeiture proceedings.).

governing in rem jurisdiction "without explicitly saying so"—but only because the Supreme Court explicitly said that is what it was doing.  Maj. at 15.[8]  *Shaffer*'s language also refutes the majority's claim that the suit is against Obaid's shares of stock, not Obaid himself.  Maj. at 15.  *Shaffer*'s basic premise was that "[a]ll proceedings, like all rights, are really against persons."  433 U.S. at 207 n.22 (quoting *Tyler*, 175 Mass. at 76).  And "[a]n adverse judgment in rem directly affects the property owner by divesting him of his rights in the property before the court."  *Id.* at 206.  Therefore, this proceeding over Obaid's stock is effectively a proceeding against Obaid, and *International Shoe*'s due process requirements apply.

## B

Second, the majority makes strenuous efforts to distinguish its narrow construction of *Shaffer* from the decisions of other circuits that have faithfully recited *Shaffer*'s holding.  But even a brief review of the relevant

---

[8] *Shaffer* could not be more clear:

> "We are left, then, to consider the significance of the long history of jurisdiction based solely on the presence of property in a State. . . .  This history must be considered as supporting the proposition that jurisdiction based solely on the presence of property satisfies the demands of due process, but it is not decisive. . . .  We therefore conclude that all assertions of state-court jurisdiction must be evaluated according to the standards set forth in *International Shoe* and its progeny."

433 U.S. at 211–12 (citations omitted).

cases establishes that the majority's interpretation of *Shaffer* is contrary to our own precedent and creates a circuit split.

We have long acknowledged that assertions of in rem jurisdiction must satisfy *International Shoe*, "even when the court's jurisdiction is predicated on its control over an item of property or res." *United States v. Ten Thousand Dollars ($10,000.00) in U.S. Currency*, 860 F.2d 1511, 1513 (9th Cir. 1988). Further, we have recognized *Shaffer*'s ruling that "'judicial jurisdiction over a thing' is a customary elliptical way of referring to jurisdiction over the interests of persons in a thing." *Id*. (quoting *Shaffer*, 433 U.S. at 207).

Our sister circuits have interpreted and applied *Shaffer* the same way. In *United States v. Batato*, the Fourth Circuit recited *Shaffer*'s conclusion that "in order to justify an exercise of jurisdiction in rem, the basis for jurisdiction must be sufficient to justify exercising jurisdiction over the interests of persons in a thing," and applied "a traditional, state-based minimum contacts approach" to determine whether it had jurisdiction over claimants to property subject to a civil forfeiture action. 833 F.3d 413, 423 (4th Cir. 2016) (quoting *Shaffer*, 433 U.S. at 207).[9] Similarly, the Second

---

[9] The majority asserts that *Batato* did not follow *Shaffer* because it "assume[d] without deciding" that *Shaffer* was applicable, and stated that "*Shaffer* "provides only limited guidance as to how to proceed." Maj. at 18. This is incorrect, because the majority takes these quotes out of context. *Batato* expressly acknowledged the applicability of the minimum contacts test to in rem proceedings. 833 F.3d at 423. It then stated that *Shaffer* "provide[d] only limited guidance as to how to proceed" regarding one aspect of that minimum contacts test: whether a court must consider a foreign property owner's contacts with only the forum state, or with the United States as a whole. *Id*. at 423 & n.3. But because the foreign claimants had sufficient contacts with the forum state, *Batato* could

Circuit acknowledged that *Shaffer* "explained that to have *in rem* jurisdiction it is necessary, at the very least, to satisfy the minimum contacts standard set out in *International Shoe*" and upheld the district court's conclusion that it lacked in rem jurisdiction over a defendant that "did not have minimum contacts." *LiButti v. United States*, 178 F.3d 114, 123 (2d Cir. 1999).[10]    These faithful applications of *Shaffer* are decisive holdings, not "lukewarm discussion[s]." Maj. at 20.

Other circuits have acknowledged the breadth of *Shaffer*'s rule.  Shortly after *Shaffer* was decided, the Fifth, Sixth and Seventh Circuits correctly recited its holding.  *See Inland Credit Corp. v. M/T Bow Egret*, 556 F.2d 756, 757 (5th Cir. 1977) (denying a petition for rehearing en banc and citing *Shaffer*'s holding that "states' assertion of in rem jurisdiction must satisfy the same 'minimum contacts standard' applied to in personam jurisdiction"); *Pickens v. Hess*, 573 F.2d 380,

---

"assume without deciding" that the more demanding "state-based minimum contacts approach" controlled. *Id.* at 423. *Batato* made clear that the court could not exercise in rem jurisdiction without obtaining personal jurisdiction over the owner of the property subject to civil forfeiture.  In sum, nothing in *Batato* suggests any reluctance to apply *Shaffer*.

[10] The majority's statement that *Libutti* "did not dismiss the *in rem* action for lack of jurisdiction," Maj. at 19, mischaracterizes the case.  For our purposes, the pertinent question in *Libutti* was whether the district court could exercise jurisdiction over a third party who had an ownership interest in a race horse.  *Libutti* held that the court did not have in personam jurisdiction over the third party because the third party lacked minimum contacts with the forum state, and "[s]ince [the third party] did not have minimum contacts, the district court did not have *in rem* jurisdiction either." 178 F.3d at 123. While *Libutti* upheld the trial court's rulings with regard to the defendant over which the court had jurisdiction, Maj. at 19, this is irrelevant to our analysis.

387 (6th Cir. 1978) (citing *Shaffer* for the proposition that "all
claims of jurisdiction, both in personam and in rem, must be
evaluated in light of the standards of *International Shoe* and
its progeny"); *Lakeside Bridge & Steel Co. v. Mountain State
Const. Co., Inc.*, 597 F.2d 596, 600 (7th Cir. 1979) (stating,
in its overview of in rem jurisdiction, that "the principles of
*International Shoe* were held [in *Shaffer*] to govern assertion
by a state of In rem as well as In personam jurisdiction").[11]
A decade later, the Third and Fourth Circuits cited *Shaffer* for
the same principle. *See Salazar v. Atlantic Sun*, 881 F.2d 73,
76 (3d Cir. 1989) (noting that *Shaffer* affected "traditional in
rem procedures" by requiring "the presence of a defendant's
minimum contacts with the forum"); *Pittsburgh Terminal
Corp. v. Mid Allegheny Corp.*, 831 F.2d 522, 526 (4th Cir.
1987) (explaining that, after *Shaffer*, "the minimum contacts
rule of *International Shoe* would henceforth be applied to

---

[11] Scholars writing in *Shaffer*'s immediate aftermath expressed no
doubt as to whether *Shaffer* applied to in rem proceedings. *See* Angela M.
Bohmann, *Applicability of* Shaffer *to Admiralty in Rem Jurisdiction*,
53 Tul. L. Rev. 135, 135 (1978–79) ("In its 1977 decision in *Shaffer v.
Heitner*, the Supreme Court determined that the due process clause of the
Fourteenth Amendment required all assertions of state court jurisdiction
to be tested under the principles established in its earlier decision in
*International Shoe Co. v. Washington*); *see also*, John R. Leathers, *The
First Two Years After* Shaffer v. Heitner, 40 La. L. Rev. 907, 910 (1980);
Stefan A. Riesenfeld, Shaffer v. Heitner*: Holding, Implications,
Forebodings*, 30 Hast. L.J. 1183, 1204 n.100 (1979); Joseph J. Kalo,
*Jurisdiction as an Evolutionary Process: The Development of Quasi in
Rem and In Personam Principles*, 1978 Duke L.J. 1147, 1189–90 (1978);
Linda J. Silberman, Shaffer v. Heitner*: The End of an Era*, 58 N.Y.U. L.
Rev. 33, 62–63 (1978); William R. Slomanson, *Real Property Unrelated
to Claim: Due Process for Quasi in Rem Jurisdiction?*, 83 Dick. L. Rev.
51, 54 (1978); Joseph P. Zammitt, *Reflections on* Shaffer v. Heitner,
5 Hast. Const. L.Q. 15, 17 (1978); Donald W. Fyr, Shaffer v. Heitner*: The
Supreme Court's Latest Last Words on State Court Jurisdiction*, 26 Emory
L.J. 739, 757–78, 762–64 (1977).

actions *in rem* and *quasi in rem*, as well as to actions *in personam*").

Against this consensus, the majority's erroneous interpretation of *Shaffer* stands alone.[12]

## V

*Shaffer* effected a transformation of the law of in rem jurisdiction in order to ensure that "fair play and substantial justice" prevail.  In doing so, the Supreme Court was well aware that it was sweeping aside a century of jurisprudence which had allowed courts to adjudicate rights to property even when doing so ran roughshod over the rights of the persons who owned the property.  By attempting to confine *Shaffer* to its facts, the majority turns its back on the Court's protection of due process rights and creates a conflict with every circuit court that has addressed this issue.  I dissent from the majority's failure to follow the Supreme Court's clear instructions.

---

[12] While the majority notes that "no court has dismissed a civil forfeiture action for lack of personal jurisdiction over a claimant," Maj. at 18, this is to be expected because a person with property in a state is likely to have enough contacts with that state to satisfy *Shaffer*, *see* 433 U.S. at 207–08.  *Shaffer* itself predicted "that jurisdiction over many types of actions which now are or might be brought in rem would not be affected by a holding that any assertion of state-court jurisdiction must satisfy the *International Shoe* standard."  *Id*. at 208.