# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:18-cv-08420-RGK-PJW | | Date | December 1, 2020 |
|---|---|---|---|---|
| Title | *United States of America v. $1,546,076.35 In Bank Funds Seized from Republic Bank of Arizona Account 1889, et al.* | | | |

| Present: The Honorable | R. GARY KLAUSNER, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Joseph Remigio | Not Reported | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |
| Attorneys Present for Plaintiff: | | Attorneys Present for Defendants: |
| Not Present | | Not Present |

**Proceedings:**  **(IN CHAMBERS) Order Re: Claimants' Motions to Dismiss [DEs 111 & 112]; Plaintiff's Motion to Strike [DE 148]**

## I.  INTRODUCTION

This is an *in rem* civil forfeiture action comprised of thirty-two member cases ("the consolidated cases") filed by the Untied States of America ("the Government" or "Plaintiff"). The Defendants in the consolidated cases are various assets which are allegedly the proceeds of illegal activities associated with the website Backpage.com ("Backpage") and other funds commingled with those proceeds ("the Defendant Assets"). The Defendant Assets were seized in connection with the ongoing criminal matter *United States of America v. Michael Lacey, et al.,* No. 18-CR-00422-PHX-SPL (D. Ariz.) ("the Arizona Proceeding").

On June 1, 2020, the Government filed the operative First Amended Consolidated Master Verified Complaint for Forfeiture ("FACMC") (ECF No. 108). The Government asserts three forfeiture claims against the Defendant Assets arising from violations of 18 U.S.C. § 981(a)(1). Various individuals and entities have intervened as claimants in this action to assert interests in the Defendant Assets. These claimants include: Jill Anderson ("Anderson"); John Becker, acting as trustee ("Becker"); John Brunst ("Brunst"); Mary Ann Brunst ("M. Brunst"); Michael Lacey ("Lacey"); James Larkin ("Larkin"); Troy Larkin ("T. Larkin"); Ramon Larkin ("R. Larkin"); Ellona Spear ("E. Spear"); Natasha Spear ("N. Spear"); Scott Spear ("Spear"); Medalist Holdings, Inc. ("Medalist"); Leeward Holdings, LLC, ("Leeward"); Camarillo Holdings, LLC ("Camarillo"); Vermillion Holdings, LLC ("Vermillion"); Cereus Properties, LLC ("Cereus"); Shearwater Investments, LLC ("Shearwater"); Broadway Capital Corp., LLC ("Broadway"); and The Brunst Family Trust (collectively, "Claimants").

Presently before the Court are: (1) the Motion to Dismiss the FACMC pursuant to Section 230 of the Communications Decency Act ("CDA") filed by various Claimants ("Claimants' First Mot. to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:18-cv-08420-RGK-PJW | | Date | December 1, 2020 |
|---|---|---|---|---|
| Title | *United States of America v. $1,546,076.35 In Bank Funds Seized from Republic Bank of Arizona Account 1889, et al.* | | | |

Dismiss") (ECF No. 111); (2) the Motion to Dismiss the FACMC for failure to state sufficiently detailed facts filed by various Claimants ("Claimants' Second Mot. to Dismiss") (ECF No. 112), and; (3) the Government's Motion to Strike the claims of various Claimants ("Pl.'s Mot. to Strike") (ECF No. 148).

For the following reasons, the Government's Motion to Strike is **GRANTED in part and DENIED** in part, and both of Claimants' Motions to Dismiss are **DENIED**.

## II.   FACTUAL BACKGROUND

The FACMC alleges the following:

Backpage.com, LLC, ("Backpage") was an internet-based company that allowed customers to post on-line classified advertisements in a variety of categories, including "adult." For most of its existence, Backpage charged customers for posting "adult" ads, and generated approximately a half-billion dollars from those ads. The vast majority of Backpage's "adult" ads consisted of offers to sell adults or children for sex ("trafficking ads"). Many of the pimps and sex traffickers who used Backpage to advertise their victims were later convicted of sex trafficking offenses.

Certain of Claimants owned and/or operated the Backpage.com website. Claimants Lacey and Larkin are co-creators of Backpage and were responsible for the website's policies and strategic direction. Lacey and Larkin, along with Claimants Brunst and Spear and non-claimants Carl Ferrer ("Ferrer") and Andrew Padilla ("Padilla") (collectively, "Backpage Operators") were corporate officers, owners, or managers of Backpage and/or Backpage related entities. The Backpage Operators knew and repeatedly acknowledged in internal company documents and emails that the overwhelming majority of the website's "adult" ads involved prostitution.

In an effort to make the advertising of sex trafficking on its website less overt, Backpage instituted and maintained policies and procedures designed to cultivate and sustain its promotion of sex trafficking and prostitution by sanitizing some of the language in the trafficking ads that customers submitted to the website. Backpage referred to this practice as "moderation." The FACMC alleges numerous details of Backpage's moderation practice.

For example, in response to pressure to "clean up" its "adult" content, Ferrer instructed Backpage's technical staff to edit the wording of trafficking ads by removing particular terms that were indicative of prostitution, but to allow the remainder of the ad to be featured on Backpage's website. Backpage also maintained a list of prohibited terms that Backpage management and employees closely identified with the obvious promotion of sex trafficking and prostitution. Backpage employees referred

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:18-cv-08420-RGK-PJW | Date | December 1, 2020 |
|---|---|---|---|
| Title | *United States of America v. $1,546,076.35 In Bank Funds Seized from Republic Bank of Arizona Account 1889, et al.* | | |

to this list as a "strip out" list. Following the implementation of moderation, this list of prohibited terms changed and evolved over time to adjust to Backpage advertisers' use of new code words to promote prostitution.

In addition to terms indicative of prostitution and sex trafficking, Backpage removed images from trafficking ad submissions as well. In January 2017, the U.S. Senate Subcommittee on Permanent Investigations concluded a lengthy investigation into sex trafficking and Backpage and issued a 50-page report entitled "Backpage.com's Knowing Facilitation of Online Sex Trafficking." The Subcommittee report concluded that "Backpage [ ] maintained a practice of altering ads before publication by deleting words, phrases, and images indicative of criminality, including child sex[.]" FACMC ¶ 126(c). The report further indicated that Backpage was fully aware that the ads were solicitations for illegal prostitution and had taken an array of affirmative steps to help pimps and traffickers sanitize these ads and conceal their illegality.

In the years preceding the Subcommittee report, Backpage was contacted by various law enforcement and elected officials with concerns about sex trafficking on the website. For example, in 2011 the mayor of Seattle sent a letter to Backpage in which the mayor stated "Seattle Police have identified an alarming number of juvenile prostitutes advertised on Backpage.com since January 2010." *Id.* ¶ 126(d). By 2015, following negative publicity, Backpage's relationships with certain financial institutions had also deteriorated. Major credit card companies were refusing to process payments to or for Backpage, and banks were closing Backpage's accounts out of concern that the accounts were being used for illegal purposes.

In response to these measures, the Backpage Operators initiated a variety of money laundering strategies designed, in part, to conceal the source and location of the revenues generated by Backpage ads. These strategies included instructing Backpage customers to send checks and money orders to a Post Office box, funneling those funds into bank accounts held in the names of entities with no apparent connection to Backpage, and then giving customers a corresponding "credit" to purchase Backpage ads, among others.

The Arizona Proceeding, in which several of the Claimants are named defendants, was filed on March 28, 2018. Beginning on that day, magistrate judges in the Central District of California found probable cause to issue warrants to seize the Defendant Assets, which are covered by the forfeiture allegations in various criminal cases in the District of Arizona, including the Arizona Proceeding. Execution of these warrants resulted in the seizure of the Defendant Assets. The government then filed a series of verified complaints, which were consolidated before this Court on December 18, 2019 (ECF No. 50). On June 1, 2020, the Government filed the FACMC.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:18-cv-08420-RGK-PJW | Date | December 1, 2020 |
|---|---|---|---|
| Title | *United States of America v. $1,546,076.35 In Bank Funds Seized from Republic Bank of Arizona Account 1889, et al.* | | |

### III.     JUDICIAL STANDARDS

#### A.      Article III Standing of Claimants in Civil Forfeiture Cases

In an *in rem* civil forfeiture proceeding such as this, "the property subject to forfeiture is the defendant. Thus, defenses against the forfeiture can be brought only by third parties, who must intervene[ ]" as claimants. *United States v. One-Sixth Share of James J. Bulger*, 326 F.3d 36, 40 (1st Cir. 2003). To satisfy the case-or-controversy requirement of Article III, a claimant must establish the three elements of standing: "that the [claimant] suffered an injury in fact, that there is a causal connection between the injury and the conduct complained of, and that it is likely the injury will be redressed by a favorable decision." *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 637 (9th Cir. 2012). "Claimants in civil forfeiture actions can satisfy this test by showing that they have 'a colorable interest in the property,' . . . which includes an ownership interest or a possessory interest[.]" *Id.* (citations omitted). "At the motion to dismiss stage, a claimant's unequivocal assertion of an ownership interest in the property is sufficient by itself to establish standing." *Id.* at 638 (citing *United States v. 475 Martin Lane,* 545 F.3d 1134, 1140 (9th Cir. 2008)).

#### B.      Pleading Standard in Civil Forfeiture Cases

Under Rule 12(b)(6), a party may move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible if the plaintiff alleges enough facts to draw a reasonable inference that the defendant is liable. *Iqbal*, 556 U.S. at 678. A plaintiff need not provide detailed factual allegations, but must provide more than mere legal conclusions. *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. When ruling on a Rule 12(b)(6) motion, the Court must accept well-pled factual allegations in the complaint as true and construe them in the light most favorable to the non-moving party. *See Autotel v. Nev. Bell. Tel. Co.*, 697 F.3d 846, 850 (9th Cir. 2012). Dismissal "is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

In addition to the usual federal pleading standard, "[*i*]n *rem* forfeitures are conducted in accordance with the Supplemental Rules for Certain Admiralty and Maritime Claims [("the Supplemental Rules")]." *See United States v. Real Prop. at 2659 Roundhill Dr.,* 194 F.3d 1020, 1024 n. 3 (9th Cir.1999). To state a claim, the Government's complaint must "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial."

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:18-cv-08420-RGK-PJW | Date | December 1, 2020 |
|---|---|---|---|
| Title | *United States of America v. $1,546,076.35 In Bank Funds Seized from Republic Bank of Arizona Account 1889, et al.* | | |

Fed.R.Civ.P. Supp. R. G(2)(f). The Government's complaint "meets this low bar" when it "'state[s] the circumstances giving rise to the forfeiture claim with sufficient particularity that [the claimant] [can] commence[ ] a meaningful investigation of the facts and draft[ ] a responsive pleading' and 'permit[s] a reasonable belief for pleading purposes that [the property in question] . . . [is] subject to forfeiture.'" *United States v. Aguilar*, 782 F.3d 1101, 1108–09 (9th Cir. 2015) (quoting *United States v. Mondragon*, 313 F.3d 862, 866–67 (4th Cir. 2002)). A court may not dismiss a forfeiture complaint "on the ground that the Government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property." 18 U.S.C. § 983(a)(3)(D).

## IV.   DISCUSSION

Pursuant to Rule G(8)(c)(ii)(A) of the Supplemental Rules, a motion to strike a claimant's claim for lack of standing "must be decided before any motion by the claimant to dismiss the action." Accordingly, the Court addresses the Government's motion to strike before turning to the Claimants' motions to dismiss.

### A.   The Government's Motion to Strike

The Government moves to strike five groupings of claims to various assets. The Court considers the parties' arguments with respect to each grouping in turn.

#### 1.   Shareholder Claims to the Compass Bank Assets

The Government seeks to forfeit $5,462,027.17 and $407,686.14 in bank funds seized from two BBVA Compass Bank Accounts held in the name of Claimant Cereus (the "Compass Bank Assets"). On May 23, 2019 and May 24, 2019, Claimants Lacey, J. Larkin, T. Larkin, R. Larkin, Spear, and Brunst filed claims to the Compass Bank Assets ("the shareholder claims"). *See* FACMC, App'x A-2, ECF No. 148-2. Each asserted an ownership interest in the Compass Bank Assets as "a shareholder of Medalist Holdings, Inc.," the purported parent company of Cereus.

The Government argues that Claimants lack standing to assert the shareholder claims because shareholders lack standing to contest the forfeiture of corporate assets. Pl.'s Mot. to Strike at 11–12. The Ninth Circuit has held in the context of a civil forfeiture action that a claimant's status as a shareholder does not confer an ownership interest upon the claimant with respect to corporate funds. *See Aguilar*, 782 F.3d at 1107–08. Here, no claimant has filed an opposition with respect to the shareholder claims. Accordingly, the court concludes that Claimants lack standing to assert the shareholder claims. The Court therefore **STRIKES** the claims appearing on the docket in case number 2:18-cv-08566 at docket entries 36, 37, 38, and 41.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:18-cv-08420-RGK-PJW | Date | December 1, 2020 |
|---|---|---|---|
| Title | *United States of America v. $1,546,076.35 In Bank Funds Seized from Republic Bank of Arizona Account 1889, et al.* | | |

      2.    <u>Natasha Spears's Claims</u>

The Government argues that the claims filed by N. Spears should be stricken because she failed to respond to the Government's special interrogatories. N. Spears did not join in any opposition to the Government's motion. Accordingly, given N. Spears's failure to respond to the Government's special interrogatories and failure to oppose the Government's motion, the Court **STRIKES** N. Spears's claims, which appear on the docket in case number 2:18-cv-08423 at docket entry 26.[1] *See United States v. $295,726.42 in Account Funds Seized*, 279 F. Supp. 3d 1050, 1056 (C.D. Cal. 2018) (conditionally striking claimant's claim due to claimant's failure to adequately respond to the Government's special interrogatory).

      3.    <u>Anderson's and Lacey's Claims to the Binghamton Assets</u>

The Government seeks to forfeit $16,500,000 in an account at K&H Bank in Hungary, held in the name of Primus Trust Company, which was wired into that account on or about January 3, 2017. The parties refer to this sum of $16,500,000 as "the Binghamton Assets"—the Court will do the same. On May 24, 2019, Claimants Anderson and Lacey filed claims to the Binghamton Assets ("the Binghamton Claims"). Lacey asserts an ownership interest in the Binghamton Assets based on his status as "the Settlor (Creator) of [the] irrevocable trust ("Binghamton Trust") for the benefit of his two children." *See* FACMC, App'x A-1, ECF No. 148-2. Anderson's purported interest in the Binghamton Assets is premised on her status as Lacey's wife. *Id.*

The Government argues that Anderson and Lacey lack standing to assert claims to the Binghamton Assets because settlors of irrevocable trusts lack ownership and possessory interests in trust assets. Lacey filed an opposition to the Government's motion to strike the Binghamton Claims; Anderson did not. In his opposition Lacey does not attack the merits of the Government's motion. Rather, Lacey states: "To the extent that this Court embraces the government's [position], this Court should nonetheless grant leave to amend because Mr. Lacey's proposed amended claim states a legal interest in the Binghamton Assets." Lacey's Opp. to Pl.'s Mot. to Strike at 3, ECF No. 152. The Court embraces the Government's position, and for the reasons set forth below, strikes the Binghamton Claims without leave to amend.

---

[1]    Scott Spears's claims that appear in case number 2:18-cv-08423 at dock entry 26 are not stricken by this order.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:18-cv-08420-RGK-PJW | | Date | December 1, 2020 |
|---|---|---|---|---|
| Title | *United States of America v. $1,546,076.35 In Bank Funds Seized from Republic Bank of Arizona Account 1889, et al.* | | | |

The issue presented by the Government's motion is whether Lacey has alleged a legal interest sufficient to provide Lacey with standing to assert a claim to the Binghamton Assets. As noted above, claimants can establish standing "by showing that they have 'a colorable interest in the property,' . . . which includes an ownership interest or a possessory interest[.]" *$133,420.00 in U.S. Currency*, 672 F.3d at 637 (citations omitted).

The only legal interest that Lacey asserts in the Binghamton Assets derives from his status as settlor of the Binghamton Trust. This interest does not amount to a colorable interest in the Binghamton Assets. Section 42 of the Restatement of Trusts states: "When a settlor transfers property to another as trustee or declares a trust of that property, unless the transferor manifests a different intention, the trustee *takes the settlor's full title or interest in that property*." RESTATEMENT (THIRD) OF TRUSTS § 42 (2003) (emphasis added). Courts in other districts have found that the creator of an irrevocable trust lacks standing to assert a claim to the trust assets in a civil forfeiture case. *See United States v. 2,767,202.27 in U.S. Currency*, No. 03-1289, 2006 WL 1989860, at *1 (C.D. Ill. July 13, 2006) ("Here, [claimant] created the Trust and presumably reaped the benefits of doing so. In the process, he gave up certain rights and one of those rights was the right to bring a claim on behalf of the Trust."); *see also United States v. All Assets Held at Bank Julius*, No. CV 04-0798 (PLF), 2020 WL 1615870, at *10 (D.D.C. Apr. 2, 2020) (finding a settlor's purported legal interest in assets held in an irrevocable trust inconsistent with the terms of the trust because the settlor pointed to no scenario in which the trust assets would revert to him).

Here, the Court concludes that Lacey's status as the settlor and creator of the irrevocable Binghamton Trust does not invest Lacey with a colorable legal interest in the trust assets. Under general trust principles, Lacey has neither a possessory interest nor an ownership interest in the trust assets. Accordingly, the Court **STRIKES** Lacey's claim to the Binghamton Assets, which appears on the docket in case number 2:18-cv-08565 at docket entry 34. Anderson's claim to the Binghamton Assets, which appears on the docket in case number 2:18-cv-08565 at docket entry 35 and derives from her status as Lacey's wife, is stricken as well.

The legal interest in the Binghamton Assets that Lacey seeks to assert in his proposed amended claim fairs no better. Although courts should generally grant parties leave to amend freely, *see* FED. R. CIV. P. 15(A)(2), "[l]iberality in granting a [party] leave to amend is subject to the qualification that the amendment . . . is not futile[,]" *Bowles v. Reade*, 198 F.3d 752, 757 (9th Cir. 1999) (citation omitted). Here, upon review of Lacey's proposed amended claim, the Court concludes that to allow Lacey to amend his claim would be futile.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:18-cv-08420-RGK-PJW | Date | December 1, 2020 |
|---|---|---|---|
| Title | *United States of America v. $1,546,076.35 In Bank Funds Seized from Republic Bank of Arizona Account 1889, et al.* | | |

In his opposition Lacey argues that "amendment would not be futile[,] as the proposed amended claim demonstrates that Mr. Lacey has a legal interest in the Binghamton Assets." Lacey's Opp. to Pl.'s Mot. to Strike at 4. In support of this argument, Lacey points to a passage from his proposed amended claim which asserts that, under Section 679 of the Internal Revenue Code, "[Lacey] is the United States owner of the Binghamton Trust." *Id.* Section 679 provides that, in general, "[a] United States person who . . . transfers property to a foreign trust . . . shall be treated as the owner for his taxable year of the portion of such trust attributable to such property if for such year there is a United States beneficiary of any portion of such trust." 26 U.S.C. § 679. Lacey's argument is unpersuasive.

Assuming *arguendo* that Lacey is "treated as the owner" of the portion of the Binghamton Trust attributable to his $16,500,000 contribution for tax purposes under Section 679, such a nominal ownership interest is insufficient to confer standing on a claimant. As the settlor of an irrevocable trust, Lacey transferred his full title and interest in the Binghamton Assets to the trustee when he settled the trust. *See* RESTATEMENT (THIRD) OF TRUSTS § 42 (2003). Although a claimant need only assert a "colorable interest" in the defendant property to satisfy Article III's standing requirements at the pleading stage, "[p]ossession of mere legal title by one who does not exercise dominion and control over the property is insufficient . . . to establish standing to challenge a forfeiture." *United States v. One Parcel of Land, Known as Lot 111-B*, 902 F.2d 1443, 1444 (9th Cir. 1990) (citation omitted); *see also All Assets Held at Bank Julius*, 2020 WL 1615870, at \*19 (finding "potential U.S. tax implications" had no bearing on what interest a claimant had in a foreign trust). Lacey's proposed amended claim does not allege that he exercises any dominion or control over the Binghamton Assets, and "bare legal title without dominion or control of the property is not enough." *See United States v. Approximately $417,148.06 in U.S. Currency Seized from Bank of Am. Account No. 08067-05302*, 72 F. App'x 624, 625 (9th Cir. 2003). Accordingly, Lacey is not granted leave to amend his claim to the Binghamton Assets.

4.   *Claims to the MoneyGram Assets*

The Government seeks to forfeit $2,412,785.47 in funds seized from the accounts of MoneyGram International ("the MoneyGram Assets"), which originated from a Midfirst Bank Account held in the name of attorney John Becker for the benefit of Lacey. On May 23 and May 24, 2019, Lacey, Anderson, and Becker (acting as trustee of the MGL Two Year Retained Annuity Trust Dated 21 November 2014) filed claims to the MoneyGram Assets (the "MoneyGram Claims").

Lacey asserts that he is the owner of the MoneyGram assets and alleges that he had the following relationship to the assets: (1) the assets were held at Midfirst Bank, in an account in the name of John Becker, for the benefit of Lacey ("Lacey's first account"); (2) at Lacey's request, the assets were

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:18-cv-08420-RGK-PJW | Date | December 1, 2020 |
|----------|------------------------|------|------------------|
| Title | *United States of America v. $1,546,076.35 In Bank Funds Seized from Republic Bank of Arizona Account 1889, et al.* | | |

transferred to MoneyGram International; (3) Lacey directed the transfer of the assets from Midfirst Bank to MoneyGram so that MoneyGram would transfer the funds to another of Lacey's accounts ("Lacey's second account"). It is undisputed that the Government seized the assets while they were in the possession of MoneyGram.

Lacey argues that he has standing to assert a claim because his ownership interest in the MoneyGram Assets did not cease when the funds were transferred to MoneyGram. The Government argues that Lacey is nothing more than a general creditor of MoneyGram, and therefore lacks standing to assert a claim to the MoneyGram Assets. For the reasons that follow, the Court concludes that Lacey's claim is sufficient to satisfy the requirements of Article III standing at the pleading stage.

The Government asserts that when funds are transferred to a money-transmitter, like MoneyGram, the transferor "becomes an unsecured creditor of the transmitter" who lacks standing to assert a claim to funds seized from the account of the transmitter. Pl.'s Mot. to Strike at 13–14. Under Ninth Circuit law, "[g]eneral unsecured creditors of the person whose property was seized lack a sufficient property interest to have standing to challenge the government's civil forfeiture." *United States v. One Hundred Thirty-Three (133) U.S. Postal Serv. Money Orders Totaling $127,479.24 In U.S. Currency*, 496 F. App'x 723, 724 (9th Cir. 2012) (citing 18 U.S.C. § 983(d)(6)(B)(i)). However, the Court finds that the Government has failed to demonstrate that Lacey's rights to the MoneyGram Assets are limited to those of a general unsecured creditor.

In civil forfeiture cases, "[o]wnership interest is determined under the law of the state in which the interest arose." *United States v. Real Prop. Located at 5208 Los Franciscos Way, Los Angeles, Cal.*, 385 F.3d 1187, 1191 (9th Cir. 2004). Here, the Government does not point to the specific state or locality in which Lacey's interest in the MoneyGram assets arose. Nor does the Government raise any argument as to what law the Court should apply in determining whether Lacey's relationship to the MoneyGram Assets invests Lacey with an actionable legal interest in the MoneyGram Assets. Instead, the Government cites three out of circuit forfeiture cases, none of which are persuasive. *See United States v. Ribadeneira*, 105 F.3d 833 (2d Cir. 1997); *United States v. BCCI Holdings (Luxembourg), S.A.*, 977 F. Supp. 20 (D.D.C. 1997); *United States v. All Funds on Deposit on or Before Nov. 8, 1994 in Citibank Account No. 42773634*, 955 F. Supp. 23 (E.D.N.Y. 1997). These three cases apply New York law and the federal criminal forfeiture statute. *See BCCI Holdings*, 977 F. Supp. at 26 ("[T]he New York Uniform Commercial Code . . ., which provides the rule of decision, is key[.]"); *Citibank Account No. 42773634*, 955 F. Supp. at 26 ("Since the funds at issue are held in bank accounts located in New York, the requirements for establishing a possessory or ownership interest over the funds is determined by New York law."); *Ribadeneira*, 105 F.3d at 835–36 (rejecting appellants' argument that they had standing in criminal forfeiture case as bona fide purchasers for value under 21 U.S.C. § 853(n)(6)(B)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:18-cv-08420-RGK-PJW | | Date | December 1, 2020 |
|---|---|---|---|---|
| Title | *United States of America v. $1,546,076.35 In Bank Funds Seized from Republic Bank of Arizona Account 1889, et al.* | | | |

The Government fails to establish what bearing, if any, New York law or 21 U.S.C. § 853(n)(6)(B) may have on the present case.

Accordingly, although the Government may ultimately prevail on its argument that Lacey lacks standing to assert a claim to the MoneyGram assets, the Court concludes that Lacey's claim of ownership over those assets amounts to an assertion of a colorable legal interest, which is sufficient at the pleading stage. The Court therefore **DENIES** the Government's motion to strike Lacey's claim to the MoneyGram Assets. However, because Anderson and Becker did not oppose the Government's motion to strike, the Court **STRIKES** their claim to the MoneyGram Assets, which appear on the docket sheet in case number 2:18-cv-08579 at docket entries 32 and 35.

### 5.    *Claims Asserted to Non-Party Assets on Information and Belief*

Separate from assets held in the names of Claimants, the Government seeks forfeiture of a range of assets held in the names of entities and individuals who are not claimants here (the "Non-Party Assets"). Claimants Lacey, J. Larkin, R. Larkin, T. Larkin, Spear, Brunst, Cereus, Medalist, Leeward, Camarillo, Vermillion, Shearwater, and Broadway (collectively, "NPA Claimants") have filed claims to the Non-Party Assets, alleging on information-and-belief that each Non-Party Asset is security for indemnification obligations under a series of purchase and sale agreements. These claims are premised on liens on the assets of Backpage.com, LLC and its affiliates that secure the balance of the purchase price for the sale of the website by certain of the Claimants and also secure related contractual obligations. Claimants' Opp. to Pl.'s Mot. to Strike at 2, ECF No. 153.

The Government argues that the claims to the Non-Party Assets cannot be pleaded on information-and-belief and must therefore be stricken. For the reasons that follow, the Court disagrees.

A lien against the defendant property is generally sufficient to confer standing on the lienholder. *See United States v. One-Sixth Share Of James J. Bulger In All Present And Future Proceeds Of Mass Millions Lottery Ticket No. M246233*, 326 F.3d 36, 43 (1st Cir. 2003). ("Normally, a lien against the defendant property would establish standing."). Here, the NPA Claimants allege on information-and-belief that they hold promissory notes that are secured by liens that encumber certain of the Non-Party Assets. Specifically, the NPA Claimants assert "that they are beneficiaries of a blanket lien securing obligations under" certain documents that effectuated the sale of Backpage.com, and "believ[e] (without knowing for certain) that specific, individual assets seized by the government are encumbered by the liens[.]" Claimants' Opp. to Pl.'s Mot. to Strike at 9–10. The NPA Claimants maintain that they pleaded their ownership interests in the Non-Party Assets on information-and-belief because they "know nothing about many of these specific assets other than what the [G]overnment has chosen to disclose in its

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:18-cv-08420-RGK-PJW | Date | December 1, 2020 |
|---|---|---|---|
| Title | *United States of America v. $1,546,076.35 In Bank Funds Seized from Republic Bank of Arizona Account 1889, et al.* | | |

complaint." *Id.* at 10. The Court finds that the NPA Claimants allegations relating to their interests in the Non-Party Assets are sufficient to satisfy the requirements of Article III standing at the pleading stage, notwithstanding the fact that some of these allegations are made on information-and-belief. *See Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) (holding that a plaintiff may plead facts on information-and-belief where the facts alleged "are peculiarly within the possession and control of the defendant[.]").

The Government argues that the NPA Claimants may not assert claims to the Non-Party Assets on information-and-belief because, under Ninth Circuit law, a forfeiture claimant's assertion of an ownership interest must be "unequivocal." Pl.'s Mot. to Strike at 16. In *$133,420.00 in U.S. Currency*, the Ninth Circuit held: "At the motion to dismiss stage, a claimant's unequivocal assertion of an ownership interest in the property is *sufficient* by itself to establish standing." 672 F.3d at 638 (emphasis added). The Government takes this passage to mean that, at the pleading stage, it is *necessary* that a claimant's ownership interest be alleged unequivocally, and argues that information-and-belief allegations are equivocal by nature.

This argument boils down to an assertion that the Ninth Circuit applies a heightened pleading standard in civil forfeiture cases by imposing a requirement for "unequivocal" pleadings on claimants. The Court finds the Government's reading of *$133,420.00 in U.S. Currency* inconsistent with the opinion's plain language, which held that a claimant's unequivocal assertion of an ownership interest in forfeited property is "sufficient"—though not necessary—to establish standing at the pleading stage. Article III standing "must be supported in the same way as any other matter on which the [claimant] bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The Court therefore finds the fact that the NPA Claimants allege certain facts on information-and-belief is not fatal to their assertion of standing at the pleading stage. *See Thompson*, 851 F.3d at 928.[2]

---

[2]     In support of its argument concerning information-and-belief claims, the Government also relies upon *Mercado v. U.S. Customs Service*, 873 F.2d 641 (2d Cir. 1989). In *Mercado*, the court held that "the conclusory, hearsay, on-information-and-belief statement of [the claimant]'s lawyer" was insufficient to support the claimant's claim to forfeited property. *Id.* at 645. Even if *Mercado* were binding precedent, it would not be dispositive of the present motion. The Government does not argue that Claimants' information-and-belief allegations constitute hearsay. According, the Court finds *Mercado* inapposite.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:18-cv-08420-RGK-PJW | | Date | December 1, 2020 |
|---|---|---|---|---|
| Title | *United States of America v. $1,546,076.35 In Bank Funds Seized from Republic Bank of Arizona Account 1889, et al.* | | | |

Accordingly, the Court concludes that the Government has failed to establish that the NPA Claimants lack standing to assert claims to the Non-Party Assets.

The Court turns now to the Claimants' two motions to dismiss.

**B.      Claimants' Motion to Dismiss Pursuant to the Communications Decency Act**

Claimants' First Motion to Dismiss is premised on the immunity provision housed in the Communications Decency Act ("CDA"), 47 U.S.C. § 230(c)(1). Section 230(c)(1) states that "[n]o provider . . . of an interactive computer service [("ICS")] shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Claimants assert that the Government may not maintain this action against the Defendant Assets because Backpage and the Claimants can not be considered the publishers of the trafficking ads at issue in this case. For the following reasons, the Court concludes that the allegations in the Government's FACMC are sufficient to withstand Claimants' CDA challenge at the pleading stage.

Section 230(c)(1)'s grant of immunity only applies to an ICS provider that "is not also an 'information content provider,' which is defined as someone who is 'responsible, in whole or in part, for the creation or development of' the offending content." *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (*en banc*) (quoting 47 U.S.C. § 230(f)(3)). A party who "materially contribut[es]" to the unlawfulness of unlawful content engages in "development" of that content for purposes of the CDA. *Id.* at 1168–69. The Ninth Circuit has defined the term development in the statute to include "the process of researching, writing, gathering, organizing and editing information for publication on web sites." *Id.* at 1168 (quoting Wikipedia, Content Development (Web), http://en.wikipedia.org/w/index.php?title=Content—development—web & oldid=188219503).

Here, the Government sufficiently alleges that Backpage was responsible, in part, for the development of the trafficking ads that were posted on Backpage's website. The FACMC alleges that Backpage employees, with the knowledge of certain Backpage Operators and as a matter of policy, actively worked to facilitate prostitution by concealing it from law enforcement through Backpage's "moderation" practices. As an example of Backpage's ad moderation, the Government alleges that in 2010, Ferrer (a co-creator and onetime CEO of Backpage) received an email from law enforcement expressing concern about ads containing the term "amber alert." FACMC ¶ 127(g). Ferrer acknowledged that the term might be "some kind of bizarre new code word for an under aged person." *Id.* He then instructed Backpage employees to remove the term "amber alert" from subsequent ads, but he did not instruct them to block the ads themselves or to report them. *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:18-cv-08420-RGK-PJW | Date | December 1, 2020 |
|---|---|---|---|
| Title | *United States of America v. $1,546,076.35 In Bank Funds Seized from Republic Bank of Arizona Account 1889, et al.* | | |

As another example, the Government alleges that on October 16, 2010, a Backpage manager sent a PowerPoint presentation that displayed a series of 38 nude and partially-nude photographs to a large number of Backpage employees. FACMC ¶ 127(c). Some of the photographs depicted graphic sex acts. *Id.* "Next to each picture was an instruction as to whether it should be approved or disapproved [for inclusion in ads] by a Backpage moderator. These instructions included 'Approve. Nude rear shots are okay as long the model is not exposing her anus or genitalia.' and 'Approve. Rear shot okay. Transparent wet panties okay.'" *Id.* The Government further alleges that on October 25, 2010, Ferrer sent an email to Padilla (Backpage's operations manager) explaining that after "sex act pic[ture]s are removed" from ads, the "ad text may stay." FACMC ¶ 127(e). These allegations give rise to a plausible inference that Backpage, through editing and moderation of ads, willfully assisted in concealing child prostitution from law enforcement. Had Backpage done nothing, law enforcement could have monitored its site for ads using the term "amber alert" and sexually explicit images. Had Backpage deleted ads containing the term amber alert and "sex act pictures," it would have denied sex traffickers a forum for their operations. What Backpage is accused of doing instead, however, is editing the ads with the purpose of concealing the illegal trafficking. This activity is illegal in itself, and therefore it is outside the CDA's grant of immunity. In short, the Government alleges that Backpage was "directly involved in the alleged illegality, and thus is not immune." *See Roommates*, 521 F.3d at 1169.

Claimants raise several arguments regarding CDA immunity which the Court addresses in turn.

Claimants' primary argument is that Backpage may not be held liable as the publisher of the trafficking ads because the ads amount to "information provided by another content provider," namely, the pimps and traffickers who submitted the ads to Backpage.com. Claimants assert that, because Backpage did not affirmatively *add* content to any of the ads submitted by third parties, Backpage is immune from suit for claims arising from the ads.

In support of their argument, Claimants rely on another case involving Backpages' alleged promotion of sex trafficking: *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12 (1st Cir. 2016). In *Doe No. 1*, several sex trafficking victims brought suit against Backpage, alleging that each had been trafficked through advertisements posted on Backpage.com. *Id.* at 17. The First Circuit affirmed the district court's holding that Backpage was immune from suit under Section 230 of the CDA. In so holding, the First Circuit found that the plaintiffs' claims "challenge[d] features that are part and parcel of the overall design and operation of [Backpage's] website" and that such features, "which reflect choices about what content can appear on the website and in what form, are editorial choices that fall within the purview of traditional publisher functions." *Id.* at 21.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:18-cv-08420-RGK-PJW | Date | December 1, 2020 |
|---|---|---|---|
| Title | *United States of America v. $1,546,076.35 In Bank Funds Seized from Republic Bank of Arizona Account 1889, et al.* | | |

Claimants' reliance on *Doe No. 1* is misplaced. Unlike the Ninth Circuit's opinion in *Roommates*, the *Doe No. 1* court did not address the fact that a website is not immune under Section 230 if the website is responsible, in whole or in part, for the development of unlawful content that a third party submits to a website. *See Roommates*, 521 F.3d at 1168 (noting the court "spen[t] many pages exploring" the meaning of the term "develop" in 47 U.S.C. § 230(f)(3)). The Ninth Circuit found that the term development in 47 U.S.C. § 230(f)(3) includes "organizing and editing information for publication on websites" and that "a website operator who edits in a manner that contributes to the alleged illegality" of the edited content "is directly involved in the alleged illegality and thus not immune." *Id.* at 1168–69. The *Doe No. 1* court, in contrast, did not consider whether Backpage was responsible for the development of the alleged trafficking ads. In fact, the *Doe No. 1* court did not so much as mention the word "develop" or "development" in its discussion of CDA immunity; the court asked only whether the harmful content at issue had been created by Backpage, or "created by others." *See Doe No. 1*, 817 F.3d at 21.

Here, the Government does not allege that Backpage "created" the alleged trafficking ads. There is no dispute that the ads posted on Backpage.com were initially submitted to Backpage by third parties. Rather, the Government alleges that Backpage edited, *i.e.* developed, ad submissions with the purpose of concealing sex trafficking. The Court therefore finds that the Government's allegations give rise to a plausible inference that Backpage edited the trafficking ads in a manner that contributed to their alleged illegality. Thus, under the Ninth Circuit's decision in *Roommates*, Backpage is alleged to have developed in part the trafficking ads. Claimants therefore have failed to demonstrate that the Government's claims are barred by Section 230.

In their reply Claimants cite the following sentence from *Roommates*: "[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230." 521 F.3d at 1170–71. Taken out of context, this sentence lends support to Claimants' argument that a website that does nothing more than selectively exclude certain images and words from content submitted by third parties is necessarily immune under Section 230. But *Roommates* directly forecloses that argument. In discussing the type of editing that is *not* immune under Section 230, the court held:

> [A] website operator who edits in a manner that contributes to the alleged illegality . . . is directly involved in the alleged illegality and thus not immune.

*Id.* at 1170. Thus, taken in context, the passage from *Roommates* to which Claimants cite provides little support to Claimants' position. Rather, *Roommates* stands for the proposition that editing can not be

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:18-cv-08420-RGK-PJW | Date | December 1, 2020 |
|---|---|---|---|
| Title | *United States of America v. $1,546,076.35 In Bank Funds Seized from Republic Bank of Arizona Account 1889, et al.* | | |

"boiled down" to immune activity where a website edits content in a manner that contributes to the content's illegality.

Next, Claimants argue that the Government's claims must be dismissed because the Government fails to point to any specific ad that Backpage allegedly edited. Claimants assert that the FACMC's failure to identify particular ads that Backpage edited is fatal to the Government's case because "Section 230 'bar[s] claims unless [the website] created or developed the particular information at issue.'" Claimants' First Mot. to Dismiss at 12 (quoting *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1125 (9th Cir. 2003)). However, the Court finds that the Governments' allegations concerning Backpage's ad editing practices are sufficient to support a reasonable belief that the Government will be able to meet its burden of proof at trial.

In addition to the allegations discussed above, the Government alleges that "Ferrer instructed Backpage's technical staff to edit the wording of adult ads (FACMC ¶ 127(a)); that in 2010, a "Backpage manager sent an internal email explaining, 'I'd like to still avoid Deleting ads when possible;' 'we're still allowing phrases with nuance;' and '[i]n the case of lesser violations, editing should be sufficient'" (*id.* ¶ 127(d)); and that "a different Backpage manager sent an internal email stating that Backpage was "editing 70 to 80%" of the ads it received from customers" (*id.* ¶ 127(f)). These allegations support a plausible inference that Backpage was editing a significant portion of the ads it received from customers and that such editing materially contributed to the alleged illegality of the ads by helping to obscure the illegal nature of the ads. The fact that the Government has yet to identify particular ads that were edited in this manner is not fatal to the Government's case at the pleading stage. *See* 18 U.S.C. § 983(a)(3)(D).

Finally, Claimants argue that Backpage is immune under Section 230 because "deleting content posted by third parties does not render a website an information content provider with respect to the content it did not remove." Claimants' Reply in Supp. of First Mot. to Dismiss at 5–6, ECF 146; Claimants' First Mot. to Dismiss at 13–15. This argument ignores *Roommates*'s holding that a website that deletes content from a post provided by a third party is not immune under Section 230 if the website's deletion contributes to the illegality of the edited post as it appears on the website. *See Roommates*, 521 F.3d at 1169 ("[A] website operator who edits in a manner that contributes to the alleged illegality—such as by removing the word 'not' from a user's message reading '[Name] did *not* steal the artwork' in order to transform an innocent message into a libelous one—is directly involved in the alleged illegality and thus not immune.") (emphasis in original). As discussed above, the Government alleges that Backpage was responsible for developing the trafficking ads by editing them in

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:18-cv-08420-RGK-PJW | Date | December 1, 2020 |
|---|---|---|---|
| Title | *United States of America v. $1,546,076.35 In Bank Funds Seized from Republic Bank of Arizona Account 1889, et al.* | | |

a manner that masked their illegality, and thereby contributed to the ads' illegality. Accordingly, the Court finds Claimants' argument unavailing.[3]

### C. Claimants' Motion to Dismiss for Failure to State a Claim

By their second motion to dismiss, Claimants argue that the Government fails to sufficiently plead any of its three claims for relief. The Government's civil forfeiture claims are based on 18 U.S.C. § 981(a)(1)(A) and (C). The statute lists a number of predicate criminal offenses that justify civil forfeiture if it can be proven by a preponderance of the evidence that property is traceable to or derived from a violation of such an offense. The Court addresses Claimants' arguments with respect to each claim in turn.

#### 1. The Government's First Claim for Relief

The Government's first claim for relief is based on 18 U.S.C. § 981(a)(1)(C). The Government alleges that the Defendant Assets constitute, and are derived from, proceeds traceable to one or more violations of 18 U.S.C. § 1591, which prohibits sex trafficking of children, and 18 U.S.C. § 1952 of the Travel Act, which prohibits interstate and foreign travel or transportation in aid of racketeering enterprises, or from a conspiracy to commit such offenses. Both 18 U.S.C. § 1591 and § 1952 constitute predicate criminal offenses for purposes of the civil forfeiture statute.

Claimants argue that the Government's allegations of sex trafficking in violation of 18 U.S.C. § 1591 are insufficient for several reasons. First, Claimants assert that the Government fails to allege that Backpage engaged in sex trafficking because the FACMC merely alleges that Backpage's editing and moderation practices assisted third parties in posting sex trafficking ads. The Court disagrees. As discussed above in the Court's analysis of the CDA, the Government has sufficiently alleged that Backpage edited the trafficking ads in a manner that contributed to the ads' illegality. Advertising is a predicate act for a charge of sex trafficking. *See* 18 U.S.C. § 1591(a)(1). Accordingly, the Government has sufficiently alleged that Backpage engaged in sex trafficking.

---

[3] Claimants also raise arguments regarding the impact that the parallel criminal proceeding in Arizona has on Backpage's immunity (Claimants' First Mot. to Dismiss at 17–18) and the relationship between the Government's money laundering claims and the CDA (*id.* at 18–19). Because the Court concludes that Claimants have failed to establish that the Government's claims are barred by Section 230 of the CDA, the Court need not address these arguments.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:18-cv-08420-RGK-PJW | Date | December 1, 2020 |
|---|---|---|---|
| Title | *United States of America v. $1,546,076.35 In Bank Funds Seized from Republic Bank of Arizona Account 1889, et al.* | | |

     Next, Claimants argue that the Government will be unable to establish that Backpage had the requisite *mens rea* to commit an act of sex trafficking. For an advertiser's conduct to violate Section 1591, the advertiser must engage in the unlawful conduct "knowingly." *Backpage.com, LLC v. Lynch*, 216 F. Supp. 3d 96, 109 (D.D.C. 2016) ("[W]here the act constituting a violation of the statute is advertising, a conviction under § 1591(a) requires a 'knowing' *mens rea* standard[.]"). The Court finds that the FACMC states sufficiently detailed facts to support a reasonable belief that the Government will be able to meet its burden of proof at trial with respect to *mens rea*.

     The Government alleges that a Backpage manager engaged in an email exchange in August 2011 "acknowledging that a large proportion of the ads originally submitted by Backpage's customers contained text and pictures that were indicative of sex trafficking[,]" and that Backpage nonetheless "published those ads after editing them to appear less obvious in promoting illegal activity." FACMC ¶ 127(i). As part of its editing or "moderation" process, Backpage maintained a "strip out" list of "terms that Backpage management and employees closely identified with the obvious promotion of sex trafficking and prostitution." *Id.* ¶ 127(h). Furthermore, the Government alleges that in response to an inquiry from a law enforcement official about the use of the term "amber alert" in an ad, Ferrer acknowledged that "amber alert" might be "some kind of bizarre new code word for an under aged person" and instructed a Backpage manager to add the term to the strip out list. *Id.* ¶ 127(g). These allegations are sufficient at the pleading stage to support the Government's claim that Backpage Operators knowingly engaged in the advertisement of sex trafficking, in violation of Section 1591.[4]

     Claimants also argue that the Government's allegations with respect to the Travel Act are deficient. The parties' briefing with respect to the Travel Act is confused. In the FACMC, the Government alleges that various of the Defendant Assets are traceable to a violation of 18 U.S.C. § 1952 of the Travel Act. In their motion, Claimants argue that "[t]he allegations in the Complaint relating to the Travel Act, 18 U.S.C. *§ 1592*, all are, at best, inactionable legal conclusions." Claimants' Second Mot. to Dismiss at 12 (emphasis added). In its opposition, the Government follows Claimants' lead and refers to the provision of the Travel Act at issue as "§ 1592." Pl.'s Opp. to Claimants' Second Mot. to Dismiss at 16, ECF No. 141. The Court assumes that the parties' references to § 1592, as opposed to §

---

[4]     Claimants also argue that the FACMC is deficient because the Government fails to allege that each individual Claimant had knowledge of any sex trafficking that Backpage allegedly committed. This argument is a red herring. A civil forfeiture complaint need not allege that each potential claimant committed a predicate criminal offense. Rather, the Government need only allege that the Defendant Assets are traceable to or derived from the commission of such an offense. *See* 18 U.S.C. § 981.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:18-cv-08420-RGK-PJW | Date | December 1, 2020 |
|---|---|---|---|
| Title | *United States of America v. $1,546,076.35 In Bank Funds Seized from Republic Bank of Arizona Account 1889, et al.* | | |

1952, are the product of typographical errors, and proceeds to consider whether Claimants have established that the Government's Section 1952 claim is subject to dismissal.

To establish a violation of § 1952, the Government must show that the violating party acted with the intent to carry out the violation. *See* 18 U.S.C. § 1952(a). The statute provides that a person or entity who "travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce" shall be found in violation of the statute if the person or entity acts with intent to:

> (1) distribute the proceeds of any unlawful activity; or
>
> (2) commit any crime of violence to further any unlawful activity; or
>
> (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
>
> and thereafter performs or attempts to perform [an act described in paragraphs (1), (2), or (3).]

18 U.S.C. § 1952(a). To establish a violation of paragraph (3) of Section 1952(a), the Government must demonstrate "that the accused formed a specific intent to promote, manage, establish, carry on or facilitate" unlawful activity. *United States v. Gibson Specialty Co.*, 507 F.2d 446, 449 (9th Cir. 1974). Relying on *Gibson*, Claimants argue that the FACMC alleges no facts to support a claim that Claimants, or anyone else, violated the Travel Act. The Court disagrees.

In *Gibson*, the Ninth Circuit held that the district court had not erred in dismissing an indictment under the Travel Act. In so holding, the court found that to establish the criminal defendant's intent to violate the Travel Act by selling certain paraphernalia used in illegal gambling, "[t]he prosecutor must show that the [defendant] in some significant manner associated himself with the purchaser's criminal [gambling] venture for the purpose of its advancement." *Id.* Here, the Court finds that the Government, unlike the prosecutor in *Gibson*, has sufficiently alleged that Backpage associated itself with sex traffickers for the purpose of advancing their illegal venture.

As detailed throughout this Order, the Government alleges that all levels of Backpage management, including several of the Claimants, were aware of Backpage's role in promoting criminal activity, and that instead of deleting or reporting illegal ads, Backpage decided to edit them and continue to accept payment from pimps and traffickers for posting the illegal ads. The Government's allegations

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:18-cv-08420-RGK-PJW | Date | December 1, 2020 |
|---|---|---|---|
| Title | *United States of America v. $1,546,076.35 In Bank Funds Seized from Republic Bank of Arizona Account 1889, et al.* | | |

of Backpage's ad moderation, and awareness that many ads were used to traffic women and children, are sufficient to give rise to a plausible inference that Backpage intended to promote the unlawful activity of sex trafficking, and actually did promote sex trafficking.

Accordingly, the Court concludes that the Government has sufficiently pleaded its 18 U.S.C. § 981(a)(1)(C) claim, based on Backpage's alleged violations of 18 U.S.C. §§ 1591 & 1952.

> 2.    *The Government's Second Claim for Relief*

The Government's second claim for relief is based on 18 U.S.C. § 981(a)(1)(A). The Government alleges that the Defendant Assets were involved in, and are traceable to, property involved in one or more transactions or attempted transactions in violation of section 18 U.S.C. § 1957 and section 18 U.S.C. § 1956(h). Sections 1957 and 1956(h) prohibit money laundering and conspiracy to commit money laundering, respectively.

"A conviction for money laundering under 18 U.S.C. § 1957 requires the government to show: (1) the [alleged launderer] knowingly engaged in a monetary transaction; (2) he knew the transaction involved criminal property; (3) the property's value exceeded $10,000; and (4) the property was derived from a specified unlawful activity." *United States v. Rogers*, 321 F.3d 1226, 1229 (9th Cir. 2003). Here, Claimants do not dispute that the Government has alleged that Backpage engaged in multiple transactions that exceeded $10,000. Rather, Claimants argue that the Government fails to sufficiently plead the second and fourth elements of money laundering. The Court finds Claimants' arguments unpersuasive.

With respect to Backpage's knowledge of transactions involving property derived from criminal activity, the FACMC alleges that "most of Backpage's earnings represented the proceeds of illegal activity" (FACMC ¶ 123); that "all levels of Backpage management . . . were aware of Backpage's role in promoting criminal activity" (*id.* ¶ 126); that "[b]y 2015, the major credit card companies were refusing to process payments to or for Backpage, and banks were closing Backpage's accounts" (*id.*); and that "[i]n response to these measures, the Backpage Operators initiated and pursued a wide variety of money laundering strategies and techniques" including "instructing customers to send checks and money orders to a Post Office box, funneling those funds into bank accounts held in the names of entities with no apparent connection to Backpage, and then giving customers a corresponding 'credit' to purchase Backpage ads" (*id.* ¶ 124). The Government points to other allegations in the FACMC in support of its money laundering claim, but the Court finds the allegations listed sufficient to support a reasonable belief that the Government will be able to meet its burden of proof with respect to money laundering at trial.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:18-cv-08420-RGK-PJW | Date | December 1, 2020 |
|---|---|---|---|
| Title | *United States of America v. $1,546,076.35 In Bank Funds Seized from Republic Bank of Arizona Account 1889, et al.* | | |

Claimants seek to bolster their argument by citing two criminal cases filed in California Superior Court in which the court dismissed charges against Larkin and Lacey that were "premised on the claim that Backpage's receipt of payment for classified adult ads was the receipt of criminal property." Claimants' Second Mot. to Dismiss at 13 (citing *People v. Ferrer*, 2016 WL 7237305 (Cal. Super. Ct. Dec. 9, 2016); *People v. Ferrer*, No. 16FE024013 (Cal. Super. Ct. Aug. 23, 2017)). In *Ferrer*, 2016 WL 7237305, the court noted that "[p]roviding a forum for online publishing is a recognized legal purpose that is generally provided immunity under the CDA[,]" and held that the defendants were immune from the state's charges pursuant to the CDA. 2016 WL 7237305, at \*10–11 ("Congress has precluded liability for online publishers for the action of publishing third party speech[.]"). Here, however, the Court has already concluded that Claimants have failed to establish that the Governments' claims are barred by the CDA's grant of immunity. Accordingly, Claimants' reliance on *Ferrer* is inapposite.

With respect to the Government's claim that the Defendant Assets derive from a conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h), Claimants assert in one paragraph, without citing to a single legal authority, that the Government's allegations are conclusory. *See* Claimants' Second Mot. to Dismiss at 16. The Court finds that Claimants' conclusory argument fails to establish that the Governments' allegations of conspiracy are deficient.

Accordingly, the Court concludes that Claimants have failed to establish that the Government's 18 U.S.C. § 981(a)(1)(A) claim, based on Backpage's alleged violations of 18 U.S.C. § 1957 and 18 U.S.C. § 1956(h), is subject to dismissal.

> 3.    *The Government's Third Claim for Relief*

The Government's third claim for relief, also based on 18 U.S.C. § 981(a)(1)(A), alleges that the Defendant Assets were involved in, and are traceable to, property involved in one or more transactions or attempted transactions in violation of section 18 U.S.C. §§ 1956(a)(1)(B)(i) & (a)(2), and a conspiracy to commit such offenses. Section 1956(a)(1)(B)(i) prohibits concealment money laundering, and Section 1956(a)(2) prohibits international money laundering.

Section 1956(a)(1)(B)(i) penalizes a person who makes certain transactions while "knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity[.]" 18 U.S.C. § 1956(a)(1)(B)(i). Claimants assert that the Government's allegations are insufficient with respect to the statute's "concealment" requirement. The Court disagrees.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:18-cv-08420-RGK-PJW | Date | December 1, 2020 |
|---|---|---|---|
| Title | *United States of America v. $1,546,076.35 In Bank Funds Seized from Republic Bank of Arizona Account 1889, et al.* | | |

As noted above, the Government alleges that by 2015, "credit card companies were refusing to process payments to or for Backpage, . . . banks were closing Backpage's accounts[,]" and that the Backpage Operators responded by implementing "a wide variety of money laundering strategies and techniques designed, in part, to conceal the source and location of the revenues generated by Backpage ads[.]" FACMC ¶¶ 123–24. For example, the Government alleges that instead of accepting credit payments, "Backpage designed a mechanism to allow advertisers to buy Backpage 'credits,' which could be accomplished in several ways, including . . . [m]ailing gift cards, checks, or money orders to 'Posting Solutions' at a P.O. Box in Dallas, Texas[.]" *Id.* ¶ 129(a). The Government also alleges that certain of the Defendant Assets were held in specific accounts that were "used in furtherance of the money laundering scheme described [in the FACMC], and in an attempt to further conceal or disguise the nature, location, source, ownership or control of the criminal proceeds" or specified unlawful activities. *See, e.g.*, FACMC ¶ 182 (describing account held in the name of one of Larkin's children); *id.* ¶ 193 (describing account held in the name of Brunst). The FACMC also alleges that each seized asset is traceable to funds involved in or derived from Backpage's business operations.

The Court finds these allegations sufficient, at the pleading stage, to support the Government's claim that the Defendant Assets are traceable to transactions that the Backpage's Operators knew were "designed in whole or in part . . . to conceal or disguise the nature" of the sex trafficking and Travel Act violations alleged in the FACMC.

Finally, Claimants argue that the Government's allegations of international money laundering under Section 1956(a)(2) are deficient because the Government fails to allege that any of the Claimants transferred money internationally. Claimants' Second Mot. to Dismiss at 15. Again, this argument is a red herring. To prevail on its third claim for forfeiture under Section 981(a)(1)(A), the Government need not establish that any particular Claimant engaged in money laundering under Section 1956; the Government need only establish that the Defendant Assets were "involved in a transaction or attempted transaction in violation of section 1956 . . ., or [constitute] property traceable to such property." *See* 18 U.S.C. § 981(a)(1)(A). The Court finds the allegations in the FACMC are sufficient to support a reasonable belief that the government will be able to meet its burden of proof at trial.

///

///

///

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:18-cv-08420-RGK-PJW | Date | December 1, 2020 |
|---|---|---|---|
| Title | ***United States of America v. $1,546,076.35 In Bank Funds Seized from Republic Bank of Arizona Account 1889, et al.*** | | |

## V.   CONCLUSION

For the foregoing reasons, the Court **GRANTS in part and DENIES in part** the Government's Motion to Strike and **DENIES** both of Claimants' Motions to Dismiss.

**IT IS SO ORDERED.**

_____ : _____

jre