TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
JONATHAN GALATZAN
Assistant United States Attorney
Chief, Asset Forfeiture Section
DAN G. BOYLE (California Bar No. 332518)
Assistant United States Attorney
Asset Forfeiture Section
      Federal Courthouse, 14th Floor
      312 North Spring Street
      Los Angeles, California 90012
      Telephone: (213) 894-2426
      Facsimile: (213) 894-0142
      E-mail: Daniel.Boyle2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　　　　v.<br><br>$1,546,076.35 IN BANK FUNDS SEIZED FROM REPUBLIC BANK OF ARIZONA ACCOUNT '1889, ET AL.,<br><br>　　　　　Defendants.<br>_____<br>Michael Lacey,<br><br>　　　　　Claimant. | Case No. CV 18-08420-RGK (PJWx)<br><br>PLAINTIFF'S CORRECTED OPPOSITION TO CLAIMANTS' MOTION FOR RELEASE OF ASSETS [ECF No. 210]<br><br>Hearing Date: January 31, 2021<br><br>Time: 9:00 a.m. |

        Plaintiff United States of America, by and through its

counsel of record, the United States Attorney for the Central

District of California and Assistant United States Attorney Dan

G. Boyle, hereby files its Corrected Opposition to Claimant

Michael Lacey's Motion to Release Assets. ECF No. 210.

     This Opposition is based upon the attached memorandum of

points and authorities, the attached declaration of AUSA Dan G.

Boyle and the exhibits thereto, the files and records in this

case, and such further evidence and argument as the Court may

permit.


 Dated: January 11, 2022     Respectfully submitted,

                              TRACY L. WILKISON
                              United States Attorney

                              SCOTT M. GARRINGER
                              Assistant United States Attorney
                              Chief, Criminal Division
                              JONATHAN GALATZAN
                              Assistant United States Attorney
                              Chief, Asset Forfeiture Section

                                    /s/
                              DAN G. BOYLE
                              Assistant United States Attorney

                              Attorneys for Plaintiff
                              UNITED STATES OF AMERICA

1

2

## **TABLE OF CONTENTS**

I.   FACTUAL AND PROCEDURAL BACKGROUND ......................... 1

II.  ARGUMENT .................................................. 5

A. Lacey Has Failed to Meet the Statutory Standards for a Post-
Complaint Motion to Return Property ......................... 5

B. Lacey's Motion is Moot as to the Union Property .......... 11

C. The FACMC States Probable Cause the Restrain the Union
Property and the RBA Funds ................................. 13

   1. The FACMC States Probable Cause as to the Union Property 14

   2. The FACMC States Probable Cause as to the RBA Funds .... 16

### TABLE OF AUTHORITIES

**Cases**

AlCharihi v. United States,

  No. CV 16-7391-JFW, 2017 WL 2861654 (C.D. Cal. May 4, 2017) . 8

Camacho v. United States,

  No. 12-CV-956-CAB (BGS), 2013 WL 12072522 (S.D. Cal. Dec. 18,

  2013) ..................................................... 11

In re Jordan,

  606 F.3d 1135 (9th Cir. 2010) ............................... 6

In re Return of Seized Prop. specifically all funds seized from

  BoundlessRise, LLC Wells Fargo Bank Acct. No. 'XXXX,

  No. SA-CV-17-771-CJC, 2017 WL 4180149 (C.D. Cal. Aug. 30,

  2017) ...................................................... 6

Kaley v. United States,

  571 U.S. 320 (2014) ....................................... 13

Karlsson v. Ewing,

  No. CV 14-0420-FMO (EX), 2018 WL 6016938 (C.D. Cal. July 25,

  2018) ..................................................... 13

Oklevueha Native Am. Church of Hawaii, Inc. v. Holder,

  676 F.3d 829 (9th Cir. 2012) .............................. 11

Sorchini v. City of Covina,

  250 F.3d 706 (9th Cir. 2001) .............................. 10

Tacori Enterprises v. Nerces Fine Jewelry,

  No. CV-12-2753-DSF, 2013 WL 12113229 (C.D. Cal. Sept. 20,

  2013) ..................................................... 10

United States v. $493,850.00 in U.S. Currency,

  518 F.3d 1159 (9th Cir. 2008) ............................. 13

United States v. $739,047.03 in U.S. Currency,

  103 F. App'x 245 (9th Cir. 2004) ............................ 9

United States v. Cleckler,

  270 F.3d 1331 (11th Cir. 2001) ............................ 16

United States v. Contents of Accts.,

  629 F.3d 601 (6th Cir. 2011) ............................... 6

United States v. Hirayama,

  No. CR 16-00749-JMS, 2021 WL 92804 (D. Haw. Jan. 11, 2021) . 12

United States v. Lindell,

  No. 3-00512 DKW, 2016 WL 4707976 (D. Haw. Sept. 8, 2016) ... 11

United States v. Monsanto,

  491 U.S. 600 (1989) ........................................ 7

United States v. Undetermined Amount of U.S. Currency,

  376 F.3d 260 (4th Cir. 2004) ............................... 8

von Hofe v. United States,

  492 F.3d 175 (2d Cir. 2007) ............................... 15


**Statutes**

18 U.S.C. § 983(f)..................................... passim

18 U.S.C. § 985............................................ 13


**Rules**

Fed.R.Civ.Proc. 12......................................... 6

Fed.R.Civ.Proc. Supp. Rule G(8)(b)......................... 6

## MEMORANDUM OF POINTS AND AUTHORITIES

On December 10, 2021, Claimant Michael Lacey ("Lacey") filed the instant motion (the "Motion" or "Mot."), which is styled as a motion for return of property, but which would effectively dismiss this action for two defendant assets. There is no question that Lacey's Motion is seeking extraordinary relief: he is asking this Court to release millions of dollars in assets which he is all-but certain to immediately spend on his defense in a parallel criminal action, without actually dismissing the complaint as to these assets, and thus releasing them from the Court's exclusive in rem jurisdiction.

Lacey's motion should be denied for multiple reasons. First, Lacey ignores the statutory requirements for a motion to return property as set forth in 18 U.S.C. § 983, and instead, relies largely on a single non-precedential and non-citable case. Second, his motion is simply moot as to one of these assets, as the government never seized the real property involved, and thus cannot return or release something it does not have. Finally, setting aside the procedural defects in the Motion, the First Amended Consolidated Master Complaint ("FACMC") states probable cause for forfeiture of the defendant assets in question.

### I.   FACTUAL AND PROCEDURAL BACKGROUND

#### Overview of Backpage

By now the Court is now well-versed in the factual history at issue in this consolidated action. In brief, the government has alleged that certain claimants here owned and/or operated the Backpage.com website ("Backpage"), and that the vast

majority of Backpage's "adult" ads consisted of offers to sell adults or children for sex. See ECF No. 108 (FACMC), ¶¶ 106-112, 121, 123, 126. For most of its existence, Backpage charged for posting these "adult" ads, and generated more than 90% of its revenue, or approximately a half-billion dollars, from those ads. See FACMC ¶¶ 107, 123. Backpage's executives and owners knew that the overwhelming majority of these "adult" ads involved prostitution. See FACMC ¶¶ 123, 126, 129-130.

### The Civil Seizure Warrants and Forfeiture Complaints

Between March 28, 2018 and June 4, 2018, magistrate judges in this District found probable cause to issue warrants to seize a range of assets, and execution of these warrants resulted in the seizure of the funds at issue. The government filed a series of complaints, which were consolidated before this Court on December 18, 2019, ECF No. 50, and on June 1, 2020, the Government filed the FACMC. See ECF No. 108. Lacey's motion concerns two defendant assets in this consolidated action.

### The Union Property

As described in the FACMC, and originally filed in Case No. 18-cv-8763, the government seeks forfeiture of a real property located in San Francisco, California, identified by APN 0097C011 (the "Union Property"). On May 24, 2019 Claimants Lacey and Jill Anderson filed claims to the Union Property.

On or about January 20, 2020, the government and Lacey entered a stipulation seeking an interlocutory sale order for the Union Property. See ECF No. 70. The Court signed the proposed order on January 31, 2020. See ECF No. 72 (the "Sale Order"). Pursuant to the Sale Order, the minimum sale price for

the Union Property was $5,000,000. <u>See</u> ECF No. 72, ¶ 7. Following the Sale Order, the United States Marshals Service ("USMS") retained property brokers and attempted to sell the Union Property in accordance with the minimum price set forth in the Sale Order but has not had any significant interest at the designated minimum price.

### The Republic Bank of Arizona Funds

As described in the FACMC, and originally filed in in Case No. 18-cv-08579, the government seeks to forfeit funds seized from two bank accounts at Republic Bank of Arizona ("RBA") with account numbers ending '2485 and '3126. <u>See</u> FACMC ¶ 156 (the "RBA Funds"). These accounts are identified in the FACMC as "Account 5" and "Account 7," respectively. <u>See</u> FACMC, ¶ 4-5.

Lacey's motion does not specifically identify what defendant bank funds he seeks released here beyond describing these assets as "Segregated Village Voice Accounts," and he does not appear to provide cites to the FACMC or account numbers for these specific accounts. <u>See</u> Mot. 6-7. For the purposes of this opposition, the government presumes that Lacey is seeking the release of the RBA Funds seized from the '2485 and '3126 accounts, as those two accounts were the subject of Lacey's prior motion practice (as described further herein).

### The Criminal Action and the Funds Motion

On March 28, 2018, an Arizona federal grand jury returned an Indictment charging Lacey and others with Travel Act and Money Laundering conspiracies. <u>See</u> <u>United States v. Lacey, et al.</u>, D. Az. CR-18-422-PHX-SMB (the "Criminal Action"). In July

3

1   of 2018, the grand jury issued a Superseding Indictment in the

2   Criminal Action. <u>See</u> D. Az. CR-18-422-PHX-SMB, ECF No. 230.

3       On October 26, 2021, Lacey and three codefendants in the

4   Criminal Action filed a motion to "partially vacate the seizure

5   warrants that currently restrain [certain] assets and order the

6   release of these limited sets of assets," including certain

7   assets at issue in this action. <u>See</u> D. Az. CR-18-422-PHX-SMB,

8   ECF No. 1366 (the "Funds Motion"). In the Funds Motion, Lacey

9   broadly alleged that he desperately needed funds to pay his

10  Criminal Action counsel, that he and his codefendants already

11  owed substantial sums of money to their counsel, and needed even

12  more for the upcoming criminal trial. <u>See id</u>.[1] The Funds Motion

13  was denied on December 12, 2021.

14                      **The Stay of this Action**

15      On January 13, 2021, the government and claimants

16  stipulated to stay this this consolidated action during the

17  pendency of the Criminal Action, which the Court ordered on

18  January 20, 2021. <u>See</u> ECF Nos 188, 189. The stipulated stay

19  permitted certain limited categories of motion practice

20  including motions "relating to the restraint and release of

21  funds," but did not permit further motions to dismiss during the

22  stay. <u>See</u> ECF No. 189. Lacey's criminal trial has been continued

23  pending an interlocutory appeal.

24

25  _____

26      [1] Lacey's counsel signed a declaration detailing this
    purported needed, while requesting sealing. While that motion to
27  seal was never granted, in an abundance of cation, the
    government does not quote or attach a copy of that document. The
28  government is prepared to file a copy if requested by the Court.

                                4

## II.   ARGUMENT

### A.   Lacey Has Failed to Meet the Statutory Standards for a Post-Complaint Motion to Return Property

In enacting the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), Congress created a balanced statutory structure aimed at protecting claimants' due process rights while ensuring that the proceeds of crime could be effectively forfeited. A claimant who believed that a complaint failed to sufficiently state grounds for forfeiture could move to dismiss pursuant to Fed.R.Civ.Proc. 12, see Fed.R.Civ. P. Supp. Rule G(8)(b), while a claimant who simply needed possession of their property during the pendency of a forfeiture action could move for return that property pursuant to Supp. Rule G(8)(d) and 18 U.S.C. § 983(f). What Congress unquestionably *did not* do with CAFRA was create a mechanism for a claimant to reclaim and dissipate the defendant res in a civil forfeiture proceeding while that same proceeding was ongoing. Indeed, such a result would be absurdly wasteful – a claimant could demand the return of seized assets, then freely spend or transfer those assets, all while the civil proceeding to forfeit those very same (now dissipated) assets continued to occupy the court's time and resources. Yet this is what Lacey is asking of this Court. He is wrong – neither § 983, the Federal Rules, nor any authority in this Circuit authorize such relief.

"The Civil Asset Forfeiture Reform Act, 18 U.S.C. § 983, governs all requests for the pretrial release of property that has been seized for civil forfeiture." United States v. 8 Gilcrease Lane, Quincy Fla. 32351, 587 F. Supp. 2d 133, 140 (D.D.C. 2008). Following CAFRA, § 983(f) is the mechanism for

seeking return of property, and "outlines the circumstances under which civil forfeiture claimants are entitled to immediate release of seized property and the procedure to be followed in obtaining such relief." United States v. Contents of Accts., 629 F.3d 601, 607 (6th Cir. 2011); see also In re Return of Seized Prop. specifically all funds seized from BoundlessRise, LLC Wells Fargo Bank Acct. No. 'XXXX, No. SA-CV-17-771-CJC, 2017 WL 4180149, at *1 (C.D. Cal. Aug. 30, 2017) ("The federal statute providing procedural protections in civil forfeiture proceedings, 18 U.S.C. § 983, allows claimants to raise any claims of irreparable injury and to seek immediate release of the seized property."); In re Jordan, 606 F.3d 1135, 1137 (9th Cir. 2010) (affirming denial of Fed.R.Crim.P. 41(g) motion to return property, describing means to seek return of property in civil forfeiture as "litigat[ing] the civil judicial forfeiture action" or "request[ing] the immediate return of their property under 18 U.S.C. § 983(f)").

As the Sixth Circuit recognized in Contents of Accts., not only does § 983(f) provide a statutory mechanism for resolving motions for return of property in civil forfeiture proceedings, but in enacting CAFRA, Congress foreclosed general injunctive relief seeking the same. See Contents of Accts., 629 F.3d at 606 ("The question presented in this case is one of first impression: whether the exercise of preliminary injunctive relief under Rule 65 to order the release of seized property would be 'inconsistent' with the procedure set out in Supplemental Rule G for the release of seized property, namely, a petition for release under § 983(f). We find that it would.").

Thus, other than litigating the forfeiture case or dismissing the action, § 983(f) is the claimant's mechanism for seeking return of property.[2]

Under § 983(f)(1), a claimant may obtain immediate release of seized property where:

> (A) the claimant has a possessory interest in the property;

> (B) the claimant has sufficient ties to the community to provide assurance that the property will be available at the time of the trial;

> (C) the continued possession by the Government pending the final disposition of forfeiture proceedings will cause substantial hardship to the claimant, such as preventing the functioning of a business, preventing an individual from working, or leaving an individual homeless;

> (D) the claimant's likely hardship from the continued possession by the Government of the seized property outweighs the risk that the property will be destroyed, damaged, lost, concealed, or transferred if

---

[2] As recognized in this Court's prior orders, see, e.g, ECF No. 106, at 2, there is a judicially-created exception to this structure: under United States v. Monsanto, 491 U.S. 600 (1989) and its progeny, courts have held that assets which are the subject of a civil forfeiture proceeding may be released to pay counsel, *but only* if a claimant lacks other assets to defend themselves in a criminal prosecution. Lacey makes no Monsanto argument here, and he has already sought (and been denied) Monsanto relief in the District of Arizona.

1    it is returned to the claimant during the pendency of
2    the proceeding; and
3         (E) none of the conditions set forth in
4    [§ 983(f)(8)] applies.
5    The conditions found in § 983(f)(8) include where the seized
6    property is "contraband, currency, or other monetary instrument,
7    or electronic funds unless such currency or other monetary
8    instrument or electronic funds constitutes the assets of a
9    legitimate business." See 18 U.S.C. § 983(f)(8)(A).
10        Lacey's motion plainly does not meet the standards of
11   § 983(f). He does not explain how the seizure is causing him
12   hardship, what his ties to the community might be, and most
13   importantly, does not argue that any returned property would be
14   preserved prior to trial. While Lacey is silent about what would
15   happen to any returned property, his claims in the Funds Motion
16   of a desperate need for money to fund his criminal defense make
17   it virtually certain that any returned property would
18   immediately be paid or transferred to his Criminal Action
19   counsel. See AlCharihi v. United States, No. CV 16-7391-JFW,
20   2017 WL 2861654, at *3 (C.D. Cal. May 4, 2017) (denying § 983(f)
21   motion where "based on Petitioner's admissions, it is clear that
22   he intends to transfer the [property] … This admission, standing
23   alone, is a sufficient basis for denial"); United States v.
24   Undetermined Amount of U.S. Currency, 376 F.3d 260, 265 (4th
25   Cir. 2004) (return of property prohibited where claimants
26   conceded that they intended to use released bank account funds
27   to pay attorneys' fees). And even if Lacey had attempted to
28   argue that the RBA Funds would not be dissipated, § 983(f)(8)(A)

8

1    would explicitly prohibit the return of bank funds (such as the
2    RBA Funds) in these circumstances.

3         With § 983(f) plainly not available to him, and with the
4    stay order prohibiting him from moving dismiss the FACMC in
5    whole or part to free up funds, Lacey has instead opted to try
6    and fashion a wholly-new remedy here, seeking the return of
7    these assets without dismissing the complaint, and without any
8    guarantee that the defendant res will remain available at the
9    time of trial. This is simply dismissal by another name. Lacey's
10   motion, if granted, would turn § 983's statutory structure on
11   its head: while Congress provided strict limitations on motions
12   to return property, including provisions aimed at preserving
13   defendant assets, see § 983(f)(7)(A) (court can enter any order
14   necessary to ensure that the value of the returned property is
15   maintained while the forfeiture action is pending), Lacey would
16   have the Court return assets free and clear, to be spent or
17   transferred while this action is stayed.

18        Against this statutory structure, Lacey does not cite any
19   statute or rule supporting his motion to have and spend the
20   defendant res in a civil forfeiture action post-complaint,
21   without dismissal. Instead, he relies largely on a single,
22   unpublished Ninth Circuit memorandum decision: United States v.
23   $739,047.03 in U.S. Currency, 103 F. App'x 245, 248 (9th Cir.
24   2004) (memorandum). But under Ninth Circuit Rule 36-3(c), this
25   pre-2007 unpublished decision "may not be cited to the courts of
26   this circuit".[3] As such, $739,047.03 is neither binding nor

27

28        [3] Not only is this decision explicitly not precedent, citing
     such a decision is sanctionable in this circuit. See, e.g.,

                                  9

persuasive, and indeed, provides a sound example of why the
Ninth Circuit has restricted citation of pre-2007 unpublished
decisions: that case was decided relatively soon after CAFRA's
substantial revisions to federal civil forfeiture law and
includes no analysis of either CAFRA or § 983(f), relying
largely on Krimstock v. Kelly, an out-of-circuit decision which
dealt with probable cause to hold vehicles after *warrantless*
seizures in DUI arrests under New York forfeiture law – not
CAFRA. See 306 F.3d 40, 50 (2d Cir. 2002). As the district
court's decision following remand in $739,047.03 shows, the
claimant there was not actually seeking return of property, just
post-seizure interest, and no probable cause hearing was
necessary, as the court found there was "no evidence the money
is necessary for Claimant's survival," and that "currency is
highly 'mobile.' Currency can be easily spent, and therefore
lost," in effect applying the § 983(f) standard. see Ex. 1,[4] at
10-11. Lacey's reliance on a non-precedential decision is no
justification for upending the structure Congress created.[5]

---

Tacori Enterprises v. Nerces Fine Jewelry, No. CV-12-2753-DSF,
2013 WL 12113229, at *2, n.2 (C.D. Cal. Sept. 20, 2013) ("Tacori
cites to an unpublished Ninth Circuit case … This is improper
under Ninth Circuit Rule 36-3(b). Further violations of Rule 36-
3(b) will result in sanctions."); see also Sorchini v. City of
Covina, 250 F.3d 706, 709 (9th Cir. 2001) (per curium)
(recognizing that violations of Rule 36-3 are sanctionable).

     [4] All references to "Exhibit" or "Ex." refer to the exhibits
to the accompanying declaration of AUSA Dan Boyle.

     [5] Other than $739,047.03 and Krimstock, Lacey cites just two
other district court cases for this proposition, and provides no
explanatory parenthetical for either of these citations. Neither
is relevant. United States v. Lindell, No. 3-00512 DKW, 2016 WL
4707976, at *7 (D. Haw. Sept. 8, 2016) was a criminal forfeiture
case where the government elected not to file a civil complaint,

1    If Lacey believes that the government has not "stat[ed]

2 sufficiently detailed facts to support a reasonable belief that

3 it will be able to meet its burden of proof at trial" (Mot. at

4 15), then his remedy is to seek dismissal once the current stay

5 is lifted, but he cannot use a purported motion for return of

6 property as a trojan horse for arguments seeking what amounts to

7 dismissal of this action as to these assets.

8    **B.   Lacey's Motion is Moot as to the Union Property**

9    The Ninth Circuit has repeatedly held that a court "cannot

10 order the government to return something it does not have."

11 Oklevueha Native Am. Church of Hawaii, Inc. v. Holder, 676 F.3d

12 829, 840 (9th Cir. 2012). Even if Lacey's new motion met the

13 requirements of § 983(f), Lacey's motion is nonetheless moot

14 with respect to the Union Property, because the government

15 cannot return or release property it has not seized – and Lacey

16 has not alleged that the Union Property was ever seized.

17    Pursuant to 18 U.S.C. § 985, the government generally

18 cannot seize real property alleged to be subject to civil

19 forfeiture. Instead, a Court's in rem jurisdiction for the civil

20 forfeiture of real property is perfected by service and

21 recording of a lis pendens. See 18 U.S.C. § 985(b)(2)("The

22 filing of a lis pendens … shall not be considered a seizure

23 under this subsection.").

24 and has no apparent relevance here, where Lacey is seeking to
release funds after a civil forfeiture complaint was filed.
25 Similarly, Camacho v. United States, No. 12-CV-956-CAB (BGS),
2013 WL 12072522, at *4 (S.D. Cal. Dec. 18, 2013) concerned a
26 putative class action regarding the release of automobiles to
lien-holders when the government _declined_ to proceed with
27 administrative forfeiture, and thus does not appear to have any
relevance to the present dispute.
28

11

The government followed § 985 here: the Union Property was not seized, and instead, the government filed a <u>lis pendens</u>. <u>See</u> Ex. 2 (notice of filing <u>lis pendens</u>). Courts have consistently held that a <u>lis pendens</u> is not a seizure of property. <u>See</u> <u>United States v. Hirayama</u>, No. CR 16-00749-JMS, 2021 WL 92804, at *5 (D. Haw. Jan. 11, 2021) ("[M]any courts have found that a lis pendens is not a 'restraint' on property and does not 'deprive' the property owner of the property" (<u>quoting United States v. Register</u>, 182 F.3d 820, 837 (11th Cir. 1999))).

All Lacey is prohibited from doing is transferring the Union Property with clean title. In fact, § 983(f) provides that, if real property is seized and then ordered retuned to a claimant, then filing a <u>lis pendens</u> is an appropriate method for the government to protect its interest in that property pending trial. <u>See</u> 18 U.S.C. § 983(f)(7)(B) ("[T]he Government may place a lien against the property or file a lis pendens to ensure that the property is not transferred to another person.").

In reality, what Lacey wants is to lift the <u>lis pendens</u> on the Union Property so it can be sold or encumbered with clear title, likely to fund his criminal defense. But Lacey has not moved to expunge the <u>lis pendens</u>, most likely because there is little question that if the government prevails in forfeiting the Union Property, that would "affect title to, or the right to possession of" the Union Property. <u>See Karlsson v. Ewing</u>, No. CV 14-0420-FMO (EX), 2018 WL 6016938, at *1 (C.D. Cal. July 25, 2018) (<u>citing</u> Cal. Civ. Proc. Code § 405.20)).

In sum, the Union Property has not been seized, so there is nothing to return. And even if the Union Property had been

seized and the Court ordered it returned, the government would nonetheless be entitled to place a lis pendens on the Union Property pursuant to § 983(f)(7)(B), leaving the parties back at the current status quo. If Lacey seeks to expunge the lis pendens on the Union Property, he must move for expungement and identify the proper legal standard.

**C.    The FACMC States Probable Cause the Restrain the Union Property and the RBA Funds**

Even if the Court overlooks Lacey's failure to follow the requirements of § 983(f), and if the Court were willing to expunge the lis pendens on the Union Property despite the pendency of this action, the government has nonetheless met the modest probable cause standard. Probable cause to restrain assets subject to forfeiture "is not a high bar," Kaley v. United States, 571 U.S. 320, 338 (2014), and is "less than prima facie proof but more than mere suspicion." United States v. $493,850.00 in U.S. Currency, 518 F.3d 1159, 1169 (9th Cir. 2008). The government must merely establish reason "to believe that the property is involved in the activity subject to the specific forfeiture statute it invokes." Id.

As an initial matter, Lacey is not disputing here that Backpage's funds are tainted. In 2018, Backpage and several of its affiliates (collectively "Backpage") pled guilty in the District of Arizona to Informations charging each with a money laundering conspiracies, admitting that Backpage "derived the great majority of its revenue from fees charged in return for publishing advertisements for 'adult' and 'escort' services," that "[t]he great majority of these advertisements [were], in

13

fact, advertisements for prostitution services," and that after "banks, credit card companies, and other financial institutions refused to do business with Backpage," Backpage "found ways to fool credit card companies into believing that Backpage-associated charges were being incurred on different websites, to route Backpage-related payments and proceeds through bank accounts held in the name of seemingly unconnected entities." See United States v. Backpage.com LLC, et al., D.Az. 18-CR-465-DJH-1, ECF No. 8-1 (plea agreement), at 11-12. These admissions are mirrored in some of the allegations in the FACMC. See, e.g., FACMC ¶¶ 107, 123-124, 132. As such, the only question is if the FACMC alleges sufficient tracing between Backpage proceeds and the Union Property and the RBA Funds. The FACMC does so.

      1.   The FACMC States Probable Cause as to the Union Property

For the Union Property, Lacey's substantive arguments largely boil down to the following: (1) the FACMC's allegations that Backpage funds were used to maintain the Union Property are "boilerplate" and "overbroad," and (2) the government has not alleged a "substantial connection" required by law. See Mot. at 17. These arguments have no merit.

First, the FACMC is not boilerplate, as it specifically details the funds alleged to have been commingled into Union Property: "Beginning in February 2013, illicit funds from Backpage's U.S. Bank account '1165 passed-through various Backpage or Backpage Operators accounts, eventually ending up in BMO Harris account '5263, owned or controlled by Lacey. In May 2015, over $10,000 of funds from BMO Harris account '5263 was

used to purchase or maintain [the Union Property]". <u>See</u> FACMC ¶ 172; <u>see also</u> FACMC ¶ 176(a) ("Between February 4 and June 6, 2013, through a series of wire transfers, Backpage's U.S. Bank account '1165 transferred approximately $41,500,000 to BMO Harris Bank account '5263"). Lacey also does not cite any authority holding that the Union Property should be returned if the government supposedly relied on "boilerplate" language.

Second, the government has alleged the "substantial connection" required here - namely, that more than $10,000 in tainted Backpage proceeds were used *to maintain* the Union Property, thus involving that property in a money laundering offense. <u>See</u> Stefan D. Cassella, <u>Asset Forfeiture Law in the United States</u> (2d ed. 2013), § 27-10(a) ("To satisfy the substantial connection requirement, the connection between the property and the offense must be more than merely incidental or fortuitous."). The Union Property was not incidental to the transaction alleged: the maintenance of that property is the very purpose of the alleged transaction. <u>See</u> FACMC ¶ 172. Courts have regularly found real properties substantially connected to illicit transactions where the property was merely used house tainted goods, a far more tenuous connection that that alleged here – including in Lacey's own cited authority. <u>See von Hofe v. United States</u>, 492 F.3d 175, 190 (2d Cir. 2007) (substantial connection between real property and 65 marijuana plants grown at the property); <u>see also United States v. Cleckler</u>, 270 F.3d 1331, 1334 (11th Cir. 2001) (substantial connection where "undisputed facts show that one drug-sale was

15

negotiated on the defendant-property (and later consummated at another location)").[6]

Finally, Lacey's appeal to the Eighth Amendment is premature. If the Union Property is ultimately forfeited, Lacey may then seek relief under the Eighth Amendment. But pursuant to Supp. Rule G(8)(e) and § 983(g), such relief is only appropriate *after* there is a forfeiture, after such a defense has been pleaded in an answer (which has not been filed), and after discovery has been conducted (which has not occurred).

2.    The FACMC States Probable Cause as to the RBA
      Funds

Lacey's probable cause arguments as to the RBA Funds are no more persuasive. Lacey's motion ignores the tracing in the FACMC, and instead, largely recycles arguments from his prior motion as to these assets. Lacey's new motion is meritless in this respect and should be denied.

Without recounting the full history of Lacey's motion practice here, Lacey moved this Court in August of 2018 claiming that certain of the defendant assets could not have been tainted, as his bookkeeper had erroneously issued two checks from a Backpage-funded account totaling $676,808.04 into the RBA '2485 account, which he had intended to keep separate from

---

[6] The "substantial connection" requirement is a low bar, and even in Lacey's cited authority, United States v. $40,200.00 in U.S. Currency, where the court did not find a substantial connection, the Court merely denied summary judgment in the government's favor, holding that the government's evidence might nonetheless still "prove sufficient to convince a fact finder of the connection to drug activity when properly submitted and examined at trial." No. CV-14-6526-MWF, 2015 WL 12914363, at *10 (C.D. Cal. Aug. 24, 2015).

Backpage. See generally 18-cv-06742, ECF No. 23 (Lacey "clerical error" motion). The government responded that this supposed clerical error would require discovery, which the Court ordered. See 18-cv-08420-RGK, ECF No. 131. On March 13, 2020, however, Lacey and the government stipulated that the government would return part of the funds subject to the purported clerical error, but that the government could amend the then-operative complaint (the "CMC") to include new tracing for the remaining funds, independent of the supposed clerical error. See ECF No. 97. For this reason, the government returned some, but not all, of the funds in question, and Lacey agreed that this resolved his motion. See id., ¶ 12 ("This stipulation and the proposed partial consent judgment resolve Claimants' motion for return of certain funds"). On June 1, 2020, the government filed the FACMC, which included this updated tracing. See ECF No. 108.

Lacey's new motion largely ignores this history and the updated tracing in the FACMC, pretending instead that the government simply agreed with Lacey's position and that the operative complaint was never substantially amended.[7] But it is beyond dispute that the government updated its tracing when filing the FACMC. See Appendix A (comparison of CMC and FACMC paragraphs 156 regarding RBA Funds). Lacey has apparently chosen not to address this new tracing, and his motion is deeply

---

[7] Lacey confusingly states that "[t]he First Amended Complaint contains now new allegations in regards to these funds," Mot. at 20, but it is not clear whether this a typo intended to be "no," or simply an awkward phrasing acknowledging that the tracing in the FACMC was indeed updated, without ever addressing the substance of this new tracing.

17

confusing here: the government identified this updated tracing to Lacey *before* filing the FACMC and explained how this tracing was separate from the supposed clerical error, yet Lacey now claims that the government "did not want to discuss or return all of the funds until [the FACMC] was filed." Mot. at 19-20. This is simply false. As demonstrated by the attached correspondence with Lacey's counsel – including counsel who signed Lacey's new motion – the government was not only willing to discuss its updated tracing but provided details of this tracing to Lacey months before the FACMC was filed.

Whether Lacey acknowledges the amendments in the FACMC or not, these updated allegations are fatal to Lacey's motion. Lacey's alleged clerical error occurred in May of 2017, See 18-cv-06742, ECF No. 23. The FACMC, however, also alleges that *months after* this purported clerical error was made and reversed, between September and December of 2017, a separate Backpage-funded account, identified as "Account '9863" at Wells Fargo Bank, FACMC ¶ 154, transferred "approximately $944,729.25 among seven transactions" into a BBVA Compass Bank account ending '4862, which itself then transferred at least $640,711 into the RBA '2485 account. See Appendix A. The FACMC goes on to allege that Lacey himself withdrew $500,000 from RBA '2485 account in 2018, and then used that $500,000 as the initial deposit to open the RBA '3126 account. See FACMC ¶ 156(e). These transactions have nothing to do with any clerical error in May of 2017, and the FACMC details how Account '9863 independently received tainted Backpage proceeds. See FACMC ¶ 154.

18

Lacey's new motion simply ignores these allegations and should be denied on these grounds alone. Whether or not any clerical error occurred in May of 2017, Lacey's motion does not dispute that four-to-six months later nearly a million dollars traceable to Backpage sources was transferred into Account '9863, of which at least $640,711 was transferred into the RBA Accounts. If Lacey does not even address these allegations, he certainly cannot be understood to argue that they do not state probable cause. In sum, even if the so-called clerical error occurred as Lacey claims, the government's updated tracing in the FACMC states probable cause to restrain the RBA Funds.

## CONCLUSION

For the above reasons, the government respectfully requests that Lacey's motion be denied.

Respectfully submitted,

DATED: January 11, 2022
TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
JONATHAN GALATZAN
Assistant United States Attorney
Chief, Asset Forfeiture Section


_/s/_____
DAN G. BOYLE
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

19

**APPENDIX A**

| **CONSOLIDATED MASTER COMPLAINT (ECF No. 66) ¶ 156** |
|---|

156. Accounts 5, 6, and 7, each held in the name of Lacey, were funded with transfers from foreign and domestic banks, which funds were traceable to SUA, involved in money laundering, or both. Backpage Operators used Accounts 5, 6, and 7 as pass-through accounts.

    a. On May 31, 2017, Account 2 transferred approximately $676,808.04 into Account 5;

    b. On June 30, 2017, Account 5 transferred $600,000 to Account 6;

| **FIRST AMENDED CONSOLIDATED MASTER COMPLAINT (ECF No. 108) ¶ 156** |
|---|

156. Accounts 5 and 7, each held in the name of Lacey, were funded with transfers from foreign and domestic banks, which funds were traceable to SUA, involved in money laundering, or both. Backpage Operators used Accounts 5 and 7 as pass-through accounts.

    a. On May 31, 2017, Account 2 transferred approximately $676,808.04 into Account 5;

    b. Between September 20, 2017 and December 8, 2017, Account '9863 transferred approximately $944,729.25 among seven transaction into Account 3.

    c. On December 13, 2017, Account 3 transferred approximately $428,645.09 into Account 5.

    d. On March 16, 2018, Account 3 transferred approximately $212,066.52 into Account 5.

20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## DECLARATION OF DAN G. BOYLE

I, DAN G. BOYLE, declare and state as follows:

1. I am an Assistant United States Attorney in the Office of the United States Attorney for the Central District of California in Los Angeles, California, and am responsible for the representation of Plaintiff United States of America in this matter. I have personal and first-hand knowledge of the facts set forth in this Declaration and, if called to testify, I could and would testify competently thereto.

2. Attached as Exhibit 1 to this declaration is a true and correct copy of an Order dated November 29, 2004, in United States v. $739,047.73 in U.S. Currency, C.D.Cal. Case No. 01-cv-1881-FMC, as document 112 in that action.

3. Attached as Exhibit 2 to this declaration is a true and correct copy of a document filed in United States v. Lacey, et al., D.Az. Case No. 18-cr-422, on September 11, 2018, as document 301 in that action.

4. Attached as Exhibit 3 to this declaration is a true and correct copy of an an email chain dated February 19, 2020.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 11, 2022, at Los Angeles, California.

/s/
DAN G. BOYLE

21