E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
JONATHAN GALATZAN
Assistant United States Attorney
Chief, Asset Forfeiture & Recovery Section
DAN G. BOYLE (Cal. Bar No. 332518)
Assistant United States Attorney
Environmental Crime and Consumer Protection Section
     Federal Courthouse, 13th Floor
     312 North Spring Street
     Los Angeles, California 90012
     Telephone:  (213) 894-2426
     Facsimile:  (213) 894-0142
     E-mail: Daniel.Boyle2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>$1,546,076.35 IN BANK FUNDS SEIZED FROM REPUBLIC BANK OF ARIZONA ACCOUNT '1889, ET AL.,<br><br>        Defendants.<br>_____<br>John Brunst,<br><br>        Claimant. | Case No. CV 18-08420-RGK (PJWx)<br><br>PLAINTIFF'S OPPOSITION TO CLAIMANT'S MOTION FOR RELEASE OF ASSETS [ECF No. 270]<br><br>Hearing Date: Nov. 13, 2023 |

Plaintiff United States of America, by and through its

counsel of record, the United States Attorney for the Central

District of California and Assistant United States Attorney Dan

G. Boyle, hereby files its Opposition to Claimants John Brunst and the Brunst Family Trust's Motion to Release of Seized Assets. See ECF No. 270.

This Opposition is based upon the attached memorandum of points and authorities, the attached declaration of AUSA Dan G. Boyle and the exhibits thereto, the attached declaration of Lyndon Versoza, the files and records in this case, and such further evidence and argument as the Court may permit.


Dated: October 30, 2023          Respectfully submitted,

                                 E. MARTIN ESTRADA
                                 United States Attorney

                                 MACK E. JENKINS
                                 Assistant United States Attorney
                                 Chief, Criminal Division
                                 JONATHAN GALATZAN
                                 Assistant United States Attorney
                                 Chief, Asset Forfeiture Section

                                 _____/s/_____
                                 DAN G. BOYLE
                                 Assistant United States Attorney

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

# **TABLE OF CONTENTS**

I.    FACTUAL AND PROCEDURAL BACKGROUND ..................... 0

II.   RELEVANT LAW ......................................... 3

III.  ARGUMENT ............................................. 6

   A.  Brunst Has Failed to Specifically Identify the Relief
       Requested ........................................... 6

   B.  Brunst Has Failed to Make a Sufficient Showing Under the
       Sixth Amendment ..................................... 7

   C.  The Government has Established Probable Cause ........ 11

       1. Brunst's Reliance on the Allegations in the
          Forfeiture Complaint is Misplaced ................ 11

       2. The Government has Established Probable Cause ..... 12

   D.  Brunst's Arguments Regarding Cooperating Defendant Carl
       Ferrer are Irrelevant ............................... 17

   E.  The Government Reserves the Right to Argue Mootness if
       the Court or Jury in the Criminal Action Finds the
       Seized Accounts Forfeitable ......................... 19

1

## TABLE OF AUTHORITIES

**Cases**

Austin v. United States,

  509 U.S. 602 (1993) ....................................... 7

Caplin & Drysdale v. United States,

  491 U.S. 617 (1989)........................................ 5

Kaley v. United States,

  571 U.S. 320 (2014)........................................ 6

Matter of Seizure of Any & all funds held in Republic Bank of

  Arizona Accts.,

  No. 2:18-CV-06742-RGK, 2019 WL 8892585 (C.D. Cal. Dec. 20,

  2019) ..................................................... 6

United States v. $19,985.99 in U.S. Currency,

  No. CV 07-03622-GHK, 2011 WL 5303131 (C.D. Cal. Nov. 1, 2011)

  ......................................................... 16

United States v. $292,888.04 in U.S. Currency,

  54 F.3d 564 (9th Cir. 1995) ............................... 7

United States v. $493,850.00 in U.S. Currency,

  518 F.3d 1159, 1169 (9th Cir. 2008)........................ 6

United States v. Aguilar,

  782 F.3d 1101 (9th Cir. 2015) ............................ 13

United States v. Approximately $1.67 Million (US) in Cash, Stock

  & Other Valuable Assets Held by or at 1) Total Aviation Ldt.,

  513 F.3d 991, 999 (9th Cir. 2008) ......................... 7

United States v. Bonventre,

  720 F.3d 126 (2d Cir. 2013)................................ 5

United States v. Chittenden,

  848 F.3d 188 (4th Cir.) .................................. 12

United States v. Gal,

 606 F. App'x 868 (9th Cir. 2015)............................... 5

United States v. Garcia,

 37 F.3d 1359 (9th Cir. 1994) ............................... 18

United States v. Gordon,

 657 F. App'x 773 (10th Cir. 2016) ......................... 11

United States v. Green,

 516 F. App'x. 113 (3d Cir. 2013) .......................... 17

United States v. Jamieson,

 427 F.3d 394 (6th Cir. 2005) .............................. 17

United States v. Lacey,

 378 F. Supp. 3d 814 (D. Ariz. 2019) ...................... 20

United States v. Lazarenko,

 564 F.3d 1026 (9th Cir. 2009) ............................. 18

United States v. Marshall,

 754 F. App'x 157 (4th Cir. 2018) ......................... 11

United States v. Melrose E. Subdiv.,

 357 F.3d 493 (5th Cir. 2004) .............................. 17

United States v. Monsanto,

 491 U.S. 600 (1989)............................... 5, 7, 11, 13

United States v. Taylor,

 239 F.3d 994 (9th Cir.2001) .............................. 17

United States v. Unimex,

 991 F.2d 546 (9th Cir. 1993)............................... 5

United States v. Walsh,

 712 F.3d 119 (2d Cir. 2013)............................... 7

United States v.1982 Yukon Delta Houseboat,

 774 F.2d 1432 (9th Cir. 1985)............................... 7

### MEMORANDUM OF POINTS AND AUTHORITIES

On October 14, 2023, Claimants John Brunst and the Brunst Family Trust (collectively, "Brunst") filed a motion (the "Motion" or "Mot.") to release seized assets in this action, and specifically, to release "$1.5 million in seized funds to cover Brunst's unpaid attorney's fees and attorney's fees he will continue to incur in connection with the trial of the related criminal action, pending in the U.S. District Court for the District of Arizona." Mot. at 2.

The Motion should be denied for multiple reasons. First, Brunst has failed to make a sufficient showing of a Sixth Amendment injury, because he has been represented by his counsel of choice, and a request to use seized assets to pay past-due bills for services already rendered is not supported by the Sixth Amendment. Second, even if Brunst had made a sufficient Sixth Amendment showing, the government can meet the low bar of establishing probable cause to believe that these assets will be subject to forfeiture as proceeds of crime. In addition, it appears likely that by the noticed motion date, the jury in Brunst's criminal case may have determined whether these same assets are subject to forfeiture, and if so, the government reserves the right to update the Court and argue mootness.

### I.   FACTUAL AND PROCEDURAL BACKGROUND

### Overview of Backpage

By now, the Court is now well-versed in the factual history at issue in this consolidated action. In brief, the government has alleged in the First Amended Consolidated Master Complaint for forfeiture ("FACMC") that certain claimants here owned

and/or operated the Backpage.com website ("Backpage"), and that the vast majority of Backpage's "adult" ads consisted of offers to sell adults or children for sex. See FACMC, ¶¶ 106-112, 121, 123, 126. For most of its existence, Backpage charged for posting these "adult" ads, and generated more than 90% of its revenue, or approximately a half-billion dollars, from those ads. See FACMC ¶¶ 107, 123.

### The Civil Action and Seized Assets

Between March 28, 2018 and June 4, 2018, magistrate judges in this District found probable cause to issue warrants to seize a range of assets, and execution of these warrants resulted in the seizure of the accounts at issue. The government filed a series of complaints, which were consolidated before this Court on December 18, 2019, ECF No. 50, and on June 1, 2020, the Government filed the FACMC.

As described in the Motion, the government is seeking to forfeit funds seized from, or restrained in, a series of accounts held by Brunst (the "Seized Accounts"). See Mot., at 7; see also Declaration of Lyndon Versoza ("Versoza Decl."), ¶ 4-7. In addition, the government is seeking to forfeit two of Brunst's real properties, and has placed lis pendens on these properties, but these properties have not actually been seized. See Mot., at 7.

### The Fees Stipulation

On March 10, 2023, the government and Brunst stipulated to the release of $500,000 from one of the Seized Accounts, specifically so that Brunst could use these funds to prepare for his criminal trial in the District of Arizona (the "Fees

Stipulation"). <u>See</u> ECF No. 270. In consideration for this release of funds, Brunst waived any right to seek any further pretrial release of his seized assets, including the Seized Accounts. <u>See</u> <u>id.</u>, at ¶ 12.

### **The Criminal Action and Allegations of the SI**

On March 28, 2018, an Arizona federal grand jury returned an Indictment charging Brunst and others with Travel Act and Money Laundering conspiracies. <u>See</u> <u>United States v. Lacey, et al.</u>, D. Az. CR-18-422-PHX-SMB (the "Criminal Action"). In July of 2018, the grand jury issued a Superseding Indictment ("SI") in the Criminal Action. <u>See</u> D. Az. CR-18-422-PHX-SMB, ECF No. 230. The SI includes the following allegations which are specifically relevant here:

- "Backpage derived the overwhelming majority of its revenue from [prostitution] ads. These practices enabled Backpage to earn over $500 million in prostitution-related revenue during its fourteen years of existence." SI, ¶ 1.

- "[I]n or around November 2012, [defendants] spun off VVMH's print publications and began utilizing several new corporate entities, including … Camarillo Holdings, LLC, to serve as Backpage's parent companies." SI, ¶ 26.

- "Backpage's customers overwhelmingly used the proceeds of criminal activity (i.e., money earned from pimping and prostitution) when purchasing ads on Backpage. In addition, because Backpage's publication of such ads was an independent crime … the fees it collected from customers posting prostitution ads-estimated at more than

$500 million-constituted the proceeds of unlawful activity." SI, ¶ 177.

- "In many instances, the next stage of the money-laundering process was for money to be wired from Website Technologies accounts to bank accounts held by a different entity called Cereus Properties LLC. SI, ¶ 190;

- Between around December 2015 and October 2016, Website Technologies accounts sent wire transfers totaling over $47 million to accounts held by Cereus Properties. Id.

Trial in the Criminal Action began on August 29, 2023, and as of the date of this writing, the defendants are currently making closing arguments, and the jury is expected to begin deliberations this week. Pursuant to Federal Rule of Criminal Procedure Rule 32.2, Brunst has requested that, if convicted and forfeiture is sought, the jury in the Criminal Action be retained to determine forfeiture of any specific property.

## II.  RELEVANT LAW

Where there is probable cause to believe a defendant's assets will be forfeited, those assets may be seized regardless of whether the defendant will be unable to afford her counsel of choice. See United States v. Monsanto, 491 U.S. 600, 615-616 (1989). This is because there is "a strong governmental interest in obtaining full recovery of all forfeitable assets" that "overrides any Sixth Amendment interest in permitting criminals to use assets adjudged forfeitable to pay for their defense." Caplin & Drysdale v. United States, 491 U.S. 617, 631 (1989); see also United States v. Gal, 606 F. App'x 868, 876 (9th Cir. 2015) ("No Sixth Amendment violation occurred. The Government

3

established probable cause to believe that the funds were obtained through fraud and were therefore subject to forfeiture. Accordingly, Campa had no right to use them to pay for an attorney." (internal citation omitted)).

Post-Monsanto, a criminal defendant may seek a limited hearing to challenge the probable cause for an asset restraint (a "Monsanto hearing"), but only if the defendant makes an initial showing of a potential Sixth Amendment injury. In United States v. Unimex, Inc., the Ninth Circuit held that the burden is on the movant to establish a "substantial claim" of a Sixth Amendment injury through "sufficiently definite, specific, detailed, and nonconjectural" affidavits. 991 F.2d 546, 551 (9th Cir. 1993). Similarly, in United States v. Bonventre, 720 F.3d 126, 133 (2d Cir. 2013), the Second Circuit held that, to qualify for Monsanto hearing, a defendant must disclose his net worth, provide a comprehensive list of his assets, and explain how he has been paying his counsel and other living expenses.[1]

Moreover, the Supreme Court has held that a Monsanto hearing is not a forum to challenge the grand jury's findings. In Kaley v. United States, the Supreme Court held that a

---

[1] Brunst also cites to the Supreme Court's decision in Luis v. United States, where the Supreme Court addressed a "defendant's legitimate, untainted assets (those not traceable to a criminal offense) needed to retain counsel of choice)." 136 S. Ct. 1083, 1088 (2016). As this Court has noted in a prior order, Luis still requires a showing that a claimant needs such funds. Matter of Seizure of: Any & all funds held in Republic Bank of Arizona Accts., No. 2:18-CV-06742-RGK, 2019 WL 8892585, at *8 (C.D. Cal. Dec. 20, 2019). Luis, however, does not address probable cause, as Luis explicitly deals with assets not alleged to be tainted.

<u>Monsanto</u> hearing is not a forum to relitigate a grand jury's probable cause finding and is limited to challenging the nexus between the property and charged offense. 571 U.S. 320, 328 (2014) ("The grand jury gets to say—without any review, oversight, or second-guessing—whether probable cause exists to think that a person committed a crime.").

As such, where a defendant makes a sufficient Sixth Amendment showing, the government must establish probable cause to believe that the seized property is subject to forfeiture based on charged offenses. <u>Kaley</u>, 571 U.S. at 323–24. Probable cause to restrain assets subject to forfeiture "is not a high bar," <u>id.</u>, at 338 (Roberts, C.J., dissenting), and is "less than prima facie proof but more than mere suspicion." <u>United States v. $493,850.00 in U.S. Currency</u>, 518 F.3d 1159, 1169 (9th Cir. 2008). The government must merely establish reason "to believe that the property is involved in the activity subject to the specific forfeiture statute it invokes." <u>Id</u>.

To make such a showing of probable cause, the government may rely on hearsay and circumstantial evidence. <u>See</u> <u>United States v. Approximately $1.67 Million (US) in Cash, Stock & Other Valuable Assets Held by or at 1) Total Aviation Ldt.</u>, 513 F.3d 991, 999 (9th Cir. 2008) ("Credible hearsay or circumstantial evidence can be used to support probable cause.") (<u>citing</u> <u>United States v.1982 Yukon Delta Houseboat</u>, 774 F.2d 1432, 1434 (9th Cir. 1985))); <u>United States v. Walsh</u>, 712 F.3d 119, 124 (2d Cir. 2013) ("<u>Monsanto</u> permits a court to receive and consider at such a hearing evidence and information that

would be inadmissible under the Federal Rules of Evidence." (cleaned up)).

Finally, while a <u>Monsanto</u> motion may be brought before the Court hearing a civil forfeiture action (such as here) there is no relief available under <u>Monsanto</u> to defend a civil forfeiture action. <u>Monsanto</u> is explicitly a remedy under the Sixth Amendment, and there is no Sixth Amendment right to counsel in a civil forfeiture proceeding. <u>See</u> <u>Austin v. United States</u>, 509 U.S. 602, 608 (1993) ("The protections provided by the Sixth Amendment are explicitly confined to criminal prosecutions."); <u>United States v. $292,888.04 in U.S. Currency</u>, 54 F.3d 564, 569 (9th Cir. 1995) (finding that "no Sixth Amendment right to counsel attached in this case because imprisonment is not authorized by any of the civil forfeiture statutes"). Rather, a civil forfeiture claimant's remedy is found in 28 U.S.C. § 2465, which provides that the government must pay reasonable attorney's fees to a substantially-prevailing claimant.

**III.  ARGUMENT**

> **A.  Brunst Has Failed to Specifically Identify the Relief Requested**

As a threshold matter, it is unclear what specific relief Brunst is requesting in the Motion. In his Motion, Brunst requests that the Court order the "release of $1.5 million in seized funds to pay for [Brunst's] counsel." Mot., at 18. However, Brunst acknowledges in this Motion that the government seized seven bank accounts (the Seized Accounts) and placed restraints on two pieces of real property (the "Liened Real Estate"). Mot., at 7. Brunst's Motion does not identify with

specificity *which* of the relevant defendant assets Brunst is seeking to release. Nonetheless, because the government believes that Brunst's Motion can be denied regardless of which assets he is seeking, the government has responded in full here, with one caveat: for the purposes of this response, the government has interpreted Brunst's request for the "release of $1.5 million in seized funds" to refer to what Brunst has styled as the "Seized Accounts" in his Motion, because the relevant real estate assets were never "seized." As such, the government has focused this response on the Seized Accounts. However, to the extent that Brunst takes the position that his Motion also applies to the Liened Real Estate, the government reserves the right to supplement this response.

### B. Brunst Has Failed to Make a Sufficient Showing Under the Sixth Amendment

The government does not dispute that Brunst has made what appears to be a fair disclosure of his current assets.[2] Nonetheless, this disclosure alone does not meet the Unimex standard, because he has still failed to sufficiently allege a Sixth Amendment injury. Brunst is largely not seeking funds to defend himself at trial; rather, he is seeking to pay past-due bills for attorneys' fees already incurred. Put another way, Brunst has been represented by his counsel of choice and has not indicated that representation is likely to change, and thus he cannot show a Sixth Amendment injury.

---

[2] Brunst's counsel also provided the government with a detailed breakdown of Brunst's current finances prior to the Fees Stipulation.

As noted above, the government returned $500,000 to Brunst roughly six months before trial in the Criminal Action through the Fees Stipulation. While Brunst does not detail how these funds were spent, his Motion suggests that at least some of these funds were used to satisfy past-due legal bills, rather than preserved for trial. See Mot. at 7, n.2 (stating that the $500,000 release in early 2023 "partially addressed outstanding amounts owed to counsel for pre-trial work."). In return for the Fees Stipulation, Brunst waived the right to seek any further pretrial release of assets. See ECF No. 251, ¶ 12.

Through the Fees Stipulation, Brunst agreed that he could only bring this Motion at a point when trial in the Criminal Action was well underway – and in fact, is now substantially complete. For example, as of October 23, 2023,[3] the government had completed its case-in-chief and rested, and all that remained was the defense case, jury instructions, and summations. Furthermore, based on the present state of the trial, it appears that there may be a jury verdict by the noticed motion date of November 13, 2023.

Brunst concedes that he does not need $1.5 million to complete the limited remaining trial work; in his Motion, his counsel states generally that counsel's firm is owed $700,000 as of the date of the Motion, and that "I estimate that my firm will incur at least an additional $800,000 in fees and costs for

---

[3] The government's opposition to the Motion was originally due on October 23, 2023, and as such, the government uses this date in responding. Brunst agreed to extend the government's time to respond as a professional courtesy, and this courtesy should not be held to prejudice him.

the remainder of the trial, jury deliberations, and extensive post-trial work, if that becomes necessary." ECF No. 270-1, ¶ 3. But this sort of generalized statement of need was recently rejected by Judge Gee in <u>United State v. Omidi</u>: "aspirational and speculative defense projections do not satisfy the standard for a <u>Unimex/Monsanto</u> hearing … Defendant Omidi's estimated costs are, in short, insufficiently tethered to anything concrete." Case No. 2:17-cr-00661-DMG, ECF No. 1190, at 4.[4] Put another way, Brunst cannot and does not argue that he needs $1.5 million to complete the remaining phases of the Criminal Action.

Rather, the bulk of what Brunst is seeking is money to pay his counsel for fees already incurred, which have not been paid. Based on his Motion, the $500,000 disbursed pursuant to the Fees Stipulation was exhausted prior to or during trial, and Brunst's counsel continued to incur fees representing him through trial. While it is certainly laudable that Brunst's counsel has stuck by their client and litigated vigorously, <u>Monsanto</u> is simply not a remedy for counsel to collect on unpaid bills; it is a prophylactic measure created to ensure that a criminal defendant's Sixth Amendment right to counsel of choice are protected – and Brunst's certainly have been. There is no

---

[4] Much like here, in <u>Omidi</u>, the government had earlier agreed to release a portion of the seized funds ($10 million out of more than $100 million seized). Judge Gee noted that Omidi had failed to adequately account for how such released funds were spent preparing for trial, and "to the extent Defendant Omidi's remaining legal defense funds are dissipating, he and his counsel … must, like other defendants, budget for and prioritize their anticipated costs and fees accordingly." Case No. 2:17-cr-00661-DMG, ECF No. 1190, at 4.

question that Brunst has received top-flight legal defense from his counsel of choice throughout the Criminal Action.

The fatal flaw in Brunt's Motion is that the Sixth Amendment protects the client, not counsel. It "guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds." Caplin & Drysdale, 491 U.S. at 624-25. As courts have recognized, a defendant cannot show a Sixth Amendment injury where he was, in fact, represented by his counsel of choice. See United States v. Marshall, 754 F. App'x 157, 161 (4th Cir. 2018) ("Because Marshall was represented by the counsel of his choice, there was no need for the seized funds…"); United States v. Gordon, 657 F. App'x 773, 778 (10th Cir. 2016) ("Gordon did not need the assets to retain counsel as he, in fact, had retained counsel of his choice and that counsel thoroughly and vigorously represented him at trial") (citations and alterations omitted); United States v. Chittenden, 848 F.3d 188, 194-95 (4th Cir.) ("Chittenden's right to counsel of choice is simply not implicated here … Chittenden was not forced to change her privately retained attorneys or to rely on appointed counsel. As Chittenden's (chosen) counsel conceded at oral argument, nothing in the record indicates that she wanted different attorneys. Given that the pretrial seizure of funds did not prevent Chittenden from being represented by the lawyers she wanted, we reject her claim that the government violated her Sixth Amendment right to counsel of choice" (internal quotation marks omitted))(vacated on other grounds, 583 U.S. 971).

10

Brunst could have rejected the Fees Stipulation and brought this Motion before trial, but did not. Instead, he made a strategic choice to enter the Fees Stipulation, and in return for $500,000 to prepare for trial, gave up the option to file this Motion before trial began. Thus, it was incumbent upon him to litigate within this budget. See Omidi, Case No. 2:17-cr-00661-DMG, ECF No. 1190, at 4 ("[S]eized funds are not a piggy bank to which [defendant] may turn when his defense costs increase."). He has been represented by some of the best defense counsel available, and has not made any showing that this exemplary representation is going to end. Therefore, he cannot make the required Sixth Amendment injury showing, and thus, has no right to a hearing under Monsanto/Unimex.

**C.   The Government has Established Probable Cause**

    1.   Brunst's Reliance on the Allegations in the Forfeiture Complaint is Misplaced

In his Motion, Brunst relies heavily on the tracing set forth in the FACMC. See, e.g., Mot. at 8-9, 14. In effect, Brunst appears to suggest that the government is either limited to the tracing identified in the FACMC, or at least that his Motion should be assessed based on the allegations in the FCMC. See Mot. at 9 ("[A]t best, the Consolidated Complaint alleges that $435,956.59 of the Brunst Seized Accounts are traceable to the alleged 'specified unlawful activity.'"). He is incorrect.

As noted above, Monsanto is a Sixth Amendment remedy, and there is no Sixth Amendment right in a civil forfeiture proceeding. A civil forfeiture complaint such as the FACMC is not required to set forth tracing in detail. See United States

v. Aguilar, 782 F.3d 1101, 1109 (9th Cir. 2015) ("[T]here is no merit to Appellants' argument that the government's complaint is legally insufficient because it relies on the lowest intermediate balance rule. Since tracing is not at issue at the motion to dismiss stage, the government's current legal theory is irrelevant."). Instead, pursuant to Supp. Rule G(1)(f), a civil forfeiture complaint must "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Reading a civil forfeiture complaint to restrict the government's ability to restrain assets in the Monsanto context would run contrary to authority recognizing the propriety of parallel civil and criminal cases. In sum, the government is not limited to the tracing set forth in the FACMC, and as set forth below, there is ample evidence that the Seized Accounts are proceeds of the offenses alleged in the SI.

        2.   The Government has Established Probable Cause

Setting aside Brunst's suggestion that the government is limited to the allegation in the FACMC, the government has met the probable cause standard here.

Brunst dedicates much of his Motion to arguing that the government cannot hold the seized funds as commingled assets, see Mot. at 15-18, but this misses the point: the contents of the Seized Accounts are the *proceeds* of the offenses alleged, namely Backpage's facilitation of myriad prostitution enterprises. Brunst suggests that "[t]he Government cannot dispute that, of the over $9 million in Brunst Seized Accounts … it has restrained, a portion of those seizures are unconnected

to any crime charged against Brunst" Mot. at 14. But this is not so. As shown by the facts set forth in the Versoza Declaration and further detailed below, there is probable cause to believe that virtually every dollar in the Seized Accounts is traceable to the operation of Backpage. Indeed, during the relevant years, Brunst had effectively no other sources of income. At this stage, this more than establishes probable cause.

First, Brust does not challenge the illegality of Backpage's operations, and nor could he at this stage. In 2018, Backpage, Website Technologies, and several of Backpage's other affiliates (collectively "Backpage") pled guilty to money laundering, admitting that Backpage "derived the great majority of its revenue from fees charged in return for publishing advertisements for 'adult' and 'escort' services," that "[t]he great majority of these advertisements [were], in fact, advertisements for prostitution services," and that after "banks, credit card companies, and other financial institutions refused to do business with Backpage," Backpage "found ways to fool credit card companies into believing that Backpage-associated charges were being incurred on different websites, to route Backpage-related payments and proceeds through bank accounts held in the name of seemingly unconnected entities." See Boyle Decl., Ex 1[5] (Plea Agreement of Backpage.com LLC, at 11-12; see also Ex. 2 (Plea Agreement of Website Technologies,

---

[5] All references to "Exhibit" or "Ex." refer to the exhibits to the accompanying declaration of AUSA Dan Boyle.

at 11-12).[6] In addition, the Supreme Court has held the Court cannot look behind an indictment at this stage, and as recounted above, the SI alleged that Backpage made hundreds of millions from prostitution ads. See SI, ¶¶ 1, 177.

Second, there is ample evidence that Cereus Properties ("Cereus") and Camarillo Holdings ("Camarillo") were entities primarily used to receive and transfer the proceeds of Backpage's illegal operations. As noted above, each entity was identified in the SI, which the Court will not second-guess at this pretrial stage. See SI, ¶¶ 26, 190. Furthermore, Backpage's CEO, Ferrer, testified extensively at trial that each entity was primarily used to receive Backpage proceeds and transfer such funds on to Brunst and the other former owners of Backpage. See Boyle Decl., Ex. 3, at 4-5, 7-8 (Cereus); id., at 3 (Camarillo).[7] In addition, the government's financial summary witness, Quoc Thai, testified that financial records showed "$99 million transferred from Backpage.com to Camarillo Holdings" and "28 transactions between Website [Technologies] to Cereus in the amount of $39,249,211.37." See Boyle Decl., Ex. 4, at 3, 6.

Third, the Versoza Declaration sets forth how funds from Cereus and Camarillo were transferred to Brunst's WFB x4891 account, then at least $7,669,480 of such funds was transferred

---

[6] While a plea agreement is generally hearsay, as noted above, the Court may rely on hearsay evidence to establish probable cause. Moreover, here Backpage's CEO, Ferrer, has testified in the Criminal Action and been subject to cross examination on these matters by Brunst's counsel.

[7] This testimony is not hearsay, as both Ferrer and Thai were questioned extensively by counsel for Brunst and other defendants.

14

on to Brunst's WFB x7474 account. <u>See</u> Versoza Decl., ¶ 8-9.[8] From there, at least $1.5 million flowed from that account to the AB Accounts, through AB x6878. <u>Id</u>., ¶ 12. In addition, another $1 million flowed to AB x6878 though another Brunst bank account at BMO Harris Bank. <u>Id</u>., ¶ 12(d-e). With respect to the BBVA x3825 account, as stated in the Versoza Declaration, that account received at least $1,288,570.70 from an account in the name of Cereus, far exceeding the $359,527.06 seized from BBVA x3825. <u>Id</u>., ¶ 16.

In addition, at this stage, the Court can consider and rely on evidence of a lack of legitimate income. <u>See United States v. $19,985.99 in U.S. Currency</u>, No. CV 07-03622-GHK FMOX, 2011 WL 5303131, at *3 (C.D. Cal. Nov. 1, 2011) ("Without a legitimate source of income, any payment must have come from an illegitimate source of income."); <u>United States v. Taylor</u>, 239 F.3d 994, 999 (9th Cir.2001) ("The government sought to prove the origin of the funds by presenting evidence that Taylor had no money other than what he was deriving from specified unlawful activity. This is a permissible approach…"); <u>United States v. Green</u>, 516 F. App'x. 113, 135 (3d Cir. 2013) (while there was no direct evidence that defendant acquired a car with his fraud proceeds, the circumstantial evidence that defendant purchased the car during the time he was committing the offense and had no other income was sufficient); <u>United States v. Jamieson</u>, 427

---

[8] The voluminous bank records referenced in the Versoza Declaration have been previously produced to defense under bates stamps DOJ-BP-0005049579-DOJ-BP-0005051454, DOJ-BP-0005064510-DOJ-BP-0005064512, and DOJ-BP-0005044430-DOJ-BP-0005044474.

F.3d 394, 406 (6th Cir. 2005) (testimony of witness who said defendant's only source of income during the time he acquired the restrained assets was his fraud scheme was sufficient to establish probable cause); United States v. Melrose E. Subdiv., 357 F.3d 493, 507 (5th Cir. 2004) (government may rely on circumstantial evidence of "pervasive fraud" and the timing of the purchase of assets to establish probable cause for forfeiture in a fraud case);.

Here, as detailed in the Versoza Declaration, substantial sums flowed into the AB Accounts from sources which were not identified in the relevant account records, while Brunst had minimal non-Backpage income in the relevant years. See Versoza Decl. ¶ 14-15. More specifically, tax returns for Cereus and Brunst both show millions of dollars in income paid to Brunst by Cereus or payment on Backpage loans, with little non-Backpage income for these relevant years. Id. At this stage, a lack of legitimate income, combined with tracing of a substantial amount of tainted funds, meets the probable cause standard.

In sum, the government does not need to rely on a commingling theory here, because there is probable cause to believe that substantially-all of the funds in the AB Accounts and BBVA x3825 are the proceeds of Backpage's illegal operations.[9]

---

[9] Nonetheless a commingling theory is also well-supported by Ninth Circuit law, and the government has met this low bar here. The Ninth Circuit has recognized that the money laundering statues are not limited simply to the actual proceeds of crime. See United States v. Lazarenko, 564 F.3d 1026, 1035 (9th Cir. 2009) ("[I]n a money laundering charge, the commingling of tainted money with clean money taints the entire account. The

**D.   Brunst's Arguments Regarding Cooperating Defendant Carl Ferrer are Irrelevant**

Brunst also briefly argues that it would be unfair to permit Backpage's CEO, Ferrer, to use tainted funds to pay for his counsel simply because Ferrer has pled guilty and is a cooperating witness. This argument is irrelevant, and moreover, Brunst and his codefendants already made an earlier version of this argument in the District of Arizona, where it was rejected:

> Defendants contend the Government [is] treating them differently from the cooperating defendants Ferrer and Hyer — by allegedly not seeking seizure of their counsels' IOLTA accounts — also violates their Fifth Amendment and Sixth Amendment rights. They argue this undermines the workings of our adversarial system of criminal justice. Despite the common occurrence of cooperating defendants, however, Defendants do not provide case law to support that precise argument, and the Court is unable to find any.
>
> Preferential terms for defendants that plead guilty is not new to our adversarial system. "[T]he conscious exercise of some selectivity in enforcement is not in

---

money transferred from a commingled account does not need to be traceable to fraud, theft, or any wrongdoing at all. It is enough that the money, even if innocently obtained, was commingled in an account with money that was obtained illegally."); see also United States v. Garcia, 37 F.3d 1359, 1365 (9th Cir. 1994) ("We conclude that under the money laundering statutes, due to the fungibility of money, it is sufficient to prove that the funds in question came from an account in which tainted proceeds were commingled with other funds.") (called into question on other grounds, see United States v. Jackson, 167 F.3d 1280, 1284 (9th Cir. 1999)).

itself a federal constitutional violation." <u>Oyler v.</u>
<u>Boles</u>, 368 U.S. 448, 456 (1968). Selectivity in
enforcement is permissible, unless the selection was
"based upon an unjustifiable standard such as race,
religion, or other arbitrary classification." Id.; <u>see</u>
<u>Bordenkircher v. Hayes</u>, 434 U.S. 357, 364, (1978) ("To
hold that the prosecutor's desire to induce a guilty
plea is an unjustifiable standard, which, like race or
religion, may play no part in his charging decision would
contradict the very premises that underlie the concept
of plea bargaining itself."); <u>see also</u> <u>United States v.</u>
<u>Rodriguez</u>, 162 F.3d 135, 151-53 (1st Cir. 1998) (holding
that the Government's alleged policy of more lenient
treatment for co-conspirators that pleaded guilty than
those that go to trial was not unconstitutional).

As the Government points out, its primary duty with
regard to leniency to cooperating defendants is to
disclose that benefits have been provided. By disclosing
that the Government has provided the witness with
benefits for cooperating, the defense is able to attack
the witness's credibility. The Government has complied
with this obligation. Thus, Defendants' Fifth and Sixth
Amendment rights are not violated by the Government's
preferential treatment of cooperating witnesses.
<u>United States v. Lacey</u>, 378 F. Supp. 3d 814, 821 (D. Ariz. 2019)
(internal citations omitted). Nothing has changed since the
court in the Criminal Action denied this same argument more than
three years ago. To the extent that Brunst is now arguing that

18

funds flowing from entities such as Cereus are tainted, this argument does nothing but further establish probable cause to believe that Brunst's own seized assets traceable to Cereus are subject to forfeiture.

> **E.  The Government Reserves the Right to Argue Mootness if the Court or Jury in the Criminal Action Finds the Seized Accounts Forfeitable**

As noted above, as of the date of this brief, the SI in the Criminal Action is expected to be sent to the jury for deliberations within days of this filing. If jury returns a guilty verdict on relevant counts, the government expects that the question of forfeiture of the Seized Account will be submitted to the jury (at Brunst's request). Should the jury in the Criminal Action convict Brunst, and also find the Seized Account forfeitable, the government reserves the right to update this Court and argue that the Brunst's Motion is moot in light of his conviction and any finding that the Seized Accounts are forfeitable.

**CONCLUSION**

For the above reasons, the government respectfully requests that Brunst's Motion be denied.

DATED: October 30, 2023      Respectfully submitted,

                              E. MARTIN ESTRADA
                              United States Attorney
                              MACK E. JENKINS
                              Assistant United States Attorney
                              Chief, Criminal Division
                              JONATHAN GALATZAN
                              Assistant United States Attorney
                              Chief, Asset Forfeiture Section


                                  /s/
                              DAN G. BOYLE
                              Assistant United States Attorney

                              Attorneys for Plaintiff
                              UNITED STATES OF AMERICA

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF DAN G. BOYLE

I, DAN G. BOYLE, declare and state as follows:

1.   I am an Assistant United States Attorney in the Office of the United States Attorney for the Central District of California in Los Angeles, California, and am responsible for the representation of Plaintiff United States of America in this matter. I have personal and first-hand knowledge of the facts set forth in this Declaration and, if called to testify, I could and would testify competently thereto.

2.   Attached as Exhibit 1 to this declaration is a true and correct copy of the Plea Agreement of Backpage, LLC. in D.Az. Case No. 18-cr-465, accepted on May 1, 2018.

3.   Attached as Exhibit 2 to this declaration is a true and correct copy of the Plea Agreement of Website Technologies, LLC, in D.Az. Case No. 18-cr-465, accepted on May 1, 2018.

4.   Attached as Exhibit 3 to this declaration is a true and correct copy of a compilation of pages from the rough court reporter's transcript of the testimony of Carl Ferrer in United States v. Lacey, et al, D.Az. Case No. 18-cr-422.

5.   Attached as Exhibit 4 to this declaration is a true and correct copy of a compilation of pages from the rough court reporter's transcript of the testimony of Quoc Thai in United States v. Lacey, et al, D.Az. Case No. 18-cr-422.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 30, 2023, at Los Angeles, California.

/s/
DAN G. BOYLE